**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CAPITAL MARKETS ALLIANCE ASSOCIATION,<br><br>*Plaintiff*,<br>v.<br><br>COMMODITY FUTURES TRADING COMMISSION,<br><br>MICHAEL S. SELIG, *in his official capacity as Chairman of the Commodity Futures Trading Commission*,<br><br>*Defendants*. | Civil Action No. 1:26-cv-9608<br><br>COMPLAINT FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF |

Plaintiff Capital Markets Alliance Association (Alliance) files this suit against Defendants the Commodity Futures Trading Commission (CFTC) and Michael S. Selig, in his official capacity as Chairman of the CFTC.

## INTRODUCTION

1. Just hours ago, the CFTC dramatically upended the regulatory framework governing the U.S. securities markets by authorizing certain trading platforms to list financial products linked to U.S. stocks, without satisfying the strict regulatory requirements that Congress enacted to protect investors and markets. These products, known as “perpetual” single-stock derivatives, effectively allow investors to indefinitely speculate on the price movements of individual stocks such as Apple or Microsoft, without owning any shares. By approving these products for trading without a word explaining how its action comports with the statutory framework, the

CFTC has permitted an end-run around Congress's deliberate statutory protections and invited a parallel, synthetic market in U.S. stocks to grow outside the exclusive jurisdiction of the Securities and Exchange Commission (SEC). Absent judicial intervention, single-stock perpetuals will imminently begin trading without congressionally required safeguards, threatening irreparable harm to plaintiff Capital Markets Alliance Association, investors, and the public.

2. A "perpetual" derivative, as its name implies, is essentially an indefinite position on the price movements of an underlying asset. A perpetual derivative can be created on almost any asset, such as bitcoin, oil, gold, or stocks. Perpetual derivatives have recently proliferated on trading platforms outside of the United States.[1] But they can pose significant risk: the trading of cryptocurrency perpetuals, for example, has triggered repeated liquidation events where more than a million investors at a time are wiped out as a result of market volatility.[2]

3. Until today, U.S. regulators, including the CFTC, prohibited trading platforms from offering perpetual derivatives on individual stocks to U.S. retail investors. That is because the CFTC had accurately classified perpetual derivatives as "swaps" under the financial regulatory framework established by Congress, meaning that perpetual derivatives referencing individual stocks are "security-based swaps." Given the central role that swaps played in the 2008 financial crisis, Congress

---

[1] *See* Elizabeth Dethy and Kevin Lu, *The Perpification of Everything: What Brokers Need to Offer Perps*, Talos (Sep. 10, 2026), https://tinyurl.com/yp4u5pm7; *State of Crypto Perpetuals Report 2026*, CoinGecko (May 21, 2026), https://tinyurl.com/mst747t4.

[2] *Top Crypto Liquidation Events*, coinglass, https://tinyurl.com/2sfyv3rp (last visited Nov. 3, 2026).

imposed significant limits on where and how security-based swaps may be offered and sold, including mandating that they be made available to retail investors only on national securities exchanges subject to the SEC's full regulatory oversight.

4. The CFTC has now abruptly and inexplicably changed positions, approving applications to list perpetual derivatives on single stocks (the Stock Perpetual Approvals) filed by three CFTC-regulated platforms: KalshiEX LLC (Kalshi), Coinbase Derivatives LLC (Coinbase), and Bitnomial Exchange LLC (Bitnomial). In an about-face from its prior position, the CFTC has embraced the applicants' classification of these products as "security futures," rather than security-based swaps. And it did so without any reasoned order explaining its actions: the CFTC simply allowed the 45-day regulatory review period to expire, after which the filings were deemed approved. Trading in single-stock perpetuals may now begin on the CFTC-regulated platforms at any time, without the platforms having to comply with the strict requirements Congress mandated for security-based swaps, and outside of the SEC's exclusive jurisdiction.

5. The CFTC cannot redraw the statutory boundaries that Congress established through mislabeling. Single-stock perpetuals are not security futures. They are security-based swaps: they provide for payments based on the value of a single security, transfer the financial risk of changes in that value, and convey no ownership interest in the security. *See* 7 U.S.C. § 1a(47)(A)(iii); 15 U.S.C. § 78c(a)(68)(A). A security future, by contrast, is a "contract of sale for future delivery of a single security or of a narrow-based security index." 7 U.S.C. § 1a(44); 15 U.S.C. § 78c(a)(55)(A). By

design, perpetual derivatives have no expiration date and impose no future delivery obligation. This is why, prior to this Administration, the CFTC and SEC have always considered these, and similar, products to be security-based swaps.

6. In nonetheless allowing single-stock perpetuals to be made available to retail investors under the erroneous "security futures" label, the CFTC has abdicated its statutory responsibility to enforce the regulatory structure that Congress enacted. For nearly 100 years, Congress and the SEC have fine-tuned the securities laws to ensure adequate oversight and protection. This regime is a key reason why the U.S. stock markets are the gold standard globally, with more than $1 trillion in daily volume traded.

7. Prior to the CFTC's approvals, leading exchanges, associations, and bipartisan members of Congress made clear the risks to the U.S. stock market of allowing single-stock perpetuals to trade on CFTC-regulated platforms outside of Congress's deliberate framework, including that perpetuals trading could influence underlying stock prices, facilitate cross-market manipulation, and invite regulatory arbitrage.[3] The CFTC and SEC have likewise acknowledged important open questions

---

[3] *See, e.g.*, Letter from Brad Sherman and Joyce Beatty to Paul S. Atkins, Chairman of the SEC (Oct. 30, 2026) (Sherman Letter), https://tinyurl.com/4hktu2vd; Letter of Katie Britt to Paul S. Atkins, Chairman of the SEC (Oct. 29, 2026) (Britt Letter), https://tinyurl.com/u455ctd8; Letter from Mark Warner, et al., to Michael S. Selig, Chairman of the CFTC (Nov. 2, 2026), https://tinyurl.com/yusz2xja; Letter from Americans for Financial Reform Education Fund to CFTC, SR-COIN-2026-002, SR-KalshiEX-2026-02 (Oct. 29, 2026), https://tinyurl.com/48dbvrhu; Letter from Cboe Global Markets, Inc. to CFTC, Requests for Commission Approval of Single-Stock Perpetual Contracts as Security Futures Products Under CFTC Regulation 41.23(b) — Coinbase Derivatives, LLC; KalshiEX LLC; Bitnomial Exchange, LLC; North American Derivatives Exchange Inc., at 2-3 & n.4 (Oct. 30, 2026); Letter from Jeffrey S. Davis, Senior Vice President, Senior Deputy Counsel, Nasdaq, Inc., to Vanessa Countryman, Secretary, SEC, re File No. SR-COIN-2026-002, at 4 (Oct. 14, 2026), https://tinyurl.com/5xazvu5m.

about single-stock perpetual trading, including the effects it could have on "liquidity formation, price discovery, and hedging activity" in the stock market. 91 Fed. Reg. 37,873, 37,876 (June 24, 2026). Yet the CFTC has now pressed ahead, allowing single-stock perpetuals to be offered for trading to U.S. retail investors on CFTC-regulated platforms for the first time, without a word of reasoning as to how that decision is consistent with Congress's statutory definitions or the CFTC's prior position.

8. The Stock Perpetual Approvals are the latest—and most egregious—in a series of unreasoned decisions by the CFTC mislabeling "swaps" as "futures." In May 2026, the CFTC approved an application filed by Kalshi—*one day* after it was filed—that, for the first time, classified a perpetual derivative on bitcoin as a "future" instead of a "swap." The CFTC did not acknowledge, let alone explain, the reversal of its longstanding position, and its approval order largely parroted the language in Kalshi's own filing. The Chicago Mercantile Exchange (CME) promptly challenged that decision in the United States District Court for the District of Columbia, in a case that remains pending. In the following months, the CFTC continued to approve perpetual derivatives on other assets, each time as a "future" instead of a "swap," thus permitting them to trade under an incorrect regulatory regime. Through the Stock Perpetual Approvals, the CFTC has dramatically expanded its unreasoned decision-making, putting investors and our nation's securities markets at risk.

9. The Stock Perpetual Approvals violate the Administrative Procedure Act (APA) several times over. They are arbitrary and capricious because the CFTC has failed to provide any reasoned explanation for its decision and change in position.

It has also entirely failed to confront important aspects of the problem, including significant concerns that commenters raised about single-stock perpetuals trading on CFTC-regulated platforms outside the SEC's exclusive jurisdiction. The CFTC may not avoid the requirements of the APA through silence.

10. The Stock Perpetual Approvals are also contrary to law. Single-stock perpetuals are "security-based swaps" and the CFTC lacks the statutory authority to approve them for trading under the erroneous label of "security future."

11. Plaintiff Capital Markets Alliance Association asks the Court to declare the Stock Perpetual Approvals unlawful, vacate and set them aside, declare that the single-stock perpetuals covered by the challenged filings are security-based swaps, and enjoin Defendants from giving the approvals effect.

**JURISDICTION AND VENUE**

12. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.

13. Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because the CFTC is an agency of the United States and Chairman Selig is an officer of the United States acting in his official capacity, no real property is involved, and Plaintiff Capital Markets Alliance Association resides in this district.

14. The Stock Perpetual Approvals are final agency action reviewable under 5 U.S.C. § 704. Where, as here, an application to list a new contract for trading is submitted to the CFTC for prior approval, the Commodity Exchange Act (CEA) requires the Commission to "take final action on the request" within the review period.

7 U.S.C. § 7a-2(c)(4)(C). Under the CFTC's regulations, expiration of the regulatory review periods results in approval by the Commission, concluding its review of the identified applications and removing a regulatory barrier to listing the contracts. 17 C.F.R. §§ 40.3(d)(1), 40.5(d)(1). The Commission's rules provide that, absent a notice of non-approval, the products "shall be deemed approved by the Commission" when that period closes. 17 C.F.R. §§ 40.3(d)(1), 40.5(d)(1). That approval is an "order" and a "license" within the meaning of the APA. 5 U.S.C. § 551(6), (8).

15. The Stock Perpetual Approvals are final agency action. The close of the regulatory review period for the September 18, 2026 applications was November 2, 2026, and the applications are now deemed approved under CFTC regulation. 17 C.F.R. §§ 40.3(d)(1), 40.5(d)(1). Chairman Selig issued a statement on November 3, 2026, acknowledging that the applications "were deemed approved by the Commission," and "can begin trading for the first time on CFTC-registered exchanges."[4] That statement is attached as Exhibit 1. The approvals mark the culmination of the agency's decision-making and have legal consequence. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). Plaintiff challenges those approvals and has no other adequate remedy in a court. *Id.* at 597, 600; *see also, e.g.*, *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 98–101 (D.C. Cir. 2020).

16. The Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202, 5 U.S.C. §§ 705–706, and the Court's inherent authority to enjoin federal officials from violating the law.

---

[4] CFTC, *Statement on Equity Perpetual Futures* (Nov. 3, 2026), https://tinyurl.com/5yk3vd9x.

## PARTIES

17. Plaintiff Capital Markets Alliance Association is a non-profit trade association with its principal place of business in New York, New York. The Alliance brings together some of the most significant institutions in American finance to advance policies that promote and strengthen our capital markets. Together, its membership spans the regulated ecosystem through which U.S. stocks and stock-linked derivatives are traded, executed, and priced. Its members operate equity and options exchanges, handle and execute retail and institutional customer orders, and make markets by quoting competitive prices on exchanges. The Alliance's membership also includes an associational member whose members include public pension funds, investment advisers, broker-dealers, exchanges, and data firms.

18. Defendant Commodity Futures Trading Commission is an agency of the United States government.

19. Defendant Michael S. Selig is the Chairman of the Commodity Futures Trading Commission and currently its sole Commissioner. He is sued in his official capacity.

