**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CAPITAL MARKETS ALLIANCE ASSOCIATION,<br><br>*Plaintiff*,<br><br>v.<br><br>COMMODITY FUTURES TRADING COMMISSION, et al.,<br><br>*Defendants*. | Civil Action No. 26-cv-9608 |

**DECLARATION OF ROBERT HOCKING**

I, Robert Hocking, pursuant to 28 U.S.C. § 1746, do hereby state and declare as follows:

1. My name is Robert Hocking. I am over the age of eighteen and competent to make this declaration. All facts stated herein are based on my personal knowledge, including knowledge I have acquired through my role at Cboe Global Markets, Inc. (together with its U.S. exchange subsidiaries, Cboe), discussions with colleagues responsible for Cboe's U.S. equities and options exchanges, my review of Cboe's business records, and my review of the public filings and other documents described below.

2. I am Executive Vice President – Global Head of Derivatives of Cboe Global Markets, Inc., a position I have held since 2025. In that role, I lead the strategic direction and growth of Cboe's global derivatives business, overseeing a broad

portfolio that includes Cboe's U.S. options and futures markets, derivatives innovation and education, and market intelligence. I have worked in the U.S. securities and derivatives markets for approximately 25 years.

3. I submit this declaration in support of Plaintiff Capital Markets Alliance Association's Emergency Motion for Temporary Restraining Order, Preliminary Injunction, and 5 U.S.C. § 705 Stay.

**A. Cboe**

4. Cboe is a member of Plaintiff Capital Markets Alliance Association.

5. Cboe is a global derivatives and exchange network. In the United States, it operates four equities exchanges—Cboe BZX Exchange, Cboe BYX Exchange, Cboe EDGA Exchange, and Cboe EDGX Exchange—and four options exchanges—Cboe Options Exchange, Cboe C2 Options Exchange, Cboe BZX Options Exchange, and Cboe EDGX Options Exchange. Cboe Options Exchange is the largest options exchange in the United States. Each of these markets is a national securities exchange registered with the Securities and Exchange Commission (SEC). Cboe also operates Cboe Futures Exchange, a designated contract market (DCM) regulated by the Commodity Futures Trading Commission (CFTC).

6. Cboe's equities exchanges provide markets in National Market System (NMS) stocks and exchange-traded products. Its options exchanges list and trade options on individual stocks, exchange-traded products, and indexes. Single-stock options provide leveraged exposure to changes in a stock's price and are used for directional trading and hedging, among other purposes. Cboe earns transaction fees on the stocks

and options traded on its exchanges, and trading activity supports its market-data, connectivity, and related revenues.

7. As national securities exchanges, Cboe's U.S. equities and options exchanges are self-regulatory organizations subject to the SEC's oversight under the Securities Exchange Act of 1934 (Exchange Act). Among other things, the Exchange Act requires that their rules be designed to prevent fraud and manipulation and protect investors and the public interest; their fees be reasonable and equitably allocated; and their proposed rule changes be filed with the SEC, published for public comment, and subject to SEC review. Orders and trades on Cboe's securities exchanges are reported to the Consolidated Audit Trail and other securities-market reporting and surveillance systems. Options on an individual stock may be listed only if the stock and the option satisfy SEC-approved listing standards, and every listed-options transaction is cleared through a clearing agency registered with the SEC.

### B. The CFTC's Approval of Single-Stock Perpetuals

8. I understand that on November 3, 2026, applications filed by KalshiEX LLC (Kalshi), Coinbase Derivatives LLC (Coinbase), and Bitnomial Exchange LLC (Bitnomial) to list "perpetual" contracts on single stocks as "security futures" were deemed approved by the CFTC. I refer to those approvals as the "Stock Perpetual Approvals."

9. I have reviewed the applications filed by Kalshi, Coinbase, and Bitnomial. Although the applications differ with respect to some details, the contracts share the same key features. Each contract gives its holder continuous cash-settled exposure to

changes in the price of an individual stock or other referenced security without giving the holder shares, voting rights, or any other ownership interest in that security. Each contract has no scheduled expiration or final-settlement date and uses recurring payments between long and short positions purportedly designed to keep the contract's price aligned with the price of the referenced security.

10. The applications collectively cover dozens of contracts tied to individual stocks, including stocks issued by Apple, Alphabet, and Microsoft—stocks that trade on Cboe's equities exchanges and on which Cboe's options exchanges list actively traded options. Coinbase and Kalshi state that they intend to list their contracts shortly after CFTC approval, and Bitnomial states that it will announce a first trading date once the applicable approval and initial-listing requirements are satisfied. The applications therefore contemplate that trading may begin shortly. I also understand that Kalshi began trading a perpetual contract on a broad-based stock index within days after that contract was deemed approved by the CFTC in October 2026.

11. The applications contemplate minimum unhedged margin levels of approximately 15% to 15.5% of a contract's current market value. At those minimum levels, a holder who posts $1,000 in margin can obtain roughly $6,450 to $6,667 in stock-price exposure. The platforms also promote the perpetual contracts as providing continuous exposure to the price changes of an underlying stock without owning the stock or rolling an expiring contract. In a traditional futures contract, by contrast, a trader seeking to maintain exposure to the asset beyond the contract's expiration date

generally must close the expiring position and establish a new position in a later-dated contract, which is a process known as "rolling."

