433 W Van Buren St.
Chicago, IL
60607
United States

cboe.com

October 14, 2026

**VIA ELECTRONIC SUBMISSION**

Ms. Vanessa Countryman
Secretary, Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-1090

**Re: SR-KALSHIEX-2026-002; SR-COIN-2026-002; SR-BTNL-2026-001; SR-OGM-2026-001**

Dear Ms. Countryman:

Cboe Global Markets, Inc. ("Cboe") respectfully submits this letter to the Securities and Exchange Commission ("SEC" or "Commission") regarding four proposed rule changes that would permit the listing for trading as security futures certain single-stock perpetual contracts on individual equity securities ("Stock Perpetuals"). Stock Perpetuals, however, are not security futures. Cboe therefore respectfully urges the Commission to abrogate each of the proposed rule changes, require that they be refiled under Section 19(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and disapprove them.

Between September 18 and October 2, 2026, Bitnomial Exchange, LLC, Coinbase Derivatives, LLC, KalshiEX LLC, and the North American Derivatives Exchange Inc. (together, "the DCMs") filed notice of proposed rule changes that they have filed with the Commodity Futures Trading Commission ("CFTC") seeking approval to list for trading Stock Perpetuals.[1] Because the DCMs are registered with the CFTC as designated contract markets and recently filed notice registrations to become security futures exchanges, their proposed rule changes are not by default subject to the usual Commission review and approval procedure to which most proposed rule changes are subject under Section 19(b)(1) and (2) of the Exchange Act.[2] Nonetheless, at any time within 60 days of CFTC approval of each of these proposed rule changes, the SEC, after consultation with the CFTC, may require each DCM to refile its proposed rule changes under Section 19(b)(1) by summarily abrogating the proposed rule change if it appears that the proposed

1 <u>See</u> Securities Exchange Act Release No. 106421 (Sept. 18, 2026), 91 FR 60438 (Sept. 23, 2026) ("Bitnomial Filing"); Securities Exchange Act Release No. 106420 (Sept. 18, 2026), 91 FR 60448 (Sept. 23, 2026) ("CDE Filing"); Securities Exchange Act Release No. 106422 (Sept. 18, 2026), 91 FR 60467 (Sept. 23, 2026) ("Kalshi Filing"); Securities Exchange Act Release No. 106521 (Sept. 29, 2026), 91 FR 62786 (Oct. 2, 2026) ("Nadex Filing").

2 <u>See</u> 15 U.S.C. §§ 78f(g)(4)(B), 78s(b)(7).

rule change unduly burdens competition or efficiency, conflicts with the securities laws, or is inconsistent with the public interest and protection of investors.[3]

The filings here merit Commission review by having the DCMs refile the proposed rule changes under Section 19(b)(1). First, it appears that the proposed rule changes conflict with securities laws. The proposed rule changes rest on the premise that Stock Perpetuals are "security futures," but the securities laws define a "security future" as a contract "for future delivery."[4] As described further below, the Stock Perpetuals do not meet that definition because (1) they contemplate no future delivery, and (2) the periodic funding payments the DCMs propose to substitute for future delivery fall short of the statutory requirement.

Moreover, the proposed rule changes unduly burden competition or efficiency and are inconsistent with the public interest and protection of investors. The filings would effect a significant change in market structure: they would, for the first time, permit leveraged, perpetual exposure to individual U.S. equities to trade outside the regulatory framework that governs the equity and listed options markets—concerns that commenters and both agencies have already recognized.[5] When the SEC and the CFTC recently requested comment on "whether a cash-settled 'perpetual' contract referencing an equity security could be treated as a security future," market participants, including the Managed Funds Association, SIFMA, and ISDA, raised significant concerns in response. Competition on lawful terms is welcome, but a regulatory advantage obtained by misclassifying a product unduly burdens competition and efficiency. At a minimum, the agencies' request for comment and significant issues raised in response confirm that the DCMs' proposed rule changes raise significant issues that the Commission needs to consider.

---

3 See 15 U.S.C. § 78s(b)(7).

4 See 15 U.S.C. § 78c(a)(55)(A); 7 U.S.C. § 1a(44).

5 See Joint Request for Comment on Further Definition of "Swap" and "Security-Based Swap" and on Alternative Compliance, Securities Exchange Act Release No. 105735 (June 18, 2026), 91 FR 37873, 37876 (June 24, 2026) (the "Joint Request") ("For example, is there a need for greater clarity regarding whether a cash-settled 'perpetual' contract referencing an equity security could be treated as a security future? What effects could the introduction of such products have on liquidity formation, price discovery, and hedging activity, particularly with regards to the derivatives and underlying cash equity markets?"); see also Letter from Jennifer W. Han, Chief Legal Officer & Head of Global Regulatory Affairs, Managed Funds Association to Christopher Kirkpatrick, Secretary, CFTC & Vanessa A. Countryman, Secretary, SEC, at 8-12 (Sept. 14, 2026) ("MFA Letter") (responding to the Joint Request and discussing the potential concerns with treating perpetual contracts on equity securities as security futures products), available at https://www.sec.gov/comments/S7-2026-21/s7202621-1050039-3579266.pdf; Letter from Kyle Brandon, Managing Director, Head of Derivatives Policy, SIFMA, Christopher Young, Head of U.S. Public Policy, ISDA, and William C. Thum, Managing Director and Associate General Counsel, SIFMA AMG, to Christopher Kirkpatrick, Secretary, CFTC & Vanessa A. Countryman, Secretary, SEC, at 7-11 (Aug. 24, 2026) ("SIFMA/ISDA Letter") (same), available at https://www.sec.gov/comments/S7-2026-21/s7202621-1015999-3265808.pdf.

