Cboe

433 W Van Buren St.
Chicago, IL
60607
United States

cboe.com

October 30, 2026

**VIA ELECTRONIC SUBMISSION**

Mr. Christopher J. Kirkpatrick
Secretary
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581

**Re: Requests for Commission Approval of Single-Stock Perpetual Contracts as Security Futures Products Under CFTC Regulation 41.23(b) — Coinbase Derivatives, LLC; KalshiEX LLC; Bitnomial Exchange, LLC; North American Derivatives Exchange Inc.**

Dear Mr. Kirkpatrick:

Cboe Global Markets, Inc. ("Cboe") respectfully submits this letter to the Commodity Futures Trading Commission ("CFTC" or "Commission") regarding four requests for Commission approval to list for trading, as security futures products, certain single-stock perpetual contracts on individual equity securities ("Stock Perpetuals"). The requests depend entirely on the classification of Stock Perpetuals as security futures. They are not. Stock Perpetuals are security-based swaps, which fall outside the Commission's jurisdiction, and the Commodity Exchange Act ("CEA") provides no basis for the Commission to approve them. No approval, exemption, or interpretation by the Commission can cure that defect because only Congress can change statutory definitions. Cboe therefore respectfully urges the Commission to deny each request.

Between September 18 and October 2, 2026, Bitnomial Exchange, LLC, Coinbase Derivatives, LLC, KalshiEX LLC, and the North American Derivatives Exchange Inc. (together, "the DCMs") each requested that the Commission approve Stock Perpetuals for listing as security futures products pursuant to Section 5c(c) of the CEA and Commission Regulation 41.23(b), and each DCM filed corresponding notices with the Securities and Exchange Commission ("SEC") under Section 19(b)(7) of the Securities Exchange Act of 1934 (the "Exchange Act").[1] Because the

1 See Securities Exchange Act Release No. 106421 (Sept. 18, 2026), 91 FR 60438 (Sept. 23, 2026) ("Bitnomial Filing"); Securities Exchange Act Release No. 106420 (Sept. 18, 2026), 91 FR 60448 (Sept. 23, 2026) ("CDE Filing"); Securities Exchange Act Release No. 106422 (Sept. 18, 2026), 91 FR 60467 (Sept. 23, 2026) ("Kalshi Filing"); Securities Exchange Act Release No. 106521 (Sept. 29, 2026), 91 FR 62786 (Oct. 2, 2026) ("Nadex Filing").

DCMs are registered with the Commission as designated contract markets and have notice-registered with the SEC as national securities exchanges solely for the purpose of trading security futures products, their ability to list Stock Perpetuals under this framework depends on the products, in fact, being security futures.[2] Regulation 41.23(b) provides a path for Commission approval of security futures products; it does not authorize the Commission to approve, as security futures, contracts that do not, in fact, meet the statutory definition of a security future.

Each request rests on the premise that Stock Perpetuals are "security futures." But the CEA and the Exchange Act define a "security future" as a contract of sale "for future delivery."[3] As described further below, Stock Perpetuals do not meet that definition because (1) they contemplate no future delivery, and (2) the periodic funding payments the DCMs propose to substitute for future delivery fall short of the statutory requirement. After summarizing related market-structure, surveillance, and investor-protection concerns, this letter explains in Part I why Stock Perpetuals are not security futures and in Part II why, even if they could be considered security futures, the filings do not satisfy the comparable listing standards requirement.

In addition to the fact that Stock Perpetuals do not meet the statutory definition of security future, approval of the DCM requests to list and trade Stock Perpetuals would also have significant adverse consequences for market structure and investor protection. The requests would, for the first time, permit leveraged, perpetual exposure to individual U.S. equities to trade outside the regulatory framework that governs the equity and listed options markets—concerns that commenters and both agencies have already recognized.[4] When the Commission and the SEC recently requested comment on "whether a cash-settled 'perpetual' contract referencing an equity

---

2 See 15 U.S.C. §§ 78f(g)(4)(B), 78s(b)(7). The term "security futures product" is broader than (but includes) the term "security future." The Exchange Act defines "security futures product" to mean a security future or any put, call, straddle, option, or privilege on any security future. See 15 U.S.C. § 78c(a)(56); see also 7 U.S.C. § 1a(45).

