**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CAPITAL MARKETS ALLIANCE ASSOCIATION,<br><br>*Plaintiff*,<br><br>v.<br><br>COMMODITY FUTURES TRADING COMMISSION, et al.,<br><br>*Defendants*. | Civil Action No. 26-cv-9608 |

# DECLARATION OF STEPHEN BERGER

I, Stephen Berger, pursuant to 28 U.S.C. § 1746, do hereby state and declare as follows:

1. My name is Stephen Berger. I am over the age of eighteen and competent to make this declaration. All facts stated herein are based on my personal knowledge, including knowledge I have acquired through my role described below, my regular work with Citadel Securities LLC (Citadel Securities), discussions with colleagues responsible for Citadel Securities' U.S. equities and listed-options businesses, and my review of the public filings and other documents described below.

2. I am a Managing Director and the Global Head of Government and Regulatory Policy at Citadel Securities. In that role, I monitor and analyze legislative, regulatory, and public policy developments affecting the financial markets, advise senior leadership on those issues, and engage with policymakers, regulators, and industry

participants on market-structure and related matters. As part of my responsibilities, I regularly work with colleagues at Citadel Securities on regulatory and policy matters affecting its businesses, including its activities in the U.S. equity and listed-options markets. I have worked on financial market regulation and market structure for approximately twenty years.

3. I submit this declaration in support of Plaintiff Capital Markets Alliance Association's Emergency Motion for Temporary Restraining Order, Preliminary Injunction, and 5 U.S.C. § 705 Stay.

**A. Citadel Securities**

4. Citadel Securities is a member of Plaintiff Capital Markets Alliance Association.

5. Citadel Securities is a leading market maker in U.S. equities and listed-options. It is the leading Designated Market Maker on the New York Stock Exchange (NYSE), keeping trading orderly and efficient for over 2,000 listings, representing approximately 62% of all NYSE listings. In equities, it is the leading destination for U.S. retail order flow, executing approximately 35% of U.S.-listed retail volume and more than 23% of total U.S. equity-market volume. In options, it is the leading retail market maker and executes over 30% of U.S. consolidated equity options volume.

6. Citadel Securities conducts its U.S. equities and listed-options business through affiliated Securities and Exchange Commission (SEC)-registered broker-dealers that are members of the Financial Industry Regulatory Authority (FINRA). Three aspects of its U.S. equities and listed-options business are particularly relevant

to this declaration: its exchange market-making business, its wholesale market-making business, and its institutional client-execution and liquidity-provision business.

7. First, Citadel Securities is a market maker on national securities exchanges and the leading Designated Market Maker on NYSE. Citadel Securities continuously quotes two-sided markets in thousands of National Market System (NMS) stocks, exchange-traded products, and listed-options. In those roles, it supplies displayed quotes and liquidity on which the equity and options markets depend, and it earns revenue from the volume it trades.

8. Second, Citadel Securities is a wholesale market maker. Broker-dealers that serve retail investors route customer orders in stocks and listed-options to Citadel Securities for execution. Citadel Securities earns revenue by filling orders in stocks and listed-options that SEC-registered broker-dealers route to it.

9. Third, Citadel Securities provides execution and liquidity to institutional clients in U.S. equities and listed-options, including for larger block transactions. Institutional clients use stocks and listed-options to obtain directional exposure, hedge existing positions, and manage risk. Citadel Securities earns revenue from executing and providing liquidity for those transactions.

10. Across these roles, Citadel Securities has invested billions of dollars (i) to be a trusted source of liquidity in both tranquil and turbulent times, (ii) in technologies that seamlessly connect broker-dealers and institutions to its liquidity ecosystem, and (iii) to operate in full compliance with the regulatory framework administered by

the SEC, FINRA, and the national securities exchanges. Among other things, Citadel Securities must comply with rules governing best execution, customer order handling, public reporting of execution quality, net capital, books and records, and market conduct. On the equities side, the national securities exchanges on which Citadel Securities trades are also subject to the Securities Exchange Act of 1934 (Exchange Act) and Regulation NMS requirements designed to ensure fair and efficient access to displayed quotations and to prevent unfair discrimination among brokers or dealers. Citadel Securities' orders and trades are also captured by the Consolidated Audit Trail (CAT) and the cross-market surveillance systems through which the SEC, FINRA, and the exchanges monitor activity in the national securities markets. Collectively, this regulatory framework safeguards market integrity, underpins investor confidence in the fairness of markets, and contributes to the global preeminence of the U.S. securities markets.

**B. The CFTC's Approval of Single-Stock Perpetuals**

11. I understand that on November 3, 2026, applications filed by KalshiEX LLC (Kalshi), Coinbase Derivatives LLC (Coinbase), and Bitnomial Exchange LLC (Bitnomial) to list "perpetual" contracts on single stocks as "security futures" were deemed approved by the Commodity Futures Trading Commission (CFTC). I refer to the contracts as the "Stock Perpetuals" and those approvals as the "Stock Perpetual Approvals."

12. I have reviewed the applications filed by Kalshi, Coinbase, and Bitnomial. Although the applications differ with respect to some details, the contracts share key

features. Each contract gives its holder cash-settled exposure to changes in the price of an individual stock or other referenced security without giving the holder shares, voting rights, or any other ownership interest in that security. Each contract has no scheduled expiration or final-settlement date and uses recurring payments between long and short positions purportedly designed to keep the contract's price aligned with the price of the referenced security.

13. The applications collectively cover dozens of contracts tied to individual stocks, including Apple, Alphabet, and Microsoft—stocks in which Citadel Securities makes markets and provides liquidity to both retail and institutional investors every trading day and that underlie listed options in which Citadel Securities also makes markets. Some of the approved contracts also reference exchange-traded products or other securities in which Citadel Securities makes markets or executes client orders. Coinbase and Kalshi state that they intend to list their contracts shortly after CFTC approval, and Bitnomial states that it will announce a first trading date once the applicable approval and initial-listing requirements are satisfied. Trading is thus likely to begin imminently. I also understand that Kalshi began trading a perpetual contract on a broad-based stock index within days after that contract was deemed approved by the CFTC in October 2026.

14. The filings contemplate minimum unhedged margin levels of approximately 15% to 15.5% of a contract's current market value. At those minimum levels, a holder who posts $2,000 in margin can obtain roughly $12,900 to $13,300 in stock-price exposure. By comparison, under Regulation T's 50% initial-margin requirement,

$2,000 in customer equity generally supports an ordinary purchase of no more than $4,000 of marginable stock, absent a higher broker-dealer requirement.

### C. Imminent Harm to Citadel Securities

15. Citadel Securities steadfastly supports innovation and competition on a level playing field, including with respect to the legal framework governing financial products. If the Stock Perpetuals were treated as security-based swaps, transactions with retail investors would have to occur on a national securities exchange registered under Section 6(b) of the Exchange Act, and the products would be subject to applicable Securities Act of 1933 registration requirements. Instead, the Stock Perpetual Approvals allow the venues to list the contracts under the laxer security-futures framework. In my view, that is not competition on either a level playing field or under lawful terms.

16. In today's existing and highly competitive securities market, Citadel Securities has invested billions of dollars building a leading securities market-making business that delivers superior pricing and liquidity to both retail and institutional investors under an SEC regulatory framework whose mission is to protect investors, facilitate capital formation, and maintain fair, orderly, and efficient markets. The overnight creation of a parallel shadow securities market untethered to that framework and mission by definition jeopardizes the integrity of the U.S. financial markets, the benefits and protections enjoyed by investors in those markets, and the value of Citadel Securities' historical investment. Permitting economically substitutable products to trade under materially different regulatory requirements

creates an immediate competitive disadvantage for firms that have made substantial investments in complying with the existing securities regulatory framework.

17. The national securities exchanges on which Citadel Securities trades are subject to fair access and nondiscrimination requirements that provide a level playing field for exchange members. My understanding is that Stock Perpetual venues are not held to these same standards, and affiliations between a venue and market intermediaries can create potential conflicts and a risk of preferential treatment that may make it more difficult for unaffiliated firms, including Citadel Securities, to participate and compete on equal terms.

18. A Stock Perpetual is not identical to a stock or listed option, but it can serve as an economic substitute by providing leveraged exposure to the same stock-price movements. Based on my experience, because the approved contracts cover widely traded stocks, permit substantial leverage, and have no scheduled expiration, I expect some retail and institutional activity that otherwise would occur in the securities markets to shift to Stock Perpetual venues. When that occurs, Citadel Securities loses the opportunity to continue to serve its customers and counterparties, and earn associated revenue, by executing or providing liquidity in corresponding equity and options transactions. Trading volume may also decline on exchanges where Citadel Securities makes markets, including in stocks for which it serves as the Designated Market Maker on the NYSE.

19. The competitive harms described above cannot simply be addressed by Citadel Securities joining new Stock Perpetual venues. First, as noted above, these

venues are not subject to the same fair access and nondiscrimination requirements as national securities exchanges. Second, doing so would require Citadel Securities to establish new trading and clearing arrangements and to operate under venue and clearing rules and risks different from those governing the securities markets. None of these are reasonable or acceptable preconditions to fair competition.

20. Because Stock Perpetual activity may affect related securities-market flow, Citadel Securities may need to obtain and integrate separate data from the perpetual venues into its pricing and risk systems. Citadel Securities continuously quotes firm prices, which are an important component of market liquidity. To maintain reliable quotes in stocks that are also referenced by Stock Perpetuals, Citadel Securities will need timely and reliable information about trading in those contracts. Whether sufficiently granular information will be available on timely and comparable terms is uncertain. If it is available, Citadel Securities will need to evaluate and integrate new data into its pricing models, risk systems, and surveillance processes, requiring immediate personnel and technology resources.

21. Unlike transactions in underlying equities and listed options, orders and trades in single-stock perpetuals will not be captured in a consolidated, cross-market system like the CAT but will instead be captured in a more fragmented manner through separate designated contract market audit trails and applicable CFTC reporting systems. This impairs the SEC's ability to conduct cross-market surveillance and ensure that markets are free from fraud and manipulation.

### D. These Harms Cannot Be Remedied After the Fact

22. Based on the statements in the applications, I expect trading in the contracts covered by the Stock Perpetual Approvals to begin imminently. Trading activity that shifts to a perpetual platform cannot later be executed by or through Citadel Securities.

23. In my experience, the longer the challenged products trade, the more likely holders and other market participants are to establish open interest and reliance on those products. Once positions and trading patterns develop around those products, they may be difficult to unwind or displace.

24. Based on my experience, later relief would also become substantially more difficult to implement once customers establish open positions in the challenged contracts. Any halt to trading would require the platforms and customers to address those positions—potentially through closing, transfer, or another wind-down mechanism—and the operational complexity and potential market disruption would increase as the number and size of open positions grow. Preventing trading before positions are established avoids those downstream risks.

25. To my knowledge, the contracts covered by the Stock Perpetual Approvals were not available for trading in the United States on Kalshi, Coinbase, or Bitnomial before the approvals took effect. The approvals permit those platforms to offer the challenged contracts in the U.S. for the first time.

### E. Harms to Investors and the Markets

26. Citadel Securities is also concerned about the effects the introduction of these products will have on investors and the U.S. equity and options markets as a whole. The approved contracts permit substantial leverage under untested risk management frameworks, which can rapidly lead to the use of forced liquidations and auto-deleveraging mechanisms during periods of market volatility—exacerbating market stress in a manner that can negatively affect a wide range of investors and the broader U.S. equity markets, including investors who never even traded a perpetual contract. In this way, widespread, highly leveraged trading in equity-linked perpetuals could create externalities that negatively impact investors and market participants who never chose to assume the risk of trading these products, and losses and liquidity demands could pose a threat to broader financial stability in the securities markets.

27. Market makers such as Citadel Securities depend on the ability to price securities accurately, manage inventory, and hedge positions effectively. Market stress originating in Stock Perpetual trading could create forced selling, hedging pressures, volatility, and funding demands that spill into the underlying equity markets. As a result, Citadel Securities and similarly positioned market participants could incur financial losses, face greater operating costs, and become less able to execute customer transactions and provide liquidity in underlying equity securities. This could create a downward spiral that reduces liquidity and further amplifies volatility in the underlying equity markets, which in turn adversely affects market

participants and investors by increasing trading costs, making transactions more difficult to execute, and increasing exposure to financial losses.

28. A migration of trading interest toward Stock Perpetuals could reduce liquidity and impair price discovery in underlying equity securities. Less displayed liquidity and weaker price signals could make it more difficult for market participants, including Citadel Securities, to manage cross-market risks. Financial institutions rely on market prices to value positions, calculate exposures, determine collateral requirements, and manage financial risks. If equity prices become unreliable or excessively volatile, that can result in margin calls, collateral demands, forced liquidation, and reductions in market-making capacity. Those effects would reach investors throughout the securities markets, and Citadel Securities, as a major liquidity provider, would be among the first market participants to experience them.

29. Finally, if the Stock Perpetuals are listed as security futures now but later determined to be security-based swaps, the serious securities registration consequences would be difficult to unwind. Among other difficulties, unregistered offers and sales of security-based swaps to retail investors could give rise to federal rescission rights and other remedies for the buyers.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: November 3, 2026

Stephen Berger