**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CAPITAL MARKETS ALLIANCE ASSOCIATION,<br><br>*Plaintiff*,<br><br>v.<br><br>COMMODITY FUTURES TRADING COMMISSION, et al.,<br><br>*Defendants*. | Civil Action No. 26-cv-9608 |

# DECLARATION OF TYLER GELLASCH

I, Tyler Gellasch, pursuant to 28 U.S.C. § 1746, do hereby state and declare as follows:

1. My name is Tyler Gellasch. I am over the age of eighteen and competent to make this declaration. All facts stated herein are based on my personal knowledge, including knowledge I have acquired in my role at Healthy Markets Association (Healthy Markets) through regular communications with Healthy Markets' members regarding their businesses and the markets in which they operate, my review of Healthy Markets' business records, and my review of the public filings and other documents described below.

2. I am the President and CEO of Healthy Markets. I have been the organization's chief executive since Healthy Markets' launch in 2015. I previously served in the U.S. Senate as Counsel to Senator Carl Levin and as Senior Counsel to the U.S.

Permanent Subcommittee on Investigations of the U.S. Senate Committee on Homeland Security and Government Affairs. While on the Senate staff, I helped draft key provisions of the Dodd-Frank Act and other financial laws. I also served as Counsel to Commissioner Kara M. Stein at the Securities and Exchange Commission (SEC). I have worked on the regulation, structure, and policy of the U.S. securities markets for approximately two decades.

3. I submit this declaration in support of Plaintiff Capital Markets Alliance Association's Emergency Motion for Temporary Restraining Order, Preliminary Injunction, and 5 U.S.C. § 705 Stay.

**A. Healthy Markets Association**

4. Healthy Markets is a member of Plaintiff Capital Markets Alliance Association (Alliance). In my role as Healthy Markets' President and CEO, I am familiar with the Alliance's purposes and Healthy Markets' reasons for joining it. The Alliance brings together leading market makers, broker-dealers, and securities and derivatives exchanges to advocate for competitive, resilient, well-regulated, and innovative capital markets. The Alliance supports clear, effective regulation consistent with law and engages in regulatory and legal advocacy to protect its members' interests and ensure that regulation respects statutory limits and reasoned decision-making. The Alliance's mission includes advocating in court when necessary to protect its members' interests and ensure that regulation respects statutory limits and rests on sound analysis. Those purposes also align closely with Healthy Markets' mission.

5. Healthy Markets is an investor-focused nonprofit coalition. It provides independent information and analysis to investors and other market participants, as well as policymakers and regulators, to improve the transparency, efficiency, competitiveness, and fairness of capital markets.

6. Healthy Markets pursues that mission through education and advocacy to reduce conflicts of interest, improve timely access to market information, modernize the regulation of trading venues and funding markets, and promote robust public markets. Healthy Markets also advocates in court for the interests of its members and to protect against regulatory overreach.

7. Healthy Markets' membership includes public pension funds, investment advisers, broker-dealers, exchanges, and data firms, as noted on our website, available here: https://healthymarkets.org/about-healthy-markets/membership. In my role, I communicate regularly with Healthy Markets' members about their businesses, their trading and investment activities, and regulatory developments affecting the markets in which they operate.

8. Healthy Markets frequently provides expert congressional testimony and participates on regulatory panels. Healthy Markets also routinely submits comment letters in agency rulemaking proceedings and participates as *amicus curiae* in important cases involving our nation's securities markets.

### B. The CFTC's Approval of Single-Stock Perpetuals

9. I understand that on November 3, 2026, the Commodity Futures Trading Commission (CFTC) deemed approved applications filed by KalshiEX LLC, Coinbase

Derivatives LLC, and Bitnomial Exchange LLC to list so-called perpetual futures contracts on single stocks as "security futures." I refer to those approvals as the "Stock Perpetual Approvals" and the contracts as the "Stock Perpetuals."

10. The CFTC's Stock Perpetual Approvals are a significant concern for Healthy Markets and its members. Whether products that provide exposure to the price of individual stocks trade on markets subject to the securities laws' full set of investor-protection, fair-access, surveillance, transparency requirements, and market-stability safeguards—or instead trade on platforms subject to a materially laxer regulatory regime—goes to the core of the market-structure issues that Healthy Markets was founded to address and for which it regularly advocates.

11. I have reviewed the applications filed by Kalshi, Coinbase, and Bitnomial. Although the applications differ with respect to some details, the contracts share key features. Each contract gives its holder cash-settled exposure to changes in the price of an individual stock or other referenced security, without giving the holder any shares, voting rights, or other ownership interest in that security. Each contract has no scheduled expiration or final-settlement date and uses recurring payments between long and short positions purportedly designed to keep the contract's price aligned with the price of the referenced security.

12. The applications collectively cover dozens of contracts tied to individual stocks, including Apple, Alphabet, and Microsoft. Coinbase and Kalshi have stated that they intend to list their contracts shortly after CFTC approval, and Bitnomial has stated that it would announce a first trading date once the applicable approval

and initial listing requirements are satisfied. The applications thus contemplate that trading in these products may begin imminently.

13. On October 29, 2026, Healthy Markets submitted a letter to the CFTC and SEC regarding the filings made on September 18, 2026, by Kalshi, Coinbase, and Bitnomial, as well as a later filing by another DCM. In this letter, Healthy Markets urged the CFTC to reject the filings and the SEC to abrogate parallel proposals submitted to it. The letter explained that the proposed derivatives would comply with neither the rules for U.S. public equities nor the rules for other equity derivatives and would create new costs and risks for investors and other market participants in the U.S. public equity securities markets. A true and correct copy of that letter is attached as Exhibit A.

### C. Imminent Harm to Healthy Markets' Members

14. The CFTC's Stock Perpetual Approvals threaten immediate competitive, operational, and market-integrity harms to Healthy Markets' members, including its broker-dealer members, market-data firm members, public pension and investment-adviser members, and its exchange members.

15. Healthy Markets' members include firms that hold, manage, trade, make markets in, or operate markets for U.S. stocks and related stock derivatives, including listed equity options and security-based swaps.

16. The CFTC's Stock Perpetual Approvals create a gap in regulatory oversight with respect to activity spanning the U.S. equity markets and the markets for single-stock perpetual contracts. Healthy Markets' members participate in and depend on

the integrity of U.S. equity markets. Order and transaction data for National Market System (NMS) securities (*i.e.*, listed stocks and listed equity options) are reported to the Consolidated Audit Trail (CAT), a critical cross-market surveillance tool used by the SEC, the Financial Industry Regulatory Authority (FINRA), and the registered national securities exchanges to police stock and stock derivatives trading for manipulation and abuses (such as insider trading). It does not appear as though order and transaction data for the Stock Perpetuals would be reported to CAT. Nor, to my knowledge, would order and transaction data for Stock Perpetuals be captured in any equivalent consolidated system that links order and trade activity across the approved designated contract markets (DCMs) and the securities markets. Instead, this data would likely be captured in a more fragmented manner through separate DCM audit trails and applicable CFTC reporting systems. This fragmentation would make coordinated or manipulative activity across the perpetual and securities markets more difficult, if not impossible, for regulators such as the SEC, FINRA, and national securities exchanges to detect.

17. The Stock Perpetuals permit leveraged exposure to individual stocks that generally exceeds the levels permitted by longstanding rules related to stock and stock derivatives trading. Regulation T, which limits the amount of credit that broker-dealers can extend to customers, was adopted after the Great Crash of 1929 with the express purpose of capping leverage in the securities markets, as Congress and regulators had determined that the crash had been made materially worse by

the very high levels of leverage leading up to it. Regulation T typically requires 50% initial margin for an ordinary purchase of marginable stock.

18. My understanding of the Stock Perpetuals is that required margin levels would be significantly less, thus providing much, much greater leverage for the contract parties.

19. Based on my experience, trading in those perpetual contracts—including liquidations of under-margined positions—may lead to sudden, dramatic reductions in liquidity and amplify price instability in the underlying securities markets. Those effects could harm Healthy Markets' members—even if neither they nor their customers hold the perpetual futures contracts. These effects were recently seen in market volatility in the digital asset markets, where prices in the "cash" markets were dramatically negatively impacted along with the perpetual futures contracts for the referenced digital assets.

20. Healthy Markets' members include broker-dealers and national securities exchanges registered with the SEC. These members earn revenue from customer trading and compete for customers and order flow and face imminent harm from the Stock Perpetual Approvals.

21. When a customer trades a Stock Perpetual through a competing intermediary instead of trading the underlying stock or a listed equity option through a Healthy Markets member, that member loses the opportunity to execute that trade and earn the associated transaction-based and other revenues.

22. Based on my experience, the leverage available under the Stock Perpetuals may increase this diversion. In fact, it is my understanding that some entities currently offering so-called perpetual futures contracts for individual stocks advertise the additional leverage provided by the contracts versus traditional NMS securities in their efforts to solicit orders and compete against brokers and registered securities exchanges, including Healthy Markets' members.

23. I understand from my experience and regular communications with Healthy Markets' members that sustained diversion of customer trading activity to competing intermediaries can reduce members' transaction-based and other revenues, which may be difficult to regain.

24. Broker-dealers and market data providers for NMS securities, including Healthy Markets' members, rely on timely, reliable access to information about markets that affect the securities they trade. Based on my regular communications with them, I understand that some will want and need timely information about market activity for the Stock Perpetuals to comprehensively assess market conditions in NMS stocks and related derivatives, and potentially disseminate related information to their customers. The filings I reviewed do not specify the availability or format for the type of data those members may require. Obtaining and processing that data so that it may integrate with existing market data for NMS securities could impose additional costs, including licensing, technology and infrastructure buildouts, and other costs.

25. The vertically integrated structure of the approved venues may exacerbate the harms described above, particularly for Healthy Markets' broker-dealer, exchange, and market-data members. Based on my review of the filings related to the Stock Perpetual Approvals, each venue disclosed an affiliated futures commission merchant that could perform introducing-broker functions, extend margin, hold customer funds and property, and be a member of the exchange. This structure permits the same corporate group to combine the exchange with customer access, margin, and custody. In my experience, that common ownership creates potential conflicts and a risk that the affiliated intermediary could receive informational, execution-speed, operational, or other advantages not available to unaffiliated firms. Those potential advantages will likely make it more difficult for unaffiliated brokers, exchanges, and data firms, including Healthy Markets' members, to compete on equal terms.

26. The venues subject to the Stock Perpetual Approvals, which are notice-registered with the SEC, are not subject to all of the Exchange Act requirements that apply to exchanges trading stocks and listed options, including that they are exempt from certain requirements governing exchange membership, governance, fees, and access procedures. They also generally need not submit changes to access or fee rules through the SEC's ordinary rule-filing process that applies to other registered securities exchanges. In my experience, having different regulatory standards for market participants, which will result in added flexibility for the venues subject to the Stock Perpetual Approvals, is likely to create an uneven playing field for

competing exchanges and intermediaries that must abide by Exchange Act requirements.

27. The CFTC has recognized potential concerns with affiliations of this kind, including conflicts of interest arising in affiliated market structures, and in August 2026 proposed additional safeguards to address them. However, the CFTC has not finalized those rules, and it did not address any such concerns in deeming the Stock Perpetuals approved. When the Stock Perpetuals were deemed approved, the CFTC issued no public order addressing how those conflicts would be managed here.

28. Separately, the SEC staff raised related questions in a September 30, 2026 statement issued in light of the applicants' notice registrations. The staff noted that each of the applicants disclosed an affiliated futures commission merchant that would introduce customers, extend margin, hold customer funds and property, and be a member of the exchange. The staff pointed to the SEC's prior recognition that exchange-broker affiliations can create conflicts if the affiliate receives greater access to information, faster execution, or operational advantages in dealing with the exchange. The SEC has not resolved those questions.

29. Public pension funds, retail investors, and asset managers that invest retirement assets in stocks and stock derivatives, including Healthy Markets' members, will likely be harmed by the Stock Perpetual Approvals.

30. History shows that stress in leveraged equity derivatives can spread to underlying markets and financial intermediaries. During the May 6, 2010 Flash Crash, selling in stock-index futures traded on a CFTC-regulated exchange

contributed to disruptions in related equity markets, including sell-offs in individual stocks and stock derivatives.

31. Similarly, the March 2021 collapse of Archegos Capital Management was precipitated by minor adverse price movements generating margin calls in leveraged equity swaps, which then triggered sales, contributing to further price declines in the referenced stock and related derivatives. The events gave rise to substantial bank losses and overall market losses—even to those who were not parties to these transactions.

32. The Stock Perpetuals provide significant leveraged exposure to stock prices without ownership of the underlying stock. Adverse price movements can trigger margin calls and forced liquidations that, depending on the size and concentration of the positions and related hedging activity, may place additional pressure on the underlying stocks. As we have seen with the so-called "meme-stock" craze of 2021 and in several instances since, there may be significant "herding" activity by active investors using leveraged products, leading to significant price swings in the underlying referenced stocks.

33. Market participants, including Healthy Markets' members, are concerned that the substantial leverage of the Stock Perpetuals could amplify price movements in the underlying stocks. Although the contracts are cash-settled, market makers and other intermediaries may, and very likely will, hedge their exposures through the underlying stocks and other stock derivatives, and unwinding those hedges could add significant selling pressure and reduce liquidity. I have observed these types of

feedback loops in the digital asset markets, where so-called perpetual futures contracts are new, but already commonly traded.

34. Public pension funds, retail investors, and asset managers that invest retirement assets in stocks and stock derivatives, including Healthy Markets' members, rely on the liquidity and prices available on national securities markets to execute trades, value their portfolios, and manage risks.

35. For more than nine decades, federal law has regulated margin and leverage in securities trading. As explained above, the Stock Perpetuals permit retail customers to obtain materially greater leverage than an ordinary margined stock purchase. In my experience, that substantially greater leverage magnifies the risks described above to retail customers, the underlying stock markets, and Healthy Markets' members.

36. Based on the marketing materials I have reviewed, the Stock Perpetuals may be promoted as alternatives to trading the underlying stocks, with an emphasis on access to leveraged exposure, extended trading hours, and the ability to obtain stock-price exposure without owning the stock. To the extent these products draw net trading activity away from the underlying stocks or other derivatives, liquidity in those underlying markets could decline, potentially widening spreads and increasing trading costs for investors, including Healthy Markets' members.

### D. These Harms Cannot Be Remedied After the Fact

37. Based on the statements in the applications, I expect trading in the contracts covered by the Stock Perpetual Approvals to begin imminently.

38. From the moment trading begins, the Stock Perpetuals create a new channel through which manipulation or destabilizing trading could affect the underlying stocks and related derivatives markets. Healthy Markets' members that hold, trade, or otherwise depend on those markets will face that risk immediately.

39. The magnitude of that risk is likely to increase as trading volume, open interest, and position concentration grow. According to publicly reported data, Hyperliquid's HIP-3 markets—which include perpetuals referencing individual stocks, indices, commodities, and other assets—generated more than $500 billion in cumulative trading volume less than a year after launch. Although not all of that volume involved single-stock products, this example demonstrates how quickly a new perpetual-market segment can grow.

40. In my experience, the longer the challenged Stock Perpetuals trade, and the more activity they attract, the greater the potential is for the market-integrity, monitoring, and liquidity-fragmentation harms described above to occur—and the more difficult those harms may be to reverse.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: November 3, 2026

____________________________
Tyler Gellasch