## BACKGROUND

### I. Plaintiff's Standing

20. The Alliance's members face concrete competitive and business injury from the Stock Perpetual Approvals, which misclassify single-stock perpetuals as "security futures" and allow them to trade on CFTC-regulated platforms outside the regulatory framework that Congress established. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (association has standing where at least one

member would have standing to sue in its own right; the interests the suit seeks to protect are germane to the association's purpose; and neither the claims asserted nor relief requested requires the participation of individual members).

21. The Stock Perpetual Approvals permit CFTC-regulated trading platforms to offer a product that is a direct competitor to stocks and related derivatives (such as listed stock options), providing an alternative way to gain exposure to individual public companies, without having to comply with the full SEC regulatory framework that applies to Alliance members, and outside the statutory protections that Congress mandated. The CFTC's approvals also create new costs and risks for the investors and other market participants represented by the Alliance's associational member.

22. The U.S. equity markets are a key source of our Nation's financial strength. U.S. equity markets traded an average of 19 billion shares each trading day during the first nine months of 2026, with total notional value traded exceeding $197 trillion over that period.[5] At year-end 2025, the U.S. equity market was valued at $68.9 trillion, representing 43.7% of the world's equity capitalization.[6] Market capitalization climbed to $78.7 trillion by September 30, 2026.[7] Retail investors—

[5] SIFMA, *US Equity and Related Statistics* (Oct. 2, 2026), https://tinyurl.com/37h5mn7d; Cboe Exch., Inc., *Historical Market Volume*, https://tinyurl.com/52m7a6ae (last visited Nov. 3, 2026).

[6] SIFMA, *10 Key Findings from SIFMA's 2026 Capital Markets Fact Book* (Aug. 19, 2026), https://tinyurl.com/3wcbp4hn.

[7] SIFMA, *Research Quarterly: Equity and Related* (Oct. 23, 2026), https://tinyurl.com/523t8y2t.

individuals who buy and sell securities for their personal accounts—account for roughly 20% of U.S. equity volume and hold some $12 trillion in self-directed brokerage accounts.[8]

23. Under the CFTC's unlawful approvals, trading platforms can now offer single-stock perpetuals on U.S. stocks such as Apple, Alphabet, and Microsoft, without having to comply with the statutory requirements Congress mandated for security-based swaps and without having to comply with the full suite of regulatory requirements that applies to SEC-regulated national securities exchanges. Recently, Kalshi's chief executive announced that "[s]tock market exposure is the next step towards Kalshi becoming a full-service financial exchange, and perps are the best way for our traders to get this exposure."[9]

24. This altered playing field puts Alliance members at an unfair competitive disadvantage.[10] Alliance members have collectively invested billions of dollars in providing U.S. investors and publicly listed companies with an investing and trading ecosystem that advances the SEC's mission of protecting investors, facilitating capital formation, and maintaining fair, orderly, and efficient markets. Alliance members across every segment of the regulated securities ecosystem must now unfairly

---

[8] Investing.com, *Retail Investors Hold Equity Assets Equal to 10% of U.S. Market Cap: Goldman* (May 14, 2026), https://tinyurl.com/3jmct49m (reporting Goldman Sachs estimates). Other market-data providers place the retail share higher in volatile periods. *See, e.g.*, MEMX, *Retail Trading Insights* (Sep. 5, 2025), https://tinyurl.com/2f8sveds.

[9] Reuters, *Kalshi Launches Stock Index Perpetual Future to Expand Product Suite* (Oct. 6, 2026), https://tinyurl.com/4rcj5rz2.

[10] *See, e.g.*, Letter from Patrick Sexton, Executive Vice President, General Counsel, and Corporate Secretary, Cboe Global Markets, Inc., to Vanessa Countryman, Secretary, SEC, re SR-KALSHIEX-2026-002, SR-COIN-2026-002, SR-BTNL-2026-001, SR-OGM-2026-001, at 2 (Oct. 14, 2026).

compete, on an unlawful playing field, for the same customers and trading activity with platforms offering single-stock perpetuals outside the regulatory scheme that Congress established.

25. The Alliance's members include or represent national securities exchanges. Exchange members of the Alliance and of its associational member earn securities-related revenues, including transaction fees each time a stock or related derivative (such as a listed option) trades on their markets, and their market-data and related revenues rise and fall with that activity. The Stock Perpetual Approvals collectively cover dozens of contracts tied to individual stocks that trade on members' equities exchanges, and on which members' options exchanges list actively traded options. Alliance members welcome competition on lawful terms. But by allowing CFTC-regulated platforms to offer synthetic stock exposure under the erroneous label of "security futures"—when the perpetuals are in reality security-based swaps—the Stock Perpetual Approvals create an unequal playing field and threaten to divert trading that would otherwise occur on national securities exchanges subject to the SEC's full regulatory oversight, resulting in lost transactions and related revenue for exchange members of the Alliance and of its associational member.

26. The Alliance's members also include or represent broker-dealers that have significant securities-related revenues at stake. Millions of U.S. retail investors actively trade individual stocks and listed stock options through SEC-regulated broker-dealers, including members of the Alliance and of its associational member. The Stock Perpetual Approvals threaten to divert customers and trading activity from

broker-dealers to CFTC-regulated platforms that can offer customers stock exposure free of the statutory safeguards that Congress intended for the products. As customers and trading activity are diverted, broker-dealers including members of the Alliance and of its associational member lose not only the revenue associated with the displaced securities transaction, but also potentially the customer relationship.

27. Similarly, the Alliance's market makers supply the quotes and liquidity that make the markets function for stocks and related instruments and earn revenue from that trading activity. Each single-stock perpetual executed on a CFTC-regulated platform that otherwise could have been executed through a trading venue regulated under the SEC's full framework results in less trading activity and liquidity for market makers, negatively impacting trading revenue.[11]

28. Competitive injury is a well-established Article III injury. *See Old Town Trolley Tours of Wash., Inc. v. Wash. Metro. Area Transit Comm'n*, 129 F.3d 201, 202 (D.C. Cir. 1997) ("Competitive injury is a common and acceptable basis for establishing standing to challenge agency licensing decisions."); *see Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152 (1970). A party suffers injury in fact when an agency lifts regulatory restrictions on its competitors or otherwise allows increased competition against it, *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010),

[11] *See, e.g.*, Letter from Patrick Sexton, *supra* n.10, at 3 & n.6; Letter from Jeffrey S. Davis, Senior Vice President, Senior Deputy Counsel, Nasdaq, Inc., to Vanessa Countryman, Secretary, SEC, re File No. SR-COIN-2026-002, at 4 (Oct. 14, 2026) (warning that listing these products as security futures invites "regulatory arbitrage across economically similar instruments").

and "there is no need to wait for injury from specific transactions to claim standing," *El Paso Nat. Gas Co. v. FERC*, 50 F.3d 23, 27 (D.C. Cir. 1995).

29. The Second Circuit applies the same principle where the plaintiff "personally competes in the same arena with the party to whom the government has bestowed the assertedly illegal benefit." *In re U.S. Catholic Conference*, 885 F.2d 1020, 1029 (2d Cir. 1989); *see Schulz v. Williams*, 44 F.3d 48, 53 (2d Cir. 1994) (competitive injury from rivals permitted to avoid legal requirements the plaintiff must satisfy); *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 626 (2d Cir. 1989).

30. The CFTC does not dispute that the Stock Perpetual Approvals create competition for venues and firms that are playing by the rules Congress established—indeed, it has embraced that result.[12]

31. The injury is actual and imminent. Coinbase and Kalshi have each stated that they intend to list their contracts "shortly following" CFTC approval.[13] These platforms have millions of monthly active users.[14] Kalshi has already provided a "waitlist," advertising that single-stock perpetuals are coming soon.[15]

---

[12] Crypto Briefing, *CFTC Chair Michael Selig Defends Approval of Perps Trading in US* (June 2026), https://tinyurl.com/y4r9t8w7; Khyathi Dalal, *Own No Bitcoin? No Problem, BTC Perps Are Just Getting Started, CFTC Chair Selig Says*, Benzinga (June 2026), https://tinyurl.com/5jkdz27m.

[13] Kalshi Submission at 1, https://www.cftc.gov/filings/ptc/ptc09182627458.pdf; Coinbase Submission 1, https://www.cftc.gov/filings/ptc/ptc09182627449.pdf.

[14] Mary Cunningham, *Prediction markets offer the lure of fast money. Young men say they like their odds*, CBSNews (June 8, 2026), https://tinyurl.com/5crxrp26 (noting Kalshi's roughly 4 million active users); David Curry, *Coinbase Revenue and Usage Statistics*, Business of Apps (Sep. 17, 2026) (noting over 9 million active Coinbase users), https://tinyurl.com/4uz2z2wb.

[15] Kalshi, *Coming Soon: Stocks on Perpetuals* (Oct. 29, 2026), https://tinyurl.com/y5awe2b9; *see also* Alex Krohn, Risk.net, Kalshi Preps for 'Imminent' Launch of Single-Stock Perps (Nov. 2, 2026), https://tinyurl.com/2pft2dc4.

32. Bringing the products onto platforms with millions of U.S. retail customers threatens an immediate diversion of trading. Since the beginning of the year, monthly trading volumes in stock perpetuals by offshore cryptocurrency platforms have increased more than 50-fold, to nearly $700 billion in August 2026.[16] Indeed, offshore trading in perpetuals referencing traditional assets like stocks now rivals perpetuals on bitcoin and other cryptocurrency instruments.[17] With a $1.1 trillion daily market, a diversion of even just one percent of U.S. equity trading volume onshore would move $11 billion in trading each day out of the SEC-regulated securities ecosystem.

33. The injury is traceable to the Stock Perpetual Approvals and would be redressed by the relief requested. The Stock Perpetual Approvals green-light the platforms to list these perpetual derivatives for trading as security futures, circumventing the SEC's exclusive jurisdiction over securities and security-based swaps and Congress's clear restrictions on the offering of security-based swaps to retail investors. Vacating the Stock Perpetual Approvals and enjoining Defendants from giving them effect would prevent that listing and restore the regulatory regime that Congress enacted. Since the challenged contracts are security-based swaps, they cannot be sold to retail investors on these platforms. 15 U.S.C. §§ 77e(e), 78f(l).

34. The interests this lawsuit seeks to protect are germane to the Alliance's purpose of advancing policies that strengthen our nation's capital markets and

---

[16] Kamina Bashir, et al., *3 Stocks Drive Half of August's $665 Billion CEX Perpetual Futures Volume*, BeInCrypto (Sep. 2, 2026), https://tinyurl.com/4c263tvc.

[17] Anushka Basu, *Wall Street Assets Take Nearly a Quarter of Crypto Perpetual Trading: Glassnode Report*, Yahoo! Finance (Oct. 24, 2026), https://tinyurl.com/5n7294kn.

preserving the conditions that make American capital markets the destination of choice for businesses and investors around the world. The Alliance's mission also includes advocating in court when necessary to protect its members' interests and ensure that regulation respects statutory limits and rests on sound analysis. The Alliance supports competition among markets and market participants, which can improve execution, lower costs, and expand choice for investors. The Stock Perpetual Approvals, however, circumvent Congress's regulatory framework and invite competition on unequal terms, harming Alliance members and threatening the integrity of the U.S. equity markets. The Alliance submitted a comment letter to the CFTC urging it to intervene and reject the applicants' classification of these products as security futures, explaining that single-stock perpetuals are security-based swaps, not security futures, and explaining the risks to our nation's capital markets if single-stock perpetuals are approved for trading as security futures.[18]

35. This APA challenge does not require the participation of individual Alliance members; the Alliance seeks vacatur of the CFTC's unlawful approvals and other equitable relief, not damages that may require individualized proof. *See Bldg. & Const. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 150 (2d Cir. 2006).

[18] Letter from Capital Markets Alliance to CFTC, File No. SR-KALSHIEX-2026-02; File No. SR-COIN-2026-002; File No. SR-BTNL-2026-001; File No. SR-OGM-2026-001; and Joint Request for Comment on Further Definition of "Swap" and "Security-Based Swap" and on Alternative Compliance (Nov. 2, 2026) https://tinyurl.com/5yyr3ef8.

## II. The Two Regulatory Regimes Congress Established

36. "Since the 1930s, securities and futures have been subject to separate regulatory regimes" established by Congress that reflect differences in the respective products, participants, and markets.[19] The correct classification of a financial product is not a matter of mere semantics.[20] It determines the allocation of regulatory authority prescribed by Congress—the SEC or the CFTC—and the associated regulatory requirements and investor safeguards.

### A. The SEC Regulates the Securities Markets.

37. Congress enacted the federal securities laws, including the Securities Act of 1933, Pub. L. No. 73-22, 48 Stat. 74, and the Securities Exchange Act of 1934, Pub. L. No. 73-291, 48 Stat. 881, in response to the stock market crash of 1929 and the Great Depression that followed. The crash made starkly clear the consequences of inadequate oversight and regulation of the securities markets. Investors had bought stocks with borrowed money on margins as low as 10%, and when prices fell, forced selling spiraled.

38. Among its reforms, Congress responded by giving the Board of Governors of the Federal Reserve System—not the exchanges, and not even the SEC—the power to limit the credit that may be extended to buy securities. 15 U.S.C. § 78g. Under the Board's Regulation T, an investor may borrow no more than 50% of a

[19] SEC & CFTC, *A Joint Report of the SEC and the CFTC on Harmonization of Regulation* 1 (Oct. 16, 2009), https://tinyurl.com/34e3u89m.

[20] Antonin Scalia, Address Before the Attorney General's Conference on Economic Liberties in Washington, D.C. (June 14, 1986), in Office of Legal Policy, U.S. Department of Justice, Original Meaning Jurisprudence: A Sourcebook 101, 106 (1987) ("terminology is destiny").

stock's purchase price. 12 C.F.R. § 220.12(a). That limit protects individual investors from "becoming overly leveraged," reducing the extent to which their losses can exceed their investments.[21] It also promotes market stability by limiting "excessive speculative credit in securities transactions" and the buildup of leveraged positions that could amplify a market downturn.[22]

39. Congress also enacted a comprehensive regulatory framework to address excessive speculation, market manipulation, insider trading, and other abuses that were seen as contributing to the crisis. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194-95 (1976). The Exchange Act created the SEC and tasked it with administering and enforcing the securities laws. Congress has refined this framework for nearly a century and further strengthened the SEC's powers, finding that "[t]he securities markets are an important national asset which must be preserved and strengthened." 15 U.S.C. § 78k-1(a)(1); *see also, e.g.*, *United States v. O'Hagan*, 521 U.S. 642, 658-59 (1997) (emphasizing Congress's statutory purpose of ensuring "honest securities markets" to "promote investor confidence").

40. To these ends, the federal securities laws require issuers of securities to make specified disclosures, *see, e.g.*, 15 U.S.C. §§ 77e, 77j, 78m; prohibit insider trading and fraudulent and manipulative practices in the purchase and sale of securities, *id.* §§ 78i, 78j, 78u-1; establish a national market system that links trading venues

[21] U.S. Gen. Acct. Off., GAO/GGD-00-89, *CFTC and SEC: Issues Related to the Shad-Johnson Jurisdictional Accord* 21 (Apr. 2000).

[22] Federal Reserve Regulatory Service, *Board Rulings and Staff Opinions Interpreting Regulation T: Maintenance Margin Requirements*, 5-650.12, https://tinyurl.com/3rcbw7vt (last visited Nov. 3, 2026).

nationwide, *id.* § 78k-1; and require key market participants to register with the SEC and comply with a full suite of investor-protection and market-integrity requirements.

41. For a retail investor, those protections are concrete. A trading firm that handles retail customer orders as part of its business generally must register with the SEC as a broker-dealer and become a member of the Financial Industry Regulatory Authority (FINRA), a self-regulatory organization that conducts examinations and enforces its rules and the securities laws against its members in the first instance. 15 U.S.C. § 78o(a), (b)(8). Among other requirements, the broker-dealer must use reasonable diligence to obtain best execution for a customer's order, so that the resulting price to the customer is as favorable as possible, FINRA Rule 5310; publicly disclose where it routes orders and what is paid for them, 17 C.F.R. § 242.606; keep customer cash and securities segregated and protected, 17 C.F.R. § 240.15c3-3; and extend credit only within the Federal Reserve's margin limits, 12 C.F.R. pt. 220; *see also, e.g.*, 15 U.S.C. § 78fff-3 (specifying certain protections if a broker-dealer fails).

42. The SEC oversees FINRA and the national securities exchanges. 15 U.S.C. §§ 78f, 78o-3, 78s. A national securities exchange may operate only after the SEC finds that it is organized and has the capacity to carry out the purposes of the Exchange Act and enforce compliance with its rules. 15 U.S.C. § 78f(b)(1). Its rules must be designed to prevent fraud and manipulation, "to protect investors and the public interest," and not "to permit unfair discrimination between customers, issuers, brokers, or dealers." *Id.* § 78f(b)(5). Its rules must provide for the equitable allocation

of reasonable dues, fees, and other charges among its members, issuers, and other persons using its facilities, *id.* § 78f(b)(4), and its rules may not impose any burden on competition not necessary or appropriate in furtherance of the purposes of the Exchange Act, *id.* § 78f(b)(8). An exchange's rule changes, including changes needed to list new products, must be filed with the SEC, published for public comment, and are subject to SEC review before taking effect. 15 U.S.C. § 78s(b).

43. Transactions in National Market System (NMS) stocks are reported under SEC-approved transaction-reporting plans and published. 17 C.F.R. §§ 242.601, 242.603. And order and trading activity in NMS stocks and listed options across markets is captured in the Consolidated Audit Trail, enabling regulators to conduct cross-market surveillance. *Id.* § 242.613.

44. Congress has also recognized the importance of the SEC having regulatory jurisdiction over derivatives linked to securities. H.R. Rep. No. 97-626, at 2 (1982). From its creation, the SEC has regulated "the trading of options on securities," and Congress made that regulatory authority explicit in 1982, emphasizing the SEC's "historic mandate to foster the integrity of the markets" and "protect investors." *Id.*; *see* Pub. L. No. 97-303, 96 Stat. 1409 (1982). As discussed further below, Congress has continued to protect the SEC's oversight and supervision of securities-linked derivatives, including by giving the SEC exclusive jurisdiction over security-based swaps.

## B. The CFTC Regulates Futures Trading.

45. Congress established the CFTC in 1974 and tasked it with administering the Commodity Exchange Act, ch. 545, 49 Stat. 1491, which regulates the trading of commodity futures.

46. Congress specified that the CFTC "shall be composed of five Commissioners" appointed by the President with the advice and consent of the Senate, one of whom serves as Chairman. 7 U.S.C. § 2(a)(2).

47. A futures contract is a standardized agreement to buy or sell a commodity on a fixed date in the future at a price agreed today. *Leist v. Simplot*, 638 F.2d 283, 286 (2d Cir. 1980); *see Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 357–58 (1982).

48. The CFTC's Glossary accordingly defines a "Futures Contract" as "[a]n agreement to purchase or sell a commodity for delivery in the future: (1) at a price that is determined at initiation of the contract; (2) that obligates each party to the contract to fulfill the contract at the specified price; (3) that is used to assume or shift price risk; and (4) that may be satisfied by delivery or offset."[23]

49. The delivery or final-settlement date serves a critical function for futures contracts and is an integral contract term. Before expiration, a future may trade at a premium or discount to the spot price, reflecting financing, storage, dividends, expected supply, and other factors. Because of the possibility of arbitrage, the futures price converges toward the spot price of the asset as expiration approaches, as the

---

[23] CFTC, *Futures Glossary*, Futures Contract, https://tinyurl.com/8yeaxnnt (last visited Nov. 2, 2026).

market participants respond to the delivery or final settlement requirement. As expiration approaches, traders must confront their position and either liquidate it prior to expiration, hold it until expiration and delivery of the good or its cash equivalent, or, if a trader wants continued exposure, roll the position over by closing out the expiring position and entering a new contract.

50. Courts have long recognized that the delivery or final-settlement obligation on "a fixed date in the future" is a "basic feature[]" of a futures contract. *Leist*, 638 F.2d at 286; *see Curran*, 456 U.S. at 357–58; *see also, e.g.*, *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173-74 (2d Cir. 2013) (describing "basic features of commodity futures trading," including an agreement to buy or sell an asset for delivery "at a date in the future" (quoting *Strobl v. N.Y. Mercantile Exch.*, 768 F.2d 22, 24 (2d Cir. 1985))).

51. Futures markets developed principally to facilitate commercial hedging and professional risk transfer. "Most participants in the futures markets are commercial or institutional commodities producers or consumers."[24] For example, the farmer who locks in a price for a harvest months away, the airline that fixes the cost of next year's jet fuel, or the bank that hedges its interest-rate exposure. The contract lets those users shift the risk of a future price to someone willing to bear it. *See Curran*, 456 U.S. at 357–58.

[24] CFTC, *Basics of Futures Trading*, https://tinyurl.com/3m5znhuf (last visited Nov. 2, 2026); *see also, e.g.*, ICE Futures U.S., https://tinyurl.com/mrxswznd (last visited Nov. 2, 2026) ("Most participants in the futures markets are commercial or institutional commodities producers or consumers.").

52. The CFTC generally has exclusive jurisdiction over "contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). Although the definition of "commodity" originally included only agricultural commodities, it now extends to a broad range of goods and articles "in which contracts for future delivery" are dealt. *Leist*, 638 F.2d at 295; *see Curran*, 456 U.S. at 365 & n.29; 7 U.S.C. § 1a(9). The CEA generally requires futures contracts to be traded on or subject to the rules of designated contract markets (DCMs) overseen by the CFTC. 7 U.S.C. § 6(a).

53. The CEA's regulatory scheme relies heavily on statutory "core principles" and futures market and clearinghouse rules administered by the CFTC. 7 U.S.C. §§ 7(d), 7a-1(c). Unlike Regulation T's fixed 50% initial-margin requirement for stock purchases, futures margin is generally set by futures markets and clearing organizations under the CFTC. Futures markets also do not operate through the securities laws' national market system and have no consolidated tape, consolidated audit trail, or public order-routing disclosure regime comparable to the Exchange Act framework, resulting in less comprehensive market surveillance.

54. The CEA and the CFTC's implementing regulations generally provide two paths for DCMs to list a new contract for trading. First, a DCM may elect to self-certify to the CFTC that the contract complies with the CEA and the Commission's regulations. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a)(3)(iv). Second, a DCM may request CFTC approval. 7 U.S.C. § 7a-2(c)(4)(A). The CFTC "shall approve" a new contract unless the Commission finds it would violate the CEA or regulations. *Id.* § 7a-2(c)(5)(B); *see* 17 C.F.R. § 40.3(b). CFTC regulations generally provide a 45-day review

period and specify that the application "shall be deemed approved" at the conclusion of that review period absent a notice of non-approval or extension of the review period. 17 C.F.R. §§ 40.3(c)–(d), 40.5(c)–(d). For perpetual derivatives such as those at issue here, the CFTC instructed DCMs to use the pre-approval process. *See* 91 Fed. Reg. 33,160, 33,161 (June 3, 2026).

55. The CFTC has proposed, but not yet adopted, rules to address affiliated structures, including structures that allow platforms to use affiliates to trade against their own customers, recognizing that such structures present conflicts of interest. *Conflicts and Affiliations*, 91 Fed. Reg. 50,926, 50,950-54 (Aug. 6, 2026) (proposing rules).

56. Congress has been clear that the CFTC's jurisdiction does not "supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission." 7 U.S.C. § 2(a)(1)(A).

57. Congress also provided for the SEC to have a role in the oversight of any futures contract involving a security, recognizing the connection with the securities markets.

58. Congress narrowly defined a "security future" as "a contract of sale for future delivery of a single security or of a narrow-based security index, including any interest therein or based on the value thereof." 7 U.S.C. § 1a(44); 15 U.S.C. § 78c(a)(55)(A). Security futures are subject to statutory and regulatory requirements specific to security futures that presuppose the existence of a future delivery or final settlement date. The regulations address, for example, how the final settlement price

of a cash-settled security futures product must be determined, 17 C.F.R. § 41.25(c), and require DCMs to have rules in place establishing position limits or accountability procedures tied to the expiring contract month, *id.* § 41.25(b)(3); *see* 17 C.F.R. § 240.6h-1; *see also, e.g.*, 15 U.S.C. § 78f(h)(3); 7 U.S.C. § 2(a)(1)(D)(i). Margin rules for security futures generally set the minimum initial and maintenance margin at 15% of an unhedged position's current market value. 17 C.F.R. §§ 41.45(b), 242.403(b).

59. Under the security futures framework, eligible DCMs that seek to trade security futures are required only to notice-register with the SEC under Section 6(g). 15 U.S.C. § 78f(g)(1). A notice-registered DCM is exempt from many requirements that apply to a registered national securities exchange, such as provisions of the Section 19(b) framework and associated SEC rule-approval provisions described above. *Id.* § 78f(g)(4) (specifying exemptions); 15 U.S.C. § 78s(b)(1)-(2). As discussed above, the SEC rule-approval framework generally provides opportunities for regulatory scrutiny, public comment, and evaluation of investor protection concerns before exchange rule changes are implemented. 15 U.S.C. § 78s(b)(1)-(2).

60. A notice-registered DCM may list a new security futures product by filing with the CFTC. Notice-registered DCMs may therefore generally list new security futures products by following the CFTC pre-approval process or by self-certifying. 7 U.S.C. §§ 2(a)(1)(D), 7a-2(c); 17 C.F.R. § 41.23; *see* 17 C.F.R. §§ 40.5, 41.22, 41.25. The DCM must also file the associated rule change with the SEC. 15 U.S.C. § 78f(g)(4)(B); *id.* § 78s(b)(7)(C). After consultation with the CFTC, the SEC has a limited window

to abrogate the proposed change and require resubmission under different SEC rule-filing procedures, but no formal SEC approval is required. 15 U.S.C. § 78s(b)(7)(C); *id.* § 78s(b)(1).

### C. After the 2008 Financial Crisis, Congress Gave the SEC Exclusive Jurisdiction Over Security-Based Swaps and Strictly Limited Their Sale to Retail Investors.

61. Trading in over-the-counter swaps developed in the 1980s. *See Bloomberg L.P. v. CFTC*, 949 F. Supp. 2d 91, 97-98 (D.D.C. 2013). Over the next three decades, swaps largely remained outside the oversight of both the CFTC and SEC. *See* S. Rep. No. 111-176, at 29–32 (2010).

62. Contrary to futures and traditional options, which contemplate delivery of or performance related to a commodity at some future time, "swaps are 'pure financial instrument[s],'" *United States v. Phillips*, 155 F.4th 102, 112 (2d Cir. 2025) (quotation marks omitted), in which the parties "agree to exchange or 'swap' payments with each other" based on an underlying reference, such as "changes in a stock price, interest rate or commodity price," *Sec. Ind. & Fin. Markets Ass'n v. CFTC*, 67 F. Supp. 3d 373, 385 (D.D.C. 2014) (quotation marks omitted).

63. Ultimately, "[t]rading in swaps exploded in the early 2000s," and the absence of federal regulation of these instruments was "a contributing cause" of the 2008 financial crisis, the worst financial crisis since the Great Depression. *Phillips*, 155 F.4th at 113; *see* S. Rep. No. 111-176, at 29–32 (2010). From its October 2007 peak to its March 2009 trough, the S&P 500 Index fell 57 percent.[25] By the Financial

[25] Robert Rich, *The Great Recession*, Fed. Rsrv. Hist. (Nov. 22, 2013), https://tinyurl.com/4uypprxk.

Crisis Inquiry Commission's estimate, nearly $11 trillion in household wealth vanished.[26] Derivatives had allowed institutions and investors to take enormous positions, on little capital, in instruments no regulator could see. The market in these derivatives spiraled.[27] Federal officials warned Congress that while "individual transactions" in swaps "may seem insignificant, in aggregate, they can affect the health of the entire system." S. Rep. No. 111-176, at 31.

64. A key lesson of the crisis was the importance of the SEC having sufficient oversight over swaps linked to securities because those products present risks to the securities markets. As then-SEC Chairman Mary L. Schapiro testified before Congress in 2009, "[b]ecause market participants can readily use securities-related OTC derivatives to serve as synthetic substitutes for securities, the markets for these OTC derivatives directly and powerfully implicate the policy objectives for capital markets that Congress has set forth in the federal securities laws."[28]

65. Along the same lines, Henry T. C. Hu, then-Director of the SEC's Division of Risk, Strategy, and Financial Innovation, explained that swaps can "allow market participants to enjoy the benefits of owning the shares of a company without having to purchase any shares," and "OTC derivatives markets directly affect the

[26] Fin. Crisis Inquiry Comm'n, *The Financial Crisis Inquiry Report* xv (2011).

[27] *Id.*

[28] Mary L. Schapiro, Chairman, SEC, Testimony Concerning Regulation of Over-the-Counter Derivatives Before the Subcomm. on Sec., Ins., & Inv. of the S. Comm. on Banking, Hous., & Urban Affairs (June 22, 2009) ("Schapiro Testimony"), https://tinyurl.com/5n8ktth7.

regulated securities and futures markets by serving as a less regulated alternative for engaging in economically equivalent activity."[29]

66. Congress responded in 2010 by enacting the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act). Under Title VII of that Act, Congress brought the over-the-counter swap market under federal regulation to "promote the financial stability of the United States by improving accountability and transparency in the financial system." *Phillips*, 155 F.4th at 113 (quoting Pub. L. No. 111-203, 124 Stat. 1376 (2010)).

67. Congress divided oversight of these newly regulated instruments according to what they reference. For swaps referencing individual stocks or narrow-based indices—"security-based swaps"—it gave exclusive jurisdiction to the SEC. It assigned oversight of swaps based on commodities and broad-based indices to the CFTC. *See* Dodd-Frank Act §§ 712(a), 721(a)(21), 761(a), 124 Stat. 1641–43, 1666, 1756; *see also* H.R. Rep. No. 111-517, at 868 (2010) (Conf. Rep.) (explaining that the CFTC and SEC "are authorized to write rules for the swaps and security-based swaps markets, respectively"). That ensured that swaps referencing stocks would be joined with the SEC's existing oversight of issuers, intermediaries, and the stock markets. *See* 15 U.S.C. §§ 78c-1(b), 78i(j), 78o-10.[30]

---

[29] Henry T. C. Hu, Director, Division of Risk, Strategy, and Financial Innovation, SEC, Testimony Concerning the Over-the-Counter Derivatives Markets Act of 2009 Before the H. Comm. on Fin. Servs. (Oct. 7, 2009), https://tinyurl.com/4rxmess6.

[30] Congress has also separately defined a class of products known as "security-based swap agreements," which are subject to the SEC's antifraud and antimanipulation authority. *See* 15 U.S.C. §§ 78c(a)(78), 78c-1(b), 78j(b), 78t(d).

68. Congress defined a "swap" broadly to include "any agreement, contract, or transaction" that provides for the exchange of payments "based on the value" of a financial interest, "and that transfers, as between the parties to the transaction . . . the financial risk associated with a future change in any such value" but does not "convey[] a current or future direct or indirect ownership interest" in the asset. 7 U.S.C. § 1a(47)(A)(iii). The definition excludes certain enumerated products, including any "security futures product." *Id.* § 1a(47)(B)(i).

69. Congress defined a "security-based swap" to include any "swap" that is "based on" a "single security or loan, including any interest therein or on the value thereof." 15 U.S.C. § 78c(a)(68)(A).

70. Congress enacted a comprehensive scheme governing security-based swaps. Importantly, in light of the devastation inflicted by the financial crisis and the inherent risks of these derivatives, Congress placed strict restrictions on the sale of security-based swaps to retail investors—in statutory terms, to any person who is not an "eligible contract participant." *See* 7 U.S.C. § 1a(18). It is unlawful to effectuate a transaction in a security-based swap with or for such a person unless the transaction occurs on a national securities exchange that is registered with the SEC and subject to its full regulatory authority and the Exchange Act's investor protections. 15 U.S.C. § 78f(l). A registration statement under the Securities Act disclosing the risks of the instrument must also be in effect. 15 U.S.C. § 77e(e); *see id.* § 77j(a).

71. In enforcing violations of these retail-trading requirements, the SEC has stressed their importance in protecting investors and markets, "including ensuring

such investors receive prescribed disclosure about security-based swaps and that trading of security-based swaps occurs on exchanges subject to the highest level of regulation." *In re XBT Corp. SARL d/b/a First Global Credit*, Securities Act Release No. 10723, at 2 (Oct. 31, 2019). Those requirements "benefit investors by providing public price discovery mechanisms, access to relevant trading information, appropriate monitoring of trading activity and regulated counterparty credit risk management." *Id.*

72. In addition to the strict retail-trading requirements, Congress mandated the reporting of security-based swap transactions; enacted rules and requirements governing "security-based swap dealers" and "major security-based swap participants"; and prohibited fraud and manipulation in security-based swap transactions, among other protections. *See, e.g.*, 15 U.S.C. §§ 78m(m)-(n); id. §§ 78o-10, 78c(a)(67), (71); *id.* §§ 78c-3(a), (g), 78c-4; *id.* § 78i(j).

73. The SEC has promulgated extensive regulations to implement these statutory provisions, including rules addressing anti-fraud and antimanipulation, 88 Fed. Reg. 42,546 (June 30, 2023); registration of security-based swap dealers and major security-based swap participants, 80 Fed. Reg. 48,964 (Aug. 14, 2015); capital, margin, and segregation requirements, 84 Fed. Reg. 43,872 (Aug. 22, 2019); and business conduct standards, recordkeeping, and reporting requirements, 81 Fed. Reg. 29,960 (May 13, 2016); 84 Fed. Reg. 68,550 (Dec. 16, 2019).

74. Congress also did not leave the principal boundary between "swap" and "security-based swap" to either agency alone. It directed the two Commissions, "in

consultation with the Board of Governors," to "further define" those terms, 15 U.S.C. § 8302(d)(1), and to "treat functionally or economically similar products or entities . . . in a similar manner," *id.* § 8302(a)(7); *see also id.* § 8306(a)(2), (b) (specifying procedures for one Commission to ask the other to determine regulatory status of novel derivative products). Consistent with this framework, the two Commissions in 2012 adopted rules and interpretations further defining "swap" and "security-based swap," among other terms. *Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping*, 77 Fed. Reg. 48,208 (Aug. 13, 2012) ("Product Definitions Release").

## III. Perpetual Derivatives and Their Classification as Swaps Prior to This Administration

### A. How Perpetual Derivatives Work and Why They Are Sold

75. The concept of a perpetual derivative was proposed in an academic paper in 1993.[31] During the last decade, perpetual derivatives have been widely adopted by offshore cryptocurrency venues, which have often offered them to retail customers.[32] Perpetuals have become, in the CFTC's words, "a dominant form of crypto derivative trading in global markets," with most trading occurring offshore. Policy Statement Concerning the Listing of Perpetual Contracts, 91 Fed. Reg. 33,160, 33,161 (June 3, 2026) (Policy Statement).

[31] Robert J. Shiller, *Measuring Asset Values for Cash Settlement in Derivative Markets: Hedonic Repeated Measures Indices and Perpetual Futures*, 48 J. Fin. 911, 911–31 (1993).

[32] *See, e.g.,* Kalshi, *What Are Perpetual Futures? A Beginner's Guide,* https://tinyurl.com/23zh3kzh (last visited Nov. 3, 2026); Compl. ¶¶ 1–4, 60–64, *CFTC v. Zhao,* No. 1:23-cv-01887 (N.D. Ill. Mar. 27, 2023), ECF No. 1; Compl. ¶ 125, CFTC v. HDR Global Trading Ltd., No. 20-cv-08132 (S.D.N.Y. Oct. 1, 2020), ECF No. 1.

76. A perpetual derivative, or "perp," has two defining features: (1) it has no fixed expiration, and (2) it is designed to track the current price of the referenced asset.[33]

77. First, a perpetual derivative has no scheduled delivery or final-settlement date. That feature is reflected in its name: perpetual. It is designed never to settle. The customer makes or receives cash as the price moves, never owns the asset, never has a right to receive it, and can hold the position indefinitely.[34]

78. Second, a perpetual is designed to track the price of the underlying asset. This is achieved through funding payments exchanged at intervals specified by the contract. With respect to the single-stock perpetuals at issue here, for example, Coinbase's perpetuals provide for hourly exchanges, Bitnomial's every eight hours, and Kalshi's are daily.[35] When the perpetual trades above the referenced spot price, holders of long positions pay holders of short positions; when it trades below, the shorts pay the longs. Those payments create an economic incentive to narrow the difference between the perpetual's price and the reference price without a scheduled settlement date.

---

[33] *Policy Statement Concerning the Listing of Perpetual Contracts*, 91 Fed. Reg. 33,160, 33,160–61 (June 3, 2026).

[34] *See* Kalshi, *What Are Perpetual Futures?*, *supra* n.32 (a position "can stay open for as long as there is enough collateral behind it"). Some proposed contracts provide for final cash settlement upon specified contingent events, but none has a scheduled expiration or final settlement in the ordinary course.

[35] *Id.* (funding charged "every eight hours for crypto and once a day for precious metals"); Coinbase Derivatives Submission No. 2026-62 (Sep. 18, 2026) (Coinbase Submission), https://tinyurl.com/mtmhmdch, App. A (hourly funding calculations); *see also* CFTC, Order Approving KalshiEX LLC BTCPERP Futures Contract (May 29, 2026) (Kalshi Order) 6–7 (describing the funding mechanism).

79. These features distinguish perpetuals from futures contracts. As discussed above, a basic feature of a futures contract is a delivery or final-settlement date. Futures contracts are also not designed to precisely track the current price of the underlying asset. During the life of a futures contract, the contract may trade at a premium or discount to spot and converge toward the spot price only as the delivery or final-settlement period approaches. *See* 91 Fed. Reg. at 33,160.[36]

### B. The CFTC Has Consistently Classified Perpetual Derivatives As Swaps.

80. For years, across administrations of both parties, the CFTC treated perpetual contracts as swaps. When platforms attempted to offer perpetual derivatives to U.S. retail investors, the CFTC enforced the regulatory framework that Congress designed and treated digital-asset perpetuals with no fixed expiration or delivery as "swaps," not "futures."

81. In 2020, for example, the CFTC sued the operators of BitMEX, then the world's largest perpetuals venue, alleging that its perpetual contracts "are swaps as defined by 7 U.S.C. § 1a(47)."[37] The CFTC obtained a consent order against BitMEX on that theory in August 2021.[38]

82. The CFTC has brought enforcement action after enforcement action on the same premise, in each case alleging or obtaining findings in administrative and

[36] *See also* John C. Hull, *Options, Futures, and Other Derivatives* § 2.3 (11th ed. 2022).

[37] Compl. ¶ 125, *CFTC v. HDR Global Trading Ltd.*, No. 20-cv-08132 (S.D.N.Y. Oct. 1, 2020), ECF No. 1.

[38] Consent Order ¶ 29, *CFTC v. HDR Glob. Trading Ltd.*, No. 20-cv-08132 (S.D.N.Y. Aug. 10, 2021), ECF No. 62.

judicial consent orders that perpetual contracts are swaps.[39] In 2023, for example, the CFTC brought an enforcement action against Binance, which offered customers "perpetual[] contracts" that "transfer the price risk of the underlying digital asset as between the counterparties to a transaction," "do not have a pre-determined expiration date," and "do not result in an exchange of the underlying digital asset."[40] The CFTC asserted that, while Binance's "quarterly futures" with a "pre-determined expiration date[]" were "futures contracts," its "perpetuals" with no expiration date "are swaps."[41] A federal court entered a consent order on that basis.[42]

83. CFTC leadership said the same thing publicly. Announcing one of these actions, then-Commissioner Caroline D. Pham emphasized that "[a] swap is a swap, even by any other name," and that so-called "'perpetual futures' can constitute swaps."[43]

84. If a perpetual derivative referencing bitcoin is a swap, then a perpetual derivative referencing a stock is a security-based swap. 15 U.S.C. § 78c(a)(68)(A).

---

[39] *See, e.g.*, Compl. ¶ 23, *CFTC v. Eisenberg*, No. 23-cv-173 (S.D.N.Y. Jan. 9, 2023), ECF No. 1 ("'Perpetual futures' and 'perpetuals' . . . meet the definition of 'swaps' under the [CEA]."); Consent Order 5, *In re Deridex, Inc.*, CFTC Dkt. No. 23-42 (Sep. 7, 2023) ("[P]erpetual contracts . . . are 'swaps' under Section 1a(47) of the [CEA]."); Consent Order 5 & n.6, *In re Opyn, Inc.*, CFTC Dkt. No. 23-40 (Sep. 7, 2023) ("[P]erpetual contracts are 'swaps' under Section 1a(47) of the Act."); Compl. ¶ 41, *CFTC v. Mek Glob. Ltd.*, No. 24-cv-02255 (S.D.N.Y. Mar. 26, 2024), ECF No. 1 ("Perpetual futures are 'swaps' under the Act.").

[40] Compl. ¶¶ 62–64, *CFTC v. Zhao*, No. 23-cv-01887 (N.D. Ill. Mar. 27, 2023), ECF No. 1.

[41] *Id.* ¶¶ 60–62.

[42] Consent Order for Perm. Inj. at 8, *CFTC v. Zhao*, No. 23-cv-01887 (N.D. Ill. Dec. 14, 2023), ECF No. 80 ("[P]erpetuals are swaps.").

[43] Statement of Commissioner Caroline D. Pham Regarding Complaint Charging Swaps Manipulation and Fraud on a Decentralized Digital Asset Exchange, CFTC (Jan. 10, 2023), https://tinyurl.com/5yhkvvpy.

85. The CFTC's position was well understood by trading platforms. The platform dYdX, for example, told the CFTC that U.S. investors had been "cut off" from perpetuals by "the Commission's historical enforcement posture."[44] Industry commentators wrote that the CFTC had "viewed perps as swaps, not futures," and that businesses were deterred from offering them "due to concerns they may be classified as swaps."[45] And in February 2026, the Blockchain Association, a trade group of more than 130 digital-asset firms, petitioned the CFTC for an order under Section 4(c) of the CEA "exempting perpetual futures . . . from all requirements applicable to swaps."[46] The industry did not claim that perpetuals were futures—instead, it asked to be excused from the requirements for swaps.

### C. The SEC Classifies Comparable Single-Stock Products As Security-Based Swaps.

86. The SEC has also long understood that contracts that provide for an exchange of payments based on changes in an underlying stock value and that do not transfer any ownership interest are security-based swaps. Like the CFTC, it has

[44] dYdX Trading Inc., Comment Letter on Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives, at 1, 6 (May 21, 2025).

[45] Salah Ghazzal & Charlie Ambrose, *Bringing Perps to the People: A Proposal for Perpetual Futures Regulation in the U.S.*, Variant (Oct. 8, 2025) ("[T]he CFTC's enforcement record under the Biden administration expressed a clear view on policy: Perps should not be permitted for U.S. retail traders."); Crypto Council for Innovation, Comment Letter on General CFTC Request for Input on All Recommendations for the CFTC in the President's Working Group on Digital Assets 3 & n.5 (Nov. 26, 2025); *see also* The Digital Chamber, Comment Letter (May 21, 2025), (supporting CFTC "issuing guidance clarifying how perpetual derivatives are treated under existing futures and swap definitions").

[46] Blockchain Association, Petition for an Order under Section 4(c) of the Commodity Exchange Act: Trading and Clearing of Perpetual Derivatives on Digital Assets, at 1, 3 n.7, 8 (Feb. 24, 2026) ("[T]he potential that the CFTC will regulate them as swaps[] is hindering domestic businesses from offering perpetuals to willing retail and institutional market participants.").

enforced the requirements and protections that Congress enacted for security-based swaps.

87. In 2018, for example, the SEC sued the operator of an offshore platform that marketed "contracts for difference" (CFDs) on U.S. stocks to retail customers, alleging that they are "security-based swaps."[47] Through the contracts, users could "participate in the price movements of securities and other assets without actually owning the underlying asset," such as purchasing a long or short position "that tracks the price of the stock of a publicly-traded U.S. company."[48] The SEC recognized that because the "values of the CFDs are tied to the values of underlying securities," "they are security-based swaps," and "the federal security laws require that offerings in security-based swaps be registered with the SEC and that the transactions be executed on a registered national exchange."[49]

88. That enforcement action reflects the Commissions' joint understanding that CFDs are swaps or security-based swaps, depending on the underlying reference. A CFD exchanges the difference in the value of a stock between the opening and closing of a position, transfers no shares, imposes a financing charge for holding the position open, and commonly has no fixed expiration.[50] For years, offshore brokers have

---

[47] Compl. ¶¶ 2-3, 20, *SEC v. 1pool Ltd.*, No. 1:18-cv-2244 (D.D.C. filed Sep. 27, 2018), ECF No. 1; SEC Lit. Release No. 24330 (Sep. 27, 2018); Final J., *SEC v. 1pool Ltd.*, No. 1:18-cv-02244 (D.D.C. Mar. 4, 2019), ECF No. 14.

[48] *Id.* at 1.

[49] *Id.*

[50] *See* European Sec. & Mkts. Auth., Decision (EU) 2018/796, art. 1(a), 2018 O.J. (L 136) 50 (defining a CFD as a derivative "the purpose of which is to give the holder a long or short exposure to fluctuations in the price, level or value of an underlying . . . and that must be settled in cash or may be settled in cash at the option of one of the parties"); *see also* QFEX

sold CFDs to retail customers abroad. The Commissions addressed CFDs in the 2012 Product Definitions Release, explaining that they are "agreement[s] to exchange the difference in value of an underlying asset" over time and do not transfer ownership in the asset, and thus "fall within the scope of the swap or security-based swap definition," depending on the asset they reference.[51] A CFD based on a stock is therefore a security-based swap.[52] The Commissions defined a CFD as providing exposure to changes in the value of the underlying asset without any transfer of the asset itself.[53]

89. The SEC has brought other enforcement actions against companies offering derivatives to retail customers based on the value of stock. In 2019, the SEC sanctioned a company that offered retail customers "swaps" that "tracked the real-time price of a variety of U.S.-listed securities," emphasizing that the "Dodd-Frank Act sought to regulate the sale of security-based swaps" to retail investors "to provide important investor protections."[54] In 2020, the SEC and CFTC acted together against Abra, whose app let users obtain "synthetic exposure to price movements of stocks and exchange-traded fund ('ETF') shares that trade in the United States."[55] The SEC found that the contracts were security-based swaps unlawfully sold to retail investors, and the CFTC found that the same contracts were swaps entered into off-

---

Research, *Perps for the People* (Sep. 9, 2025), https://tinyurl.com/3x2w8etj ("Perps enable open-ended exposure to underlying assets, just like CFDs.").

[51] *Id.* at 48,259–60 & nn.595–96.

[52] *Id.* at 48,260.

[53] *Id.* at 48,259.

[54] Order Instituting Cease-and-Desist Proceedings at 2, *In re XBT Corp. SARL d/b/a First Global Credit*, Securities Act Release No. 10723 (Oct. 31, 2019).

[55] Order Instituting Cease-and-Desist Proceedings at 2–5, *In re Plutus Fin. Inc. d/b/a Abra*, Securities Act Release No. 10801, Admin. Proc. File No. 3-19873 (July 13, 2020); Order Instituting Proceedings, *In re Plutus Fin. Inc.*, CFTC Dkt. No. 20-23 (July 13, 2020).

exchange in violation of CEA Section 2(e). Just recently, in 2026, the SEC sanctioned two offshore firms for the same conduct.[56] In each case the product offered cash-settled exposure to the price of a U.S. stock, with no shares changing hands, sold to retail investors outside the securities laws—just as stock perpetuals do.

### D. Statutory Text and Precedent Make Clear That Stock Perpetuals Are Security-Based Swaps.

90. The Commissions' prior classification is correct: a perpetual derivative is a "swap," and a single-stock perpetual is a "security-based swap."

91. A perpetual contract on a stock meets all the elements of the statutory security-based swap definition. It is a "swap" because:

- it "provides on an executory basis for the exchange . . . of 1 or more payments based on the value or level of" a security;
- "transfers, as between the parties to the transaction . . . the financial risk associated with a future change in any such value";
- and does not "convey[] a current or future direct or indirect ownership interest" in the stock.

7 U.S.C. § 1a(47)(A)(iii). And it is a security-based swap because it is "based on" "a single security," "including any interest therein or on the value thereof." 7 U.S.C. § 1a(42), (47)(A)(iii); 15 U.S.C. § 78c(a)(68)(A).

92. The definition of "swap" excludes security futures. 7 U.S.C. § 1a(47)(B)(i). But perpetual derivatives referencing stock are not "security futures."

[56] Order Instituting Cease-and-Desist Proceedings at 4–5, *In re Netrios LP Ltd. & Red Acre Ltd.*, Securities Act Release No. 11425 (June 29, 2026). The SEC's enforcement of the retail restrictions on security-based swaps predates these cases. *See In re Forcerank LLC*, Securities Act Release No. 10232 (Oct. 13, 2016); *In re Equidate, Inc.*, Securities Act Release No. 10262 (Dec. 6, 2016).

Security futures are "contract[s] of sale for future delivery of a single security," 7 U.S.C. § 1a(44). By design, perpetuals do not expire and do not contemplate delivery or final settlement on any future date. As described above, the delivery obligation serves a critical function for futures markets and is an important safeguard. The statutory definition reflects that the future delivery obligation is a precondition for a contract to be a security futures contract, 7 U.S.C. § 1a(44), and the regulations governing the trading of securities futures likewise presuppose future delivery or final settlement, *see, e.g.*, 17 C.F.R. § 41.25(b), (c).

93. Precedent confirms that perpetual derivatives are swaps, not futures. The Second Circuit has repeatedly recognized that a "basic feature[]" of a futures contract is an agreement to "deliver" the referenced asset "at a fixed date in the future." *Leist v. Simplot*, 638 F.2d 283, 286 (2d Cir. 1980); *Strobl v. N.Y. Mercantile Exch.*, 768 F.2d 22, 24 (2d Cir. 1985); *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173–74 (2d Cir. 2013); *accord United States v. Bein*, 728 F.2d 107, 111 (2d Cir. 1984) ("[A] futures contract involves the sale or purchase of specified amounts of a commodity to be delivered in the future.").

94. By the same token, the Second Circuit has recognized that "[s]waps, unlike futures contracts, do not contemplate delivery of the underlying commodity." *Amaranth*, 730 F.3d at 175.

95. Other circuits agree that "common elements" of a futures contract include an "agreement[] to buy or sell" an asset "at or before a stated future time." *CFTC v. Erskine*, 512 F.3d 309, 323 (6th Cir. 2008); *see also, e.g.*, *CFTC v. Zelener*,

373 F.3d 861, 864 (7th Cir. 2004) (futures contract is a fungible promise to buy or sell "at a fixed date in the future"); *Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 974 (D.C. Cir. 2023) (futures contract is an agreement for delivery "at a set future date").

96. Even the handful of district courts that described, prior to the Dodd-Frank Act, contracts of "indefinite duration" as futures did so because the customer's obligation to make or take delivery rolled forward each day and never disappeared. *CFTC v. Int'l Fin. Servs. (N.Y.), Inc.*, 323 F. Supp. 2d 482, 494–98 (S.D.N.Y. 2004) (an "essential element" of a futures contract is the "obligation to make or take delivery of a commodity in the future"); *CFTC v. Int'l Foreign Currency, Inc.*, 334 F. Supp. 2d 305, 312 (E.D.N.Y. 2004). The statute requires the delivery obligation, even assuming the delivery date may be indefinite. *See also, e.g.*, *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 539-40, 546 (7th Cir. 1989) (finding, prior to the Dodd-Frank Act, that agreements were futures contracts where there were scheduled quarterly settlement dates).

## IV. The CFTC Abruptly Changes Course Without Explanation.

97. In recent months, the CFTC has abruptly changed course from its prior position, blessing the trading of perpetual derivatives as futures contracts rather than swaps, notwithstanding the statute and the Commissions' longstanding positions. All the while, the CFTC has failed to acknowledge its prior position or provide a reasoned explanation for this change.

### A. CFTC Approves Perpetuals on Bitcoin Without Acknowledging Its Prior Position.

98. CFTC staff first posed regulatory-classification questions in an April 21, 2025 request for public comment on perpetual derivatives.[57] The agency received more than 150 comments.[58] Commenters included trading platforms that, as discussed above, acknowledged that perpetuals fall within the swaps definition but asked the agency to change course.[59] The CFTC did not issue a rule or interpretation responding to the comments or explaining why a contract with no scheduled settlement could qualify as a contract for future delivery.

99. Instead, on May 29, 2026, the CFTC approved an application filed by Kalshi—just *one day* after it was filed—to classify a perpetual contract on bitcoin as a futures contract.[60] The CFTC's nine-page order does not acknowledge the CFTC's longstanding classification of perpetuals as swaps, let alone explain the change in position. Nor does it analyze the statutory definition of a "swap," 7 U.S.C. § 1a(47). Its legal-classification analysis largely consists of a recitation of the arguments in Kalshi's application, relying principally on pre-Dodd-Frank case law, after which the Order states that, "based on the Commission's review of [the applicant's] analysis,"

---

[57] CFTC, *Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives* 1–3 (Apr. 21, 2025), https://tinyurl.com/4ujzf7sj.

[58] CFTC, *Comments for General CFTC Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives*.

[59] *See* Intercontinental Exchange, Inc., Comment Letter on Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives 1–3 (May 21, 2025); Coinbase Derivatives, LLC, Comment Letter on Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives 1, 4–5 (May 21, 2025); The Digital Chamber, Comment Letter on Request for Comment on Perpetual Derivatives 1, 4–5 (May 21, 2025).

[60] Kalshi Order, *supra* n.35.

designating the perpetual "as a futures contract" "would not violate the CEA or the Commission's regulations."[61]

100. The Kalshi Order was promptly challenged. On June 18, 2026, CME sued the CFTC and Chairman Selig in the United States District Court for the District of Columbia, seeking vacatur of the Kalshi Order and the Policy Statement described below and a declaration that perpetual derivatives on bitcoin are swaps. Compl., *Chi. Mercantile Exch. Inc. v. Selig*, No. 1:26-cv-02157-CKK (D.D.C. June 18, 2026), ECF No. 1.

**B. The CFTC Allows Perpetuals on Additional Asset Classes.**

101. The CFTC has approved perpetuals on other asset classes without explanation, ignoring its own statements about the need for additional Commission review.

102. In the Kalshi Order, the CFTC stated that its approval was limited to perpetual contracts on "bitcoin or other digital commodities." Kalshi Order at 8. The same day, it issued a policy statement acknowledging that "[p]erpetual contracts raise novel and complex questions relating to market structure, customer protection, resilience during periods of market stress, and consistency" with the requirement that a DCM list only contracts "not readily susceptible to manipulation." 91 Fed. Reg. at 33,161. The Policy Statement directed that perpetual contracts on other asset classes "should be submitted" for "review and approval" and stated that perpetual

[61] Kalshi Order, *supra* n.35, at 6–8.

contracts referencing equity securities "would benefit from review by the Commission and the U.S. Securities and Exchange Commission." *Id.* at 33,161 & n.5.

103. On June 24, 2026, the CFTC and the SEC jointly requested comment on the regulatory classification of "'perpetual' contract[s]," including "potential ways to draw clearer regulatory lines." Joint Request for Comment on Further Definition of 'Swap' and 'Security-Based Swap' and on Alternative Compliance, 91 Fed. Reg. 37,873, 37,875–76 (June 24, 2026) (Joint Request for Comment). Among other questions, the Commissions asked what effects a cash-settled perpetual contract referencing an equity security could have on "liquidity formation, price discovery, and hedging activity, particularly with regards to the derivatives and underlying cash equity markets." *Id.* at 37,876.

104. Commenters responded that trading in securities-related derivatives is closely linked to the securities markets, that perpetual derivatives on individual stocks may create manipulation and volatility risks, and that a platform's label should not determine the governing regulator or regulatory framework.[62]

105. The CFTC has not issued a rule or classification determination addressing these comments.

106. The CFTC has instead allowed perpetuals on other asset classes to take effect without any further written approval or analysis. Kalshi has self-certified additional digital-asset and precious metals perpetuals in reliance on the Kalshi

[62] *See, e.g.*, Nasdaq Cmt. 3-4, 9-10 (Aug. 24, 2026), https://tinyurl.com/2wtw95c5; MFA Cmt. 11 (Sep. 14, 2026), https://tinyurl.com/yps7azve; MEMX Cmt. 13-16 (Aug. 24, 2026), https://tinyurl.com/p967duyu; SIFMA, et al. Cmt. 10-11 (Aug. 24, 2026), https://tinyurl.com/4nkr4p43.

Order.[63] Kalshi also filed an application to list a perpetual on a broad-based stock index, which the CFTC deemed approved on October 2, 2026 by allowing the 45-day review period under its regulations to expire.[64]

## V. The Challenged Approvals of Single-Stock Perpetuals

107. In its most recent move, the CFTC has now allowed platforms to trade perpetuals on individual stocks as security futures. The CFTC's 45-day review period for the September 18 applications filed by Kalshi, Bitnomial, and Coinbase to list perpetuals on individual stocks as "security futures" expired, without the CFTC issuing a notice of non-approval or taking action that extends the review period. As of November 3, 2026, those applications are therefore "deemed approved by the Commission, pursuant to Commission Regulation 40.3," without the Commission issuing any written order. Exhibit 1.

### A. The September 18 Applications.

108. On September 18, 2026, the three platforms submitted product applications and associated rule filings covering dozens of perpetual derivatives on individual stocks. Coinbase's application sought approval to list a "suite" of "cash-settled, perpetual futures contracts" each referencing "a single underlying equity security," and it provided a "representative specification" for a perpetual contract referencing

---

[63] *See* CME Compl. ¶ 9; *see also, e.g.*, KalshiEX LLC – CFTC Regulation 40.2(a) Notification Regarding the Initial Listing of the GOLDPERP Futures Contract (Sep. 8, 2026), https://www.cftc.gov/filings/ptc/ptc09082624176.pdf.

[64] CFTC Letter No. 26-29, at 2, 5 n.25 (Oct. 3, 2026) (recognizing that the August 18, 2026 application was "deemed approved"); *see also id.* (staff letter issuing no-action relief to permit DCMs to remove expiration dates from existing broad-based-index futures).

Apple stock.[65] Bitnomial's applications sought approval to list perpetual contracts referencing 10 individual stocks, including Alphabet and Microsoft. Kalshi provided a schedule identifying 58 contracts, proposing perpetuals on 55 stocks and three exchange-traded funds or American depositary receipts. These filings are attached as Exhibit 2.[66] The applicants made parallel notice-based SEC rule filings. Exchange Act Release Nos. 34-106420, 34-106421, 34-106422 (Sep. 18, 2026).[67]

109. While the applications differ in some details, their essential terms are the same. Each "perpetual" contract gives its holder continuing cash-settled exposure to changes in the price of an individual stock, but conveys no shares, voting rights, or other ownership interest. Each has no fixed expiration date or scheduled final settlement and uses recurring "funding" payments purportedly designed to keep the contract's price aligned with the price of the referenced stock.

110. Contrary to the applicants' erroneous characterizations, the perpetual derivatives on individual securities in the September 18 applications are security-based swaps, not security futures. Take the Apple-linked perpetuals described by each of the applicants. Holders of the perpetuals make or receive cash payments

---

[65] *See* Coinbase Submission No. 2026-62, *supra* n. 35, at 3-4.

[66] *See, e.g.*, Coinbase Submission, *supra*; Bitnomial Exchange, LLC, Submission No. 2026-107 (Sep. 18, 2026), https://tinyurl.com/mwcf9f63 (Bitnomial Submission No. 2026-107); Bitnomial Exchange, LLC, Submission No. BTNL-2026-115 (Sep. 18, 2026) (Bitnomial Submission No. BTNL-2026-115), https://tinyurl.com/8kmxetjs; KalshiEX LLC Submission (Sep. 18, 2026) (Kalshi Submission), https://tinyurl.com/y6wurh4e.

[67] Commenters, including the Alliance, Nasdaq, and Cboe, have urged the SEC to abrogate the filings because the products are security-based swaps, not security futures. *See supra* nn.3, 10-11, 18; Letter from Tyler Gellasch, President & CEO, Healthy Markets Ass'n, to Vanessa A. Countryman, Sec'y, SEC, and Christopher Kirkpatrick, Sec'y, CFTC, re Filings Related to the Listing and Trading of So-Called Perpetual Futures Contracts in U.S. Public Equity Securities (Oct. 29, 2026) ("Healthy Markets Letter").

reflecting gains and losses as the price of Apple stock moves, and the long and short sides exchange recurring "funding" payments based on the gap between the perpetual's price and the price of Apple shares to ensure the perpetual's price tracks the spot price. *See* Coinbase Submission 5, 8-9 ("Depending on whether the Contract trades above or below the Reference Security's spot price, longs pay shorts or shorts pay longs, respectively."); *see also, e.g.*, Bitnomial Submission 4; Kalshi Submission, App. A at 1. There is no scheduled expiration or final settlement date. Coinbase Submission 6; Bitnomial Submission 4; Kalshi Submission, App. A at 3. As discussed above, a perpetual derivative based on an individual stock meets each component of the security-based swap definition and is not a security future. *See* 7 U.S.C. § 1a(44), (47)(A)(iii), (B)(i); 15 U.S.C. § 78c(a)(68)(A).

111. The applicants themselves tout the distinction between the perpetuals and true futures contracts. Coinbase states that an equity perpetual "eliminates the roll cost and roll-date basis risk" associated with rolling a position in a dated future. Bitnomial states that its Alphabet perpetual provides exposure "without repeatedly rolling an expiring futures position." And Kalshi calls its products "structurally superior to a strip of dated futures" because they eliminate roll costs and "concentrate[] liquidity in a single instrument rather than fragmenting it across tenors."[68]

**B. The November 3 CFTC Stock Perpetual Approvals.**

112. The CFTC did not issue notices of non-approval of the applications within the regulatory review period, extend the review period, or request a

[68] Coinbase Submission, *supra* n.35, at 4–5; Bitnomial Submission No. BTNL-2026-115, *supra* n.66, at 3; Kalshi Submission, *supra* n.66, at 3–4.

jurisdictional determination from the SEC under 15 U.S.C. § 8306. Accordingly, on November 3, 2026, the applications were deemed approved by the CFTC. 17 C.F.R. §§ 40.3(d)(1), 40.5(d)(1), 41.23(b). As discussed above, that approval constitutes final agency action and permits the platforms to immediately start trading. *See* Exhibit 1 ("Today, perpetual futures contracts on individual equity securities . . . can begin trading for the first time on CFTC-registered exchanges.").

113. This momentous decision allows, for the first time, CFTC-regulated trading platforms to offer perpetual derivatives on single stocks without complying with Congress's requirements for security-based swaps, including directives limiting the offering of security-based swaps to retail investors. 15 U.S.C. §§ 77e(e), 78f(l).

114. The CFTC issued no written order explaining why these products qualify as security futures rather than security-based swaps. Nor did it acknowledge its longstanding prior treatment of perpetual derivatives as "swaps" or provide a reasoned explanation for its change in position. And, despite previously acknowledging that these products would benefit from further CFTC and SEC review, it allowed these products to be approved simply by letting a regulatory clock expire. The CFTC has not provided any reasoned explanation for how the trading of these products is consistent with Congress's framework.

115. The CFTC took this unreasoned action despite being well aware of the concerns of approving single-stock perpetuals to trade on CFTC-regulated platforms. Commenters, including the Alliance and Alliance members, explained to the CFTC that single-stock perpetuals do not meet the statutory definition of a security future,

that approving single-stock perpetuals as "security futures" would represent an unexplained reversal of the CFTC's longstanding position, and that permitting single-stock perpetuals to trade as security futures would undermine the investor protections and threaten the integrity of U.S. equity markets.[69] More generally, leading exchanges, associations, and members of Congress raised concerns of allowing single-stock perpetuals to be made available to U.S. investors on CFTC-regulated platforms.[70] The CFTC nonetheless plowed ahead, allowing single-stock perpetuals to trade on CFTC-regulated platforms for the first time without a written order.

## VI. The CFTC's Unlawful Actions Will Cause Immediate and Irreparable Harm to the Alliance's Members and the Public

### A. The Alliance's Members Will Be Immediately and Irreparably Harmed.

116. The Alliance's membership spans the regulated ecosystem through which U.S. stocks are traded, executed, and priced, and includes SEC-registered national securities exchanges and SEC-regulated broker-dealers. As a result of the unlawful Stock Perpetual Approvals, Alliance members face imminent diversion of trading and revenue and lost customers and goodwill. For exchanges, each single-stock perpetual executed on one of the CFTC-regulated platforms is a transaction and

[69] *See, e.g.*, Letter from Cboe Global Markets, Inc. to CFTC, Requests for Commission Approval of Single-Stock Perpetual Contracts as Security Futures Products Under CFTC Regulation 41.23(b) — Coinbase Derivatives, LLC; KalshiEX LLC; Bitnomial Exchange, LLC; North American Derivatives Exchange Inc., at 2-3 & n.4 (Oct. 30, 2026); Letter from Capital Markets Alliance to CFTC, File No. SR-KALSHIEX-2026-02; File No. SR-COIN-2026-002; File No. SR-BTNL-2026-001; File No. SR-OGM-2026-001; and Joint Request for Comment on Further Definition of "Swap" and "Security-Based Swap" and on Alternative Compliance (Nov. 2, 2026); Healthy Markets Letter, *supra* n.67.

[70] *See, e.g.*, Sherman Letter, *supra* n.3; Britt Letter, *supra* n.3; Healthy Markets Letter, *supra* n.67.

revenue that bypasses the exchange. For broker-dealers, each diverted transaction is a customer order lost to platforms that operate outside the full regulatory authority of the SEC. These losses begin the moment trading begins and compound as liquidity concentrates on the CFTC-regulated platforms—precisely the result the applicants say their products are designed to produce.

117. Those injuries are irreparable. The APA waives sovereign immunity for claims seeking relief "other than money damages," 5 U.S.C. § 702, and the Alliance's members have no damages remedy against Defendants for their lost transaction fees or other lost revenue. *See Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 260–61 (1999). Monetary loss is irreparable where sovereign immunity leaves no means to recoup it. *Ohio v. EPA*, 603 U.S. 279, 291-92 (2024) (citing "nonrecoverable" monetary harm as irreparable harm); *United States v. New York*, 708 F.2d 92, 93–94 (2d Cir. 1983) (per curiam); *New Jersey v. U.S. Dep't of Transp.*, No. 26-cv-939 (JAV), slip op. at 9 (S.D.N.Y. Feb. 6, 2026), ECF No. 45. A later judgment cannot recreate fee-generating trades executed elsewhere during the period before judgment. Vacating the approvals and enjoining Defendants from giving them effect is necessary to prevent those injuries.

### B. The Approvals Threaten Immediate, Irreparable Harm to Retail Investors, the Markets, and the Public.

118. The Stock Perpetual Approvals permit perpetual derivatives on individual stocks to be traded to U.S. retail investors without the protections Congress mandated for security-based swaps. Through erroneous labels, the CFTC has opened

retail markets to these securities products without the disclosure, market-structure, and oversight safeguards Congress prescribed.[71]

119. The CFTC's unlawful action threatens investors and the markets. For example, under the erroneous label of "security futures," the platforms propose a minimum unhedged margin of approximately 15% to 15.5% for the single-stock perpetuals, meaning that an investor's $1,000 controls roughly $6,450 to $6,667 in stock price exposure. In offering perpetuals on other assets, Kalshi has advertised the leverage that customers can obtain and displayed a leaderboard of the largest open positions.[72] Leverage magnifies gains, but it also magnifies losses. A relatively modest move against the customer can wipe out the posted margin and trigger a margin call or forced liquidation—even if the stock later recovers. Market stress that originates in perpetual trading could create forced selling, hedging pressures, volatility, and funding demands that harm investors and spill into the underlying equity markets.

120. The risk does not stop with the customer. Commenters have warned that a parallel market in stock substitutes can siphon liquidity from stocks and listed options, impair price discovery on the registered exchanges whose prices serve as reference points upon which market participants rely, and open new avenues for cross-market manipulation. Those effects would fall on Alliance members and their members that hold and trade U.S. stocks—including pension funds and asset managers—whether or not they ever trade a perpetual contract. Commenters observed that exchange-established prices anchor trading, compensation, index inclusion, margin

[71] Kalshi, *What Are Perpetual Futures?, supra* n.32.
[72] Kalshi, US500 Perpetual, https://tinyurl.com/h5ra2a9m (last visited Nov. 3, 2026).

calculations, and corporate transactions, and warned that parallel channels for equivalent securities exposure across disparate regulatory frameworks threaten the reliability of those benchmarks.[73] The Commissions asked about these very threats to "liquidity formation, price discovery, and hedging activity" in June, 91 Fed. Reg. at 37,876, but the CFTC let the approvals take effect without providing any answer or analysis.

121. The Stock Perpetual Approvals prepare the way for additional CFTC platforms to list these products. On September 24, 2026, OG.com Markets filed a product submission covering perpetual security futures on individual stocks.[74] Absent relief, filing after filing can become approval by inertia, allowing for U.S. investors to access single-stock perpetuals before the CFTC has issued a reasoned classification determination, and contrary to Congress's statutory framework.

122. Once trading of single-stock perpetuals begins, it will also be difficult to unwind if a court were to later hold the Stock Perpetual Approvals unlawful.[75] Any halt to trading would require the platforms and customers to address open positions, potentially through forced closing, transfer, or another wind-down mechanism. The operational complexity and potential market disruption will only increase as the number and size of open positions grow.

---

[73] *See* Nasdaq Cmt. 4.

[74] OG.com Markets Submission No. 2026-10 (Sep. 24, 2026), https://tinyurl.com/3yd3b49a.

[75] Letter from Katie Boyd Britt, U.S. Senator, to Paul S. Atkins, Chair, SEC, at 1-2 (Oct. 29, 2026), https://tinyurl.com/4wkzhjst (urging resolution of "classification questions *before* widespread retail trading begins" on "perpetual derivatives tied to U.S. stocks" and noting "potential harm to investors and markets if these products begin trading and a court subsequently determines that they have been improperly classified" (emphasis added)).

## COUNT I
## Violation of the Administrative Procedure Act: Arbitrary and Capricious

123. Plaintiff realleges all allegations contained in the preceding paragraphs and incorporates them herein by reference.

124. The APA prohibits the CFTC from acting in a manner that is arbitrary or capricious or not otherwise in accordance with law. 5 U.S.C. § 706(2)(A).

125. The arbitrary-and-capricious standard requires that agency action "be reasonable and reasonably explained." *Hadwan v. U.S. Dep't of State*, 139 F.4th 209, 221 (2d Cir. 2025) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court reviewing agency action must "be certain that an agency has considered all the important aspects of the issue and articulated a satisfactory explanation for its action." *Kakar v. USCIS*, 29 F.4th 129, 135 (2d Cir. 2022). And the court "generally must assess the lawfulness of an agency's action in light of the explanations the agency offered for it rather than any *ex post* rationales a court can devise." *Id.* at 132.

126. The Stock Perpetual Approvals are arbitrary and capricious because the Stock Perpetual Approvals dramatically change the status quo and upend the regulatory regime that Congress enacted, but the CFTC provided no reasoned explanation for its momentous decision. The CFTC allowed perpetual derivatives on single securities to be listed for trading on DCMs as security futures, for the first time, "without any explanation or discernible reasoning" as to how that decision comports with Congress's statutory definitions. *Brotherhood of Locomotive Eng'rs & Trainmen v.*

*Federal R.R. Admin.*, 972 F.3d 83, 115 (D.C. Cir. 2020). Instead of a reasoned explanation for its consequential decision, the agency has left "a total explanatory void." *Id.* at 117. The CFTC did not explain, for example, how the contracts satisfy the statutory security futures definition when they lack any final settlement date.

127. That failure is especially unreasonable because the Stock Perpetual Approvals rubber-stamped the applications of self-interested private parties. Courts have recognized that it is arbitrary and capricious for an agency to issue a decision that uncritically accepts the "self-serving views of [a] regulated entity" or parrots a regulated entity's reasoning. *Cboe Futures Exch., LLC v. SEC*, 77 F.4th 971, 978-79 (D.C. Cir. 2023) (explaining that an agency must "critically review[]" and adopt a regulated entity's submissions or "perform[] its own" analysis); *Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 447 (D.C. Cir. 2017) (similar). Worse than that here, the CFTC issued no written order or reasoned explanation at all, allowing the applications to be deemed approved based on the applicants' say-so that the contracts are security futures.

128. Under the CEA, the CFTC is directed to approve a new contract "unless the Commission finds" that it would violate the statute or regulations. 7 U.S.C. § 7a-2(c)(5)(B). To fulfill that responsibility and satisfy the APA's arbitrary-and-capricious standard, the CFTC was required to "actually scrutinize" the applications, *see Christ the King Manor, Inc. v. HHS*, 730 F.3d 291, 312-13 & n.23 (3d Cir. 2013), and make its *own* reasoned "find[ings]" for treating the contracts as security futures,

*Susquehanna,* 866 F.3d at 447. The CFTC "abdicated that responsibility" and simply blessed the applicants' self-serving assertions. *Id.* at 446 (quotation marks omitted).

129. The Stock Perpetual Approvals are independently arbitrary and capricious because the CFTC failed to acknowledge, much less reasonably explain, its change in position. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). When an agency changes positions, it must "display awareness" that it is doing so and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

130. As discussed above, the CFTC previously took the position—and pursued enforcement actions and entered consent orders—on the understanding that perpetual derivatives with no "pre-determined expiration date" and recurring funding payments, but no transfer of the underlying asset, are "swaps." Compl. ¶¶ 62-64, *CFTC v. Zhao*, No. 23-cv-1887 (N.D. Ill. Mar. 27, 2023), ECF No. 1; *see also* Consent Order for Permanent Injunction 8, *CFTC v. Zhao*, No. 23-cv-01887 (N.D. Ill. Dec. 14, 2023), ECF No. 80 ("Binance's perpetuals are swaps."). Perpetuals referencing a single stock are therefore security-based swaps. But the CFTC has now changed course, permitting perpetual derivatives to be classified as futures and perpetual derivatives on single securities to be classified as security futures. The agency has displayed no awareness of or offered an explanation for its change of position. It has not attempted to reconcile its prior position with its new classification of these contracts. It simply "depart[ed] from [its] prior policy *sub silentio*," in violation of the APA. *Fox Television*, 556 U.S. at 515.

131. The Stock Perpetual Approvals are also independently arbitrary and capricious because the CFTC "entirely failed to consider an important aspect of the problem" in allowing these contracts to list as security futures. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In its June 3 Policy Statement, the CFTC stated that "[p]erpetual contracts raise novel and complex questions relating to market structure, customer protection, resilience during periods of market stress, and consistency" with the principle "that a DCM list only those contracts that are not readily susceptible to manipulation." 91 Fed. Reg. 33,160, 33,161. The CFTC expressly noted that "perpetual contracts that reference equity securities," like those at issue here, "would benefit from review by the Commission and the U.S. Securities and Exchange Commission." *Id.* at 33,161 & n.5. In their joint request for comment, the CFTC and the SEC asked commenters "[w]hat effects" a cash-settled "perpetual" contract referencing an equity security could "have on liquidity formation, price discovery, and hedging activity, particularly with regards to the derivatives and underlying cash equity markets." 91 Fed. Reg. 37,873, 37,875–76. As discussed above, commenters raised to the Commissions the risks of perpetual derivatives on individual securities and their links to the securities markets.

132. The CFTC deemed the September 18 applications approved without addressing public comment or providing answers to the questions it had identified. The CFTC made no effort to "examine[] the relevant data and articulate[] . . . a rational connection between the facts found and the choice made." *New York Stock Exch. LLC*

*v. Sec. & Exch. Comm'n*, 962 F.3d 541, 553 (D.C. Cir. 2020) (quoting *State Farm*, 463 U.S. at 43); *id.* at 567 (Pillard, J., concurring) (explaining that "without a statement of the agency's position and plan we cannot distinguish a valid, nonarbitrary effort to protect investors from an invalid experiment"). Instead, the CFTC supplied no reasoned assessment of the consequences of permitting retail trading without the safeguards applicable to security-based swaps. It has not confronted how leveraged perpetuals trading could lead to mass liquidation events that could stoke market volatility. And it has not assessed how single-stock perpetuals trading could affect liquidity, price discovery, hedging, and susceptibility to manipulation in the underlying securities markets.

133. For each of these independently sufficient reasons, the Stock Perpetual Approvals are arbitrary and capricious and must be held unlawful and set aside under 5 U.S.C. § 706(2)(A).

**COUNT II**
**Violation of the Administrative Procedure Act:**
**Contrary to Law and in Excess of Statutory Authority**

134. Plaintiff realleges all allegations contained in the preceding paragraphs and incorporates them herein by reference.

135. The APA prohibits the Commission from acting contrary to law or in excess of statutory authority. 5 U.S.C. §§ 706(2)(A), (C).

136. The CFTC may not approve a new contract for listing if the contract violates the CEA or regulations. 7 U.S.C. § 7a-2(c)(5)(B); *see* 17 C.F.R. § 40.3(a)(4), (b).

137. The CFTC's Stock Perpetual Approvals are contrary to law because the single-security perpetual derivatives at issue here are not security futures.

138. The perpetual derivatives at issue are security-based swaps that Congress placed under the SEC's exclusive jurisdiction and regulatory framework. *See* 7 U.S.C. § 1a(47)(B)(x) (excluding "security-based swap" from "swap" definition); 15 U.S.C. §§ 78c(a)(68), 78o-10. The CFTC has no statutory authority to approve security-based swaps for trading on DCMs under the label of "security futures" outside of the comprehensive scheme Congress enacted for security-based swaps.

139. The perpetual derivatives are "swap[s]" because they "provide[] on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of . . . securities," "transfer, as between the parties to the transaction . . . the financial risk associated with a future change in any such value," and do not "convey[] a current or future direct or indirect ownership interest in" the asset. 7 U.S.C. § 1a(47)(A)(iii). And they are "security-based swap[s]" because they are a "swap" "based on" "a single security or loan, including any interest therein or on the value thereof." 15 U.S.C. § 78c(a)(68)(A); 7 U.S.C. § 1a(42).

140. The definition of "swap" excludes contracts that meet the definition of a security future, that is, a "contract of sale for future delivery of a single security or of a narrow-based security index, including any interest therein or based on the value thereof." 7 U.S.C. § 1a(44), (47)(B)(i). The perpetual derivatives at issue do not fall within this exclusion because they are not "contract[s] of sale for future delivery."

Perpetual derivatives, by design, do not have an expiration date and do not contemplate any fixed date for "future delivery."

141. Second Circuit precedent confirms that perpetuals are not futures. The Second Circuit has repeatedly explained that a "basic feature[]" of a commodity futures contract is that the seller agrees to "deliver the commodity at a fixed date in the future." *Leist v. Simplot*, 638 F.2d at 286; *accord In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d at 173-74; *Bein*, 728 F.2d at 111. "Swaps, unlike futures contracts, do not contemplate delivery of the underlying commodity." *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d at 175.

142. Because the challenged contracts are security-based swaps, not security futures, the Stock Perpetual Approvals are contrary to law and exceed the CFTC's statutory authority. This Court should hold them unlawful and set them aside under 5 U.S.C. § 706(2)(A), (C).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court:

A. Vacate and set aside the Stock Perpetual Approvals.

B. Declare that the perpetual derivatives on single-name securities at issue in the Stock Perpetual Approvals are "security-based swaps" under the Commodity Exchange Act and securities laws, and it is therefore unlawful for the CFTC to authorize DCMs to list such perpetual derivatives as security futures.

C. Grant a temporary restraining order, and preliminary and permanent injunctive relief, to prevent the CFTC from giving effect to the Stock Perpetual

Approvals and from permitting the contracts described in the September 18 applications to be listed as security futures products, whether by approval, by certification under 17 C.F.R. § 40.2 or § 41.23(a), or otherwise.

D. Stay the Stock Perpetual Approvals under 5 U.S.C. § 705 to preserve status and rights pending conclusion of these proceedings.

E. Award Plaintiff its reasonable costs, fees, and expenses, including attorneys' fees.

F. Award any other relief as this Court may deem just and proper.

Dated: November 3, 2026

Respectfully submitted,

/s/ *Matthew T. Murphy*
Matthew T. Murphy
VENABLE LLP
151 West 42nd Street
New York, NY 10036
Phone: 212-307-5500
mtmurphy@Venable.com

Megan Barbero (*pro hac vice pending*)
Courtney L. Dixon (*pro hac vice pending*)
Elizabeth M. Wilson (*pro hac vice pending*)
VENABLE LLP
600 Massachusetts Avenue, N.W.
Washington, DC 20001
Phone: 202-344-4000
mbarbero@venable.com

*Counsel for Plaintiff*