12. On October 14, 2026, Cboe submitted a comment letter to the SEC regarding the parallel rule filings made on September 18, 2026 by Kalshi, Coinbase, and Bitnomial, as well as a later filing by another DCM. Cboe explained that the proposed contracts are security-based swaps rather than security futures and urged the SEC to summarily abrogate the proposed rule changes, require that they be refiled under Section 19(b)(1) of the Exchange Act, and disapprove them. Cboe also raised concerns about unequal listing standards, competitive effects, and gaps in coordinated surveillance that could make manipulation and insider trading more difficult to detect. A true and correct copy of that letter is attached as Exhibit A. On October 30, 2026, Cboe submitted a comment letter to the CFTC explaining why the proposed contracts are security-based swaps rather than security futures and urging the CFTC to deny all four requests. A true and correct copy of that letter is attached as Exhibit B.

### C. Imminent Harm to Cboe

13. The Stock Perpetual Approvals threaten immediate and continuing competitive and operational harm to Cboe's equities and options exchanges.

14. A single-stock perpetual contract is not identical to a stock or listed option. But, as a single-stock derivative, a perpetual contract can serve some of the same trading objectives by providing leveraged directional exposure to, or a hedge against, changes in the price of an individual stock. The applicants emphasize that the

perpetual contracts have no scheduled expiration, eliminate the need to roll an expiring contract, and are designed to concentrate liquidity in a single instrument. I therefore expect some investors who otherwise would trade the underlying stock or a listed option to choose a single-stock perpetual contract instead.

15. Cboe's exchanges compete with other national securities exchanges for order flow from broker-dealers, market makers, and other market participants. When activity that otherwise would enter the national securities markets is diverted to a different platform, Cboe loses the opportunity to compete for and execute its share of that activity. Given the breadth and scale of Cboe's equities and options markets, if perpetual contracts are permitted to trade on other venues as security futures, I expect that some of the trading activity in perpetual contracts will consist of activity that otherwise would have been executed on a Cboe exchange. Such diverted trading activity would result in lost transaction fees and reduce the trading activity that supports Cboe's market-data, connectivity, and related businesses.

16. Cboe welcomes competition on lawful terms and itself operates markets regulated by both the SEC and the CFTC. Its concern is not lawful competition from futures markets or financial innovation, but instead that the approved perpetual contracts will compete for trading activity in derivatives tied to individual stocks under a materially different regulatory framework and outside the scheme that Congress designed. Although the DCMs listing these perpetual contracts are subject to the Commodity Exchange Act and the more limited requirements applicable to security futures offered for trading on DCMs, they are not subject to the full set of

Exchange Act requirements that govern national securities exchanges such as Cboe's equity and options exchanges.

17. If the single-stock perpetual contracts were classified as security-based swaps, they would fall under the SEC's exclusive jurisdiction and could be offered to retail investors only on SEC-regulated exchanges subject to the Exchange Act's full requirements. They would also be subject to applicable registration requirements for securities under the Securities Act of 1933. Treating the perpetual contracts as "security futures" allows the DCMs to list them under procedures that do not apply to security-based swaps. And it allows them to do so under procedures that should not apply. A securities exchange proposing to list and trade a new product must file the proposed rule change with the SEC and, where required, await an SEC order approving the rule change. The DCMs instead filed with the CFTC for approval, and the CFTC's rules permitted the applications to be deemed approved after the 45-day review period lapsed, without any written decision.

18. The difference in regulatory approaches is particularly important for listing and maintenance standards. As registered national securities exchanges, Cboe's equities and options exchanges must comply with the Exchange Act's full suite of requirements and conditions. Every single-stock option listed on a Cboe options exchange has a defined expiration and final settlement. An investor who seeks to maintain comparable derivative exposure after a dated option expires must take action at expiration and establish a new position. And if an underlying stock no longer

satisfies applicable maintenance standards, the exchange stops listing new series and may restrict trading, while existing options run off as they expire.

19. The DCMs approved to list single-stock perpetual contracts as "security futures" are not subject to those same requirements, and the CFTC's approval allows them to offer continuing exposure to an individual stock under a regulatory scheme unsuited for regulating securities. As discussed above, perpetual contracts have no scheduled expiration, allowing an investor to maintain leveraged exposure indefinitely. Moreover, as Cboe explained in its October 14 letter, at least some of the applicants' proposed listing standards would allow continued trading during a cure period or would not require the underlying security to remain an NMS stock or its issuer to remain current in its periodic reporting.

20. Cboe's exchanges compete on the basis of liquidity, execution quality, technology, and fees. Diversion of trading activity to the DCMs will reduce the opportunity to build liquidity and depth on Cboe's markets. Because liquidity attracts additional liquidity, even an initially modest diversion can compound over time, making Cboe's markets less attractive to market participants and causing losses of market share, customer relationships, and goodwill. The resulting harm is not limited to a scenario in which the challenged products attract sustained trading. Based on my experience, if retail investors take positions in single-stock perpetuals and then suffer substantial losses, forced liquidations, or other adverse outcomes and leave the trading platforms, they may avoid derivatives trading generally, even if other

products are offered on responsible terms and consistent with applicable regulatory requirements.

21. As a self-regulatory organization (SRO), Cboe must surveil trading on its exchanges to detect and deter manipulation and other unlawful trading activity. Trading in the single-stock perpetual contracts will increase the surveillance complexities for Cboe and other SROs while creating greater risks that trading activity in these products could undermine the integrity of prices established on securities markets, including Cboe's markets. Effective surveillance cannot be confined to transactions executed on a Cboe exchange, when activity in other markets may influence or move prices on Cboe's markets. The single-stock perpetual contracts derive their value from the stocks that trade on Cboe's exchanges, and single-stock perpetual positions are likely to be hedged through transactions in the underlying stocks or related listed options. To effectively perform market surveillance, Cboe will therefore need timely and granular order and trade information about related perpetual activity.

22. Orders and trades in stocks and listed options are reported to the Consolidated Audit Trail, allowing Cboe, other exchanges, the Financial Industry Regulatory Authority (FINRA), and the SEC to view related securities-market activity across all registered national securities exchanges and in the over-the-counter market. Orders and trades in single-stock perpetual contracts will not be captured in that system. Nor, to my knowledge, will they be captured in any equivalent consolidated system that links order and trade activity across the approved DCMs and the securities

markets. Instead, they will be captured in a more fragmented manner through separate DCM audit trails and applicable CFTC reporting systems. This fragmentation will make coordinated or manipulative activity across the perpetual and securities markets more difficult for Cboe and other regulators to detect.

23. Moreover, market makers on Cboe's exchanges post firm quotations, which are an important component of market liquidity, and stand ready to trade at those prices. If the information gap increases the risk that they will trade against participants with better information about related activity in the perpetual markets, market makers may respond by widening their quoted spreads or reducing their quoted sizes, diminishing liquidity and execution quality on Cboe's markets.

24. To surveil its markets effectively, Cboe will need timely and sufficiently granular information from each DCM on which the single-stock perpetual contracts trade and will need to evaluate whether existing information-sharing arrangements provide that information in a form and on a timetable that permit effective cross-market surveillance. Even full participation in an information-sharing arrangement would not, by itself, give Cboe the same comprehensive view of orders and trades that the Consolidated Audit Trail provides across the equities and options markets. Because perpetual contracts may trade on multiple platforms, Cboe may need to obtain and reconcile separate data sets before it can link perpetual-side activity to orders and trades in the securities markets. Developing supplemental surveillance, data connections, and analytical processes will require immediate expenditures of

personnel and technology resources and still may not provide equivalent visibility into the related activity.

### D. These Harms Cannot Be Remedied After the Fact

25. Based on the statements in the applications, I expect trading in the contracts covered by the Stock Perpetual Approvals to begin shortly. A transaction diverted to a DCM cannot later be executed on a Cboe exchange, and the trading opportunity and associated revenue are permanently lost.

26. In my experience, once trading activity and liquidity develop on a new venue, that activity can be difficult to recover. The longer the challenged contracts trade, the more likely market participants are to establish trading patterns, technology connections, and relationships around those products. A later judgment cannot reconstruct the volume that moved during the litigation or fully restore resulting losses of market share, customer relationships, and goodwill. Nor can a later judgment restore future demand for lawfully regulated versions of perpetual products if investors have lost confidence in the product category in the meantime.

27. To my knowledge, the contracts covered by the Stock Perpetual Approvals were not available for trading in the United States on Kalshi, Coinbase, or Bitnomial before the Stock Perpetual Approvals took effect. The approvals permit those platforms to offer the challenged contracts in the United States for the first time.

### E. Harms to Investors and the Markets

28. Cboe is also concerned about the effects of these products on investors and the U.S. securities markets. The approved contracts allow holders to obtain continuous

leveraged exposure to a stock without owning it. And because perpetual contracts eliminate the need to roll positions to maintain exposure, they make it easier for investors to hold leveraged positions over extended periods, increasing those investors' exposure to market volatility and to substantial and unpredictable losses. Leverage magnifies losses as well as gains, and a relatively small adverse price movement may trigger a margin call or forced liquidation. In a stressed market, forced liquidations and rapid rebalancing in the perpetual market can generate abrupt hedging or deleveraging transactions in the underlying stocks and related options, potentially amplifying volatility.

29. Cboe's concerns are not limited to holders of the perpetual contracts. Investors who trade on Cboe's markets rely on liquid markets, reliable prices, and effective cross-market surveillance. If trading in single-stock perpetual contracts diverts liquidity from stocks or listed options, causes market makers to quote wider bid-ask spreads or smaller sizes, increases investors' transaction costs, impairs price discovery, increases volatility, or creates gaps in the detection of related cross-market activity, investors who never trade a perpetual contract may nevertheless bear the consequences.

30. In a stressed market, losses and liquidity demands arising from widespread, leveraged perpetual positions could also pose a threat to broader financial stability in the securities markets.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: November 3, 2026

Robert Hocking