Section 6(h)(3)(I) of the Exchange Act requires that "procedures be in place for coordinated surveillance among the market on which the security futures product is traded, any market on which any security underlying the security futures product is traded, and other markets on which any related security is traded to detect manipulation and insider trading." Classifying Stock Perpetuals as security futures would undercut that requirement by removing them from the surveillance infrastructure of the securities markets. Most notably, Stock Perpetual order and trade data would fall outside the Consolidated Audit Trail, allowing activity that can directly affect the equity markets to occur beyond the key surveillance mechanism that protects those markets.[6] And because Stock Perpetual positions will almost certainly be hedged in the securities markets, the hedges would be reported and surveilled while the related Stock Perpetual transactions would not, creating a reporting gap and a risk of undetected cross-market manipulation. ISG membership, which the Commissions treated as satisfying the coordinated surveillance requirement shortly after the adoption of the Commodity Futures Modernization Act of 2000 ("CFMA"), does not close that gap. These manipulation risks, which have been recognized since the adoption of the CFMA, are heightened by the perpetual nature of Stock Perpetuals, and were raised in Question 11 of the Joint Request, which remains open and should be addressed before four security futures exchanges begin offering Stock Perpetuals to retail investors.

At minimum, these significant issues warrant the full Section 19(b) process, not notice filings.

## I. Stock Perpetuals are not "security futures" under the CEA or the Exchange Act.

### *A. Stock Perpetuals contemplate no future delivery.*

Both the Exchange Act and the Commodity Exchange Act ("CEA") define "security future" as "a contract of sale for future delivery of a single security or of a narrow-based security index, including any interest therein or based on the value thereof."[7] The delivery requirement may be satisfied either by delivering the underlying security or by cash settlement, but the definition itself requires that there must be some "future delivery." Stock Perpetuals, by contrast, are, by design, perpetual: they have no final settlement date and never require delivery of, or final cash settlement against, the underlying security at any future time. A contract that never delivers a security or its cash equivalent is not a contract "for future delivery" of a security. Stock Perpetuals therefore are not security futures.

---

[6] Shortly after the CFMA's adoption, the SEC and CFTC explained that coordinated surveillance is "essential to detection of manipulation and insider trading" and interpreted the requirement to be met if a market is a Full Member of the Intermarket Surveillance Group ("ISG") or "has the ability to obtain all information that a Full Member of the ISG is currently able to obtain." *Cash Settlement and Regulatory Halt Requirements for Security Futures Products*, Securities Exchange Act Release No. 45956 (May 17, 2002), 67 FR 36740, 36750 (May 24, 2002). Since then, the Consolidated Audit Trail has become the comprehensive tool for surveilling orders and trades across the equities and options markets, available to FINRA, all national securities exchanges, and the SEC, but it would not capture Stock Perpetual activity.

[7] 15 U.S.C. § 78c(a)(55)(A); 7 U.S.C. § 1a(44).

This plain-language understanding of "security future" is consistent with longstanding judicial and administrative construction. Courts have long understood a futures contract as an agreement for delivery "on a date certain."[8] The Commission, too, has explained that a security future "creates an obligation either to purchase or sell the underlying securities at a specified future date."[9] Thus, even if "security future" could somehow be interpreted not to require agreement for delivery "on a date certain" (and it cannot), the Commission would need to acknowledge and provide a reasoned explanation for its change in position.[10]

*B. Funding payments are not tantamount to final settlement.*

Instead of providing for delivery or final settlement, the DCMs propose to rely on a "funding rate" mechanism, which delivers an ongoing exchange of payments based on the difference between the contract price and the price of the underlying security. That mechanism, however, is an insufficient substitute for final settlement. It does not create "[p]rice convergence with the underlying spot price at expiration," which the CFTC recently explained "is . . . inherent to the design of a traditional futures contract."[11] Instead, the funding rate mechanism simply transfers the economic risk of price changes in a single stock through recurring cash payments, without conveying any ownership of the underlying shares. Such a transfer of economic risk based on a single security is the defining feature of a security-based swap, not a security future.[12] Indeed, the CFTC itself previously described perpetual contracts as swaps in numerous prior enforcement actions. Stock Perpetuals cannot be forced into a definition that, by its terms, requires future delivery.

---

8 See, e.g., CFTC v. Erskine, 512 F.3d 309, 317 (6th Cir. 2008) (stating that a "futures contract" or "future," though "never precisely defined" is "generally understood to be an executory, mutually binding agreement providing for the future delivery of a commodity on a date certain where the grade, quantity, and price at the time of delivery are fixed") (emphasis added); see also id. at 323 (noting the "consistent theme" of six common elements among definitions of "futures contract" and including "at or before a stated future time" as one of those elements).

9 Commission Guidance on the Application of Certain Provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, and Rules Thereunder to Trading in Security Futures Products, Securities Exchange Act Release No. 46101 (June 21, 2002), 67 FR 43234, 43238 (June 27, 2002).

10 See, e.g., FDA v. Wages & White Lion Invs., L.L.C., 604 U.S. 542, 570 (2025).

11 CFTC, Policy Statement Concerning the Listing of Perpetual Contracts, 91 FR 33160, 33161 (June 3, 2026) ("CFTC Policy Statement").

12 See 15 U.S.C. § 78c(a)(68); see also 7 U.S.C. § 1a(47).

*C. The CFTC's recent approval of perpetual commodity futures does not authorize the SEC to rewrite the statutory definition of "security futures."*

The CFTC's recent determination that certain perpetual contracts may be listed as commodity futures—a term the CEA does not define—does not change this result.[13] That determination, which is currently subject to legal challenge,[14] says nothing about a term Congress expressly defined, and it cannot bind the SEC in applying a definition in the Exchange Act. "[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."[15] And the Supreme Court recently reminded agencies that "courts, not agencies, will decide 'all relevant questions of law' arising on review of agency action."[16] Whatever the policy merits of commodity perpetuals, the securities laws do not permit approval of Stock Perpetuals as security futures, and neither agency has authority to conclude otherwise.

Similarly, even if the CFTC approves the DCMs' proposed rule changes, CFTC approval does not alter the SEC's statutory obligation to consider whether the proposed rule changes should be abrogated and refiled under Section 19(b)(1). Congress defined "security future" in both the CEA and the Exchange Act, and the CFMA placed security futures under the joint jurisdiction of the SEC and the CFTC.[17] And the CFTC agrees that perpetual contracts referencing equity securities "would benefit from review" by the SEC.[18] Because it appears that the DCMs' proposed rule changes conflict with securities law, the Commission should abrogate each of the DCMs' proposed rule changes and require that they be refiled under Section 19(b)(1) of the Exchange Act.

## II. The filings do not satisfy the comparable listing standards requirement.

Even setting aside the definitional defect, the Exchange Act requires that an exchange's listing standards for security futures be no less restrictive than comparable listing standards for options traded on a national securities exchange.[19] Congress included this requirement so that security futures on individual equities would not become a less-regulated substitute for listed options.

The listing standards for Stock Perpetuals do not satisfy this requirement. As one example: No listed option on an individual equity security is perpetual; every listed option has a defined

---

13 See In the Matter of the Request for Approval by KalshiEX LLC of the BTCPERP Futures Contract (May 29, 2026).

14 See CME v. Selig, No. 1:26-cv-02157 (D.D.C.).

15 See Utility Air Regulatory Group v. EPA, 573 U.S. 302 (2014).

16 See Loper Bright Enterprises v. Raimondo, 603 U.S. 369, 392 (2024).

17 Pub. L. No. 106–554, Appendix E, 114 Stat. 2763 (2000).

18 CFTC Policy Statement, at 33161 n.5.

19 15 U.S.C. § 78f(h)(3)(C).

expiration and settles against the underlying at that date. That difference matters most after listing. When an underlying security no longer meets an options exchange's maintenance standards, the exchange stops listing new series and may restrict trading to closing transactions, and the existing series run off as they expire. A perpetual contract never runs off. KalshiEX LLC's proposed standards, for example, instead provide notice and a 90-day cure period during which trading continues as normal, and Coinbase Derivatives, LLC's proposed maintenance standards do not require that the underlying remain an NMS stock or that its issuer remain current in its periodic reporting. The result is that retail investors could hold leveraged exposure to individual equities that no longer satisfy the standards that would apply to comparable listed options. The DCMs do not explain how these features are no less restrictive than the standards that govern comparable equity options. At a minimum, that showing should be made through the full Section 19(b) process rather than through notice filings.

## III. Conclusion

The DCMs' proposed rule changes depend entirely on treating Stock Perpetuals as security futures. Because Stock Perpetuals do not meet the statutory definition of "security future" under either the Exchange Act or the CEA, and because the filings do not demonstrate compliance with the comparable listing standards requirement, the proposed rule changes conflict with the securities laws. Stock Perpetuals are, instead, security-based swaps subject to the Commission's jurisdiction. Additionally, the DCMs' proposed rule changes would unduly burden competition and efficiency and are inconsistent with the public interest and the protection of investors. Cboe therefore respectfully urges the Commission to summarily abrogate each of the proposed rule changes and require that they be refiled under Section 19(b)(1) of the Exchange Act.

Sincerely,

s/Patrick Sexton

Patrick Sexton
EVP, General Counsel, and Corporate Secretary
Cboe Global Markets, Inc.