3 See 15 U.S.C. § 78c(a)(55)(A); 7 U.S.C. § 1a(44).

4 See Joint Request for Comment on Further Definition of "Swap" and "Security-Based Swap" and on Alternative Compliance, Securities Exchange Act Release No. 105735 (June 18, 2026), 91 FR 37873, 37876 (June 24, 2026) (the "Joint Request") ("For example, is there a need for greater clarity regarding whether a cash-settled 'perpetual' contract referencing an equity security could be treated as a security future? What effects could the introduction of such products have on liquidity formation, price discovery, and hedging activity, particularly with regards to the derivatives and underlying cash equity markets?"); see also Letter from Jennifer W. Han, Chief Legal Officer & Head of Global Regulatory Affairs, Managed Funds Association, to Christopher Kirkpatrick, Secretary, CFTC & Vanessa A. Countryman, Secretary, SEC, at 8-12 (Sept. 14, 2026) ("MFA Letter") (responding to the Joint Request and discussing the potential concerns with treating perpetual contracts on equity securities as security futures products), available at https://www.sec.gov/comments/S7-2026-21/s7202621-1050039-3579266.pdf; Letter from Kyle Brandon, Managing Director, Head of Derivatives Policy, SIFMA, Christopher Young, Head of U.S. Public Policy, ISDA, and William C. Thum, Managing Director and Associate General Counsel, SIFMA AMG, to Christopher Kirkpatrick, Secretary, CFTC & Vanessa A. Countryman, Secretary, SEC, at 7-11 (Aug. 24, 2026) ("SIFMA/ISDA Letter") (same), available at https://www.sec.gov/comments/S7-2026-21/s7202621-1015999-3265808.pdf.

security could be treated as a security future" (the "Joint Request"), numerous trade associations representing a broad spectrum of different market participants, including the Managed Funds Association, SIFMA, and ISDA, raised significant concerns in response. Cboe welcomes competition, but that competition must operate within the law. The agencies' request for comment and the significant issues that have been raised by various commenters in response to that request underscore that the Commission should not approve the requests.

These concerns are structural, not merely a matter of labeling. A conventional security future has a fixed expiration date at which time the contract terminates through delivery or a final cash settlement and the holder's leverage resets. Stock Perpetuals have no such endpoint: a position may be held indefinitely, with funding payments continuously adjusting the economics of a trade that never terminates. The regulatory structure that was implemented to regulate security futures, notably the customer margin framework, was calibrated for a terminable instrument, not a perpetual one.

The mismatch also extends to customer disclosure. The uniform "Security Futures Risk Disclosure Statement" tells retail customers that "security futures contracts expire on a specific date" and that a person "cannot hold a long position in a security futures contract for an extended period of time"—statements that would be inaccurate for Stock Perpetuals. Indeed, at least one DCM markets Stock Perpetuals for precisely the opposite feature, as suited to traders "who want continuous exposure without managing contract cycles." Misclassification would also create uncertainty about how customer positions and assets are treated if an intermediary fails. Futures, security futures, and security-based swaps are each subject to their own customer protection and insolvency rules, and the DCMs propose to hold customer margin for Stock Perpetuals in futures accounts segregated under Section 4d of the CEA. If Stock Perpetuals are later determined to be security-based swaps, customers would not know in advance which regime governs their positions, and functionally identical products could receive fragmented treatment depending on the venue, the account type, or the timing of a court's classification ruling. That uncertainty is a further reason to resolve the classification question before, rather than after, these products are offered to retail customers.

Section 6(h)(3)(I) of the Exchange Act, with which the DCMs must comply as notice-registered security futures exchanges, requires that "procedures be in place for coordinated surveillance among the market on which the security futures product is traded, any market on which any security underlying the security futures product is traded, and other markets on which any related security is traded to detect manipulation and insider trading." The DCMs certify to the Commission that such processes are in place due to their membership in the Intermarket Surveillance Group ("ISG"); however, trading in the Stock Perpetuals would not be subject to current coordinated surveillance. Specifically, treating Stock Perpetuals as security futures would remove them from the surveillance infrastructure of the equities markets. For example, Stock Perpetual order and trade data would fall outside the Consolidated Audit Trail, allowing activity that can directly affect

the equity markets to occur beyond the key surveillance mechanism that protects those markets.[5] And because Stock Perpetual positions will almost certainly be hedged in the equity markets, the hedges would be reported and surveilled while the related Stock Perpetual transactions would not, creating a reporting gap and a risk of undetected cross-market manipulation.

ISG membership, which both the CFTC and SEC have historically treated as satisfying the coordinated surveillance requirement, does not close that gap. These manipulation risks have been recognized since the enactment of the Commodity Futures Modernization Act of 2000 ("CFMA"), are heightened by the perpetual nature of Stock Perpetuals, and were raised in Question 11 of the Joint Request.[6] These risks are a further consequence of treating a perpetual contract as a security future, and a further reason the Commission should not approve the requests.

Approval would also expose retail customers, and the DCMs themselves, to significant risk under the federal securities laws because Stock Perpetuals meet the definition of a security-based swap. Section 3(a)(14) of the Securities Act of 1933 exempts security futures products from registration, but it does not exempt security-based swaps, and the SEC's exemption from Exchange Act Section 12(g) registration likewise extends to security futures products, not security-based swaps. Security-based swaps may be offered to persons who are not eligible contract participants only on a national securities exchange registered under Section 6(a) of the Exchange Act; the DCMs are only notice-registered. If a court later determines that Stock Perpetuals are, and always were, security-based swaps, retail customers who purchased them could have rescission rights and other remedies, and the resulting dislocation would be difficult to unwind. Denying the requests now, rather than approving them and awaiting judicial resolution, avoids that harm.

---

5 Shortly after the adoption of the Commodity Futures Modernization Act in 2000 that legalized the trading of security futures products, the SEC and CFTC explained that coordinated surveillance is "essential to detection of manipulation and insider trading" and interpreted the requirement to be met if a market is a Full Member of the Intermarket Surveillance Group ("ISG") or "has the ability to obtain all information that a Full Member of the ISG is currently able to obtain." SEC & CFTC, Joint Final Rule, Cash Settlement and Regulatory Halt Requirements for Security Futures Products, 67 FR 36740, 36750 (May 24, 2002). Since then, the Consolidated Audit Trail has become the comprehensive tool for surveilling orders and trades across the equities and options markets, available to FINRA, all national securities exchanges, and the SEC, but it would not capture Stock Perpetual activity.

6 Question 11 of the Joint Request states: "Any contract of sale of a commodity for future delivery (or option on such a contract), as well as any security futures product, is excluded from the 'swap' definition. Is there a need for greater clarity from the Commissions regarding the treatment of futures, including security futures, in the context of innovative markets? For example, is there a need for greater clarity regarding whether a cash-settled 'perpetual' contract referencing an equity security could be treated as a security future? What effects could the introduction of such products have on liquidity formation, price discovery, and hedging activity, particularly with regards to the derivatives and underlying cash equity markets?"

These concerns all follow from the line Congress drew when it defined a security future by reference to future delivery. The Commission need not weigh them, however, because Stock Perpetuals are not security futures and the CEA therefore does not support their approval.

## I. Stock Perpetuals are not "security futures" under the CEA or the Exchange Act.

### A. Stock Perpetuals contemplate no future delivery.

Both the CEA and the Exchange Act define "security future" as "a contract of sale for future delivery of a single security or of a narrow-based security index, including any interest therein or based on the value thereof."[7] The delivery requirement may be satisfied either by delivering the underlying security or by cash settlement, but the definition itself requires "future delivery." Stock Perpetuals, by contrast, are, by design, perpetual: they have no final settlement date and never require delivery of, or final cash settlement against, the underlying security at any future time. A contract for an equity security that never delivers (and, in fact, is specifically designed never to deliver) the security or its cash equivalent is not a contract "for future delivery" of that security. Stock Perpetuals therefore are not security futures.

This plain-language understanding of "security future" is consistent with longstanding judicial and administrative construction. Courts have long understood a futures contract as an agreement for delivery "on a date certain."[8] The SEC, too, has explained that a security future "creates an obligation either to purchase or sell the underlying securities at a specified future date."[9] As noted above, the disclosure provided to retail investors similarly describes security futures as instruments with a specified expiration date.[10] Thus, even if "security future" could somehow be interpreted not to require agreement for delivery "on a date certain" (and it cannot), any agency departing from that settled understanding would need to acknowledge and provide a reasoned explanation for the change in position.[11]

---

7 15 U.S.C. § 78c(a)(55)(A); 7 U.S.C. § 1a(44).

8 See, e.g., CFTC v. Erskine, 512 F.3d 309, 317 (6th Cir. 2008) (stating that a "futures contract" or "future," though "never precisely defined," is "generally understood to be an executory, mutually binding agreement providing for the future delivery of a commodity on a date certain where the grade, quantity, and price at the time of delivery are fixed") (emphasis added); see also id. at 323 (noting the "consistent theme" of six common elements among definitions of "futures contract" and including "at or before a stated future time" as one of those elements).

9 Commission Guidance on the Application of Certain Provisions of the Securities Act of 1933, the Securities Exchange Act of 1934, and Rules Thereunder to Trading in Security Futures Products, Securities Exchange Act Release No. 46101 (June 21, 2002), 67 FR 43234, 43238 (June 27, 2002).

10 FINRA rules require that broker-dealers provide their customers with the current security futures risk disclosure statement at or prior to the time such customer's account is approved for trading security futures. FINRA Rule 2370(b)(11).

11 See, e.g., FDA v. Wages & White Lion Invs., L.L.C., 604 U.S. 542, 570 (2025).

### B. Funding payments are not tantamount to final settlement.

Instead of providing for delivery or final settlement, the DCMs propose to rely on a "funding rate" mechanism, which provides for an ongoing exchange of payments based on the difference between the contract price and the price of the underlying security. That mechanism, however, is an insufficient substitute for final settlement. It does not create "[p]rice convergence with the underlying spot price at expiration," which the Commission recently explained "is . . . inherent to the design of a traditional futures contract."[12] Instead, the funding rate mechanism simply transfers the economic risk of price changes in a single stock through recurring cash payments, without conveying any ownership of the underlying shares. Such a transfer of economic risk based on a single security is the defining feature of a security-based swap, not a security future. Nor are funding payments equivalent to the daily variation payments associated with ordinary futures. Variation payments settle gains and losses on a contract that still culminates in delivery or final settlement, whereas funding payments are offered in place of that culmination.[13]

Indeed, until its May 29, 2026 order approving the BTCPERP contract,[14] the Commission repeatedly adopted the position in federal court and administrative proceedings that perpetual contracts are swaps, including in its actions involving Binance, BitMEX, Mango Markets, Deridex, and KuCoin. The Commission is now being asked to depart from its own prior position. The Commission's original position was correct. But even assuming the Commission had the authority to revisit that position, it would need to acknowledge the change, explain its reasons, and address the significant issues raised by its new position. Among other issues, the Commission would need to address the conflict any new interpretation would raise with the SEC's interpretation of a security future described above and the resulting investor confusion that this conflict would cause.

### C. The Commission's security futures rules presuppose expiration.

The Commission's own regulations confirm that security futures are expiring instruments. Regulation 41.25(b)(3) requires position limits "applicable to positions held during the last three trading days of an expiring contract month," and contemplates deliverable supply "during the specified delivery period" and positions maintained "through expiration." And the joint final settlement requirements for cash-settled security futures products, set out in Regulation 41.25 and SEC Rule 6h-1, require the final settlement price to reflect the opening price of the underlying

---

12 CFTC, Policy Statement Concerning the Listing of Perpetual Contracts, 91 FR 33160, 33161 (June 3, 2026) ("CFTC Policy Statement").

13 See 15 U.S.C. § 78c(a)(68); see also 7 U.S.C. § 1a(47). For the Commission's prior characterization of perpetual contracts as swaps, see CFTC v. Zhao, No. 23-cv-1887 (N.D. Ill. Mar. 27, 2023); CFTC v. HDR Global Trading Ltd., No. 1:20-cv-08132 (S.D.N.Y. Oct. 1, 2020); CFTC v. Eisenberg, No. 1:23-cv-00173 (S.D.N.Y. Jan. 9, 2023); In re Deridex, Inc., CFTC Docket No. 23-42 (Sept. 7, 2023); CFTC v. Mek Global Ltd., No. 1:24-cv-02255 (S.D.N.Y. Mar. 26, 2024).

14 See In re Request for Approval by KalshiEX LLC of the BTCPERP Futures Contract (CFTC May 29, 2026) ("BTCPERP Order").

security. A contract with no final settlement date cannot meet that requirement in the ordinary course.

The DCMs' submissions illustrate the mismatch: KalshiEX LLC, for example, applies the "last three trading days" position limit to the three trading days preceding "any accelerated final settlement," an event that occurs only upon delisting. The DCMs nonetheless certify that their contracts comply with Regulation 41.25. A product that can satisfy the Commission's security futures rules only by reading these requirements out of them is not a security future.

### D. The Commission's approval of perpetual commodity futures does not extend to the statutory definition of "security future."

The DCMs rely heavily on the Commission's recent determination that certain perpetual contracts may be listed as commodity futures—a term the CEA does not define.[15] That determination, which is currently subject to legal challenge,[16] does not change this result. It says nothing about "security future," a term that Congress expressly defined in both the CEA and the Exchange Act and that the Commission therefore may not construe by analogy to an undefined term even though the phrase "future delivery" occurs elsewhere in the CEA. "[A]n agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate."[17] And the Supreme Court recently reminded agencies that "courts, not agencies, will decide 'all relevant questions of law' arising on review of agency action."[18] Even if the Commission's commodity-perpetual determination were ultimately sustained in the context of commodity futures, it would not follow that the same reasoning applies to security futures, which are independently defined by statute (in both the CEA and the Exchange Act) and raise distinct questions under the securities laws—indeed, security futures are "securities." The Commission itself recognized as much when it stated that perpetual contracts referencing equity securities "merit independent analysis and review."

### E. Stock Perpetuals are security-based swaps and fall outside the Commission's jurisdiction.

Because Stock Perpetuals are not security futures (or any other product subject to the Commission's jurisdiction), they fall outside the Commission's remit. The CFMA placed security futures—and only security futures—on single securities under the joint jurisdiction of the Commission and the SEC.[19] A contract on a single security that does not meet that definition is not brought within the CEA simply because a DCM labels it a security future, and the jurisdictional lines Congress drew cannot be modified by agency consent. The absence of future delivery is

---

15 _Id._

16 See Chi. Mercantile Exch. Inc. v. Selig, No. 1:26-cv-02157 (D.D.C. filed June 18, 2026).

17 Util. Air Regul. Grp. v. EPA, 573 U.S. 302, 328 (2014).

18 Loper Bright Enters. v. Raimondo, 603 U.S. 369, 392 (2024).

19 Pub. L. No. 106-554, app. E, 114 Stat. 2763.

inherent in the products' design, so no approval, exemption, or interpretation could bring them within the definition; only Congress could change it.

Rather than security futures, Stock Perpetuals are security-based swaps. A swap that is "based on a single security or loan, including any interest therein or on the value thereof" is a security-based swap.[20] Among other things, the CEA defines a "swap" to include the following:

> any agreement, contract, or transaction . . . that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more . . . securities . . . , or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset . . .[21]

This describes Stock Perpetuals and, as discussed above, Stock Perpetuals are not excepted from the definition of "swap" as security futures. The DCMs themselves acknowledge that Stock Perpetuals avoid classification as swaps and security-based swaps only if they qualify as security futures. Their reliance on the CEA's exclusion of security futures from the swap definition assumes its own conclusion: whether Stock Perpetuals are security futures is precisely the question at issue, and the exclusion cannot be invoked to answer it. As shown above, they are not: Stock Perpetuals transfer the economic risk of a single security through recurring payments, the hallmark of a security-based swap, which Congress committed to the SEC's jurisdiction. The Commission should accordingly honor the instructions in Section 712 of the Dodd-Frank Act to align with the SEC on products like these, including the requirement for the Commission to "consult and coordinate to the extent possible with the" SEC and other prudential regulators before issuing any order related to swaps.[22] Indeed, the Commission has itself recognized that perpetual contracts referencing equity securities "would benefit from review" by the SEC.[23]

The Commission should therefore deny each of the DCMs' requests on the grounds that Stock Perpetuals are not security futures and are not subject to the Commission's jurisdiction under the CEA.

---

20 15 U.S.C. § 78c(a)(68)(A)(ii)(II); see also 7 U.S.C. § 1a(42).

21 7 U.S.C. § 1a(47)(A)(iii).

22 15 U.S.C. § 8302.

23 CFTC Policy Statement, 91 FR at 33161 n.5.

## II. The filings do not satisfy the comparable listing standards requirement.

Even setting aside the definitional defect, the requests fail on their own terms. Commission Regulation 41.21(a) requires that the underlying security conform with the security futures listing standards the DCM has filed with the SEC, and the Exchange Act requires that those listing standards be no less restrictive than comparable listing standards for options traded on a national securities exchange.[24] Congress included this requirement so that security futures on individual equities would not become a less-regulated substitute for listed options.

The listing standards for Stock Perpetuals do not satisfy this requirement. As one example, no listed option on an individual equity security is perpetual; every listed option has a defined expiration and settles against the underlying at that date.

That difference matters most after listing. When an underlying security no longer meets an options exchange's maintenance standards, the exchange stops listing new options series on that underlying security and may restrict trading to closing transactions, and the existing series run off as they expire. A perpetual contract never runs off.

KalshiEX LLC's proposed standards, for example, provide notice and a 90-day cure period during which trading in the Stock Perpetual continues as normal. Coinbase Derivatives, LLC's proposed maintenance standards do not require that the underlying stock remain an NMS stock or that its issuer remain current in its periodic reporting. The result is that retail investors could hold leveraged exposure to individual equities that no longer satisfy the standards that would apply to comparable listed options. The DCMs do not explain how these features are no less restrictive than the standards that govern comparable equity options, and thus the requested standards cannot be approved on this independent ground.

## III. Conclusion

The DCMs' requests depend entirely on treating Stock Perpetuals as security futures. Because Stock Perpetuals do not meet the statutory definition of "security future" under either the CEA or the Exchange Act—and they cannot satisfy the Commission's own expiration-based security futures rules—the Commission has no basis under Section 5c(c) of the CEA or Regulation 41.23(b) to approve them, and they fall outside the Commission's jurisdiction. Stock Perpetuals are, instead, security-based swaps subject to the SEC's exclusive jurisdiction. Independently, the requests do not demonstrate compliance with the comparable listing standards requirement, and approval would raise significant unresolved concerns regarding cross-market surveillance, investor protection, and securities registration. Cboe therefore respectfully urges the Commission to deny each of the DCMs' requests.

---

24 15 U.S.C. § 78f(h)(3)(C).

Sincerely,

*s/Patrick Sexton*

Patrick Sexton
EVP, General Counsel, and Corporate Secretary
Cboe Global Markets, Inc.