October 29, 2026

Vanessa A. Countryman, Secretary
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549-1090

Christopher Kirkpatrick, Secretary
Commodity Futures Trading Commission
1155 21st Street NW
Washington, DC 20581

Re: Filings Related to the Listing and Trading of So-Called Perpetual Futures Contracts in US Public Equity Securities, including:

- SR-KALSHIEX-2026-02 (re: Kalshi);[1]
- SR-COIN-2026-002 (re: Coinbase);[2]
- OG.com 2026-10 (re: OG.com);[3]
- BTNL-2026-107 through BTNL-2026-116 (re: Bitnomial)[4]; and
- Staff Statement on Affiliations Between National Securities Exchanges and Broker-Dealers (File No. 4-936)[5]

Dear Ms. Countryman and Mr. Kirkpatrick:

[1] *Notice of Filing and Immediate Effectiveness of a Proposed Rule Change Relating to Listing Standards for Security Futures Products*, SEC, Exch. Act Rel. No. 106422, (Sept. 18, 2026), *available at* https://www.sec.gov/files/rules/sro/kalshiex/2026/34-106422.pdf; *see also*, Letter from Xavier Sottile, KalshiEX LLC, to Secretary, CFTC, Sept. 18, 2026, *available at* https://www.cftc.gov/filings/ptc/ptc09182627752.pdf.

[2] Notice of Filing and Immediate Effectiveness of a Proposed Rule Change Relating to the Adoption of Coinbase Derivatives, LLC's Rules Governing Cash Settled Futures on Individual Equity Securities and Exchange-Traded Fund Shares, Including Perpetual Single-Stock Futures, SEC, Exch. Act Rel. No. 106420, (Sept. 18, 2026), *available at* https://www.sec.gov/files/rules/sro/coin/2026/34-106420_0.pdf; *see also*, Letter from Jane Downey, Coinbase, to Christopher J. Kirkpatrick, CFTC, Coinbase Derivatives No. 2026-62, Sept. 18, 2026, *available at* https://www.cftc.gov/filings/ptc/ptc09182627449.pdf.

[3] Letter from Stephen Humenik, OG.com, to Christopher J. Kirkpatrick, CFTC, OG.com No. 2026-10, Sept. 24, 2026, available at https://www.cftc.gov/filings/ptc/ptc09242629733.pdf. Notably, the effective date of these filings is later than others identified.

[4] We were unable to locate analogous rule change filings submitted to the SEC for all referenced venues, yet product-specific certifications are already appearing on the CFTC's docket.

[5] *Staff Statement on Affiliations Between National Securities Exchanges and Broker-Dealers,* Division of Trading and Markets, SEC, Sept. 30, 2026, *available at* https://www.sec.gov/newsroom/speeches-statements/tm-statement-affiliations-093026 (SEC Staff Statement on Affiliations").

The Healthy Markets Association[6] objects to the proposals pending before the Securities and Exchange Commission (SEC) and Commodity Futures Trading Commission (CFTC) regarding so-called perpetual futures contracts for US public equity securities.

The SEC should abrogate the proposals and the CFTC should reject the filings made with it as inconsistent with the law. Further, the Commissions should move with all deliberate speed to enforce the law with respect to US persons or persons within the US engaging in the so-called perpetual futures contracts markets for US public equity securities.

## ***Overview***

The proposals would implement an unprecedented departure from the rules that have long governed trading in US public equity securities and their derivatives. Permitting trading in so-called perpetual futures contracts for US public equity securities pursuant to these filings would be contrary to the law and public policy for at least four reasons.

First, the Administrative Procedure Act makes it clear that agency actions must be supported by gathering the relevant facts and reasonably analyzing the issues. Further, the SEC and CFTC are legally obligated to ensure that each of the filings is – on its own merit and record – consistent with the federal securities laws and the Commodity Exchange Act, respectively. The agencies cannot reasonably make those determinations based upon the paltry public records.

Second, the Commissions are being asked to simply ignore directly applicable law. Under the Dodd-Frank Wall Street Reform and Consumer Protection Act, the so-called "perpetual futures" are clearly appropriately categorized as "security-based swaps." Relabeling an open-ended, continuously margined financial instrument as a "future" does not alter its fundamental economic substance or legal character. The Commissions cannot permit venues to circumvent the SEC's comprehensive regulatory regime for security-based swaps simply by adopting the "futures" nomenclature. Even further, the regulatory procedures being relied upon by the filers are also inapplicable here. Despite these failings, the filings do not ask for, nor have the Commissions considered, broad exemptions from the applicable law and the attendant rules and guidance.

---

[6] The Healthy Markets Association is a non-profit member organization focused on improving the transparency, efficiency, competitiveness, and fairness of the capital markets. Our members include public pension funds, investment advisers, broker-dealers, exchanges, and data firms. Our members collectively have over a trillion dollars of investments in stocks, bonds, US treasury securities, private equity funds, and other "traditional" assets. Some of our members have exposure to digital assets, as well as investments in digital asset market participants, such as crypto exchanges. We work with chief investment officers, portfolio managers, trading desk heads, operations teams, risk managers, data analysts, compliance officers, and other professional investment team staffers engaged in the investment process. Our expertise and focus is on market plumbing.

Third, as a matter of policy, the filings are contrary to (1) fair, orderly, and efficient markets, (2) the protection of investors, (3) capital formation, and (4) the public interest. Put simply, the filings would establish a new trading and regulatory regime for US public equity security derivatives that would be disconnected from those for equities and other equity derivatives. Leverage, trade reporting, market surveillance, and many other complex rules would be very different for related products.

Simply not trading the products is not an escape from the impacts of their trading. Past crises and shocks have repeatedly shown that markets tied to the same underlying products will be linked together, and the risks posed by one derivative product cannot be siloed off from the rest of the markets. The risks embedded in the design of so-called perpetual futures contracts themselves, combined with their proposed disjointed regulatory treatment, is a recipe for disaster in both. So-called perpetual futures contracts pose dire risks to the integrity, reliability, efficiency, and stability of the US public equity securities markets.

Fourth, press reports and publicly available information establish deeply troubling trading patterns in prediction and perpetual futures markets that do not involve US public equity securities. Those patterns appear to include widespread manipulation, wash trading, and potential money laundering patterns.[7] At least one of the firms identified in these press reports is now seeking permission to begin so-called perpetual futures contract trading in US public equity securities. The Commissions cannot reasonably expose the US public equity securities markets to these risks without thoroughly investigating the alleged misconduct in the other markets already operated by these venues. Are these Designated Contract Markets fulfilling their responsibilities with respect to their existing markets? If not, what would be different with respect to these markets? None of these issues appear to be identified, much less addressed, in any public record related to the filings.

***<u>Background on So-Called Perpetual Futures Contracts in Stocks</u>***

So-called perpetual futures contracts, despite the name, do not have a contractually listed “future” date for expiration or delivery. Accordingly, there is no naturally occurring “convergence” of pricing between the products and their referenced assets, which is a key feature in traditional futures contract markets.

Instead, to keep the prices of the contracts aligned with the referenced assets, the contracts typically include periodic payments and adjustments features, which often include automated self-help and liquidation features. In this way, the so-called perpetual futures contracts are – for economic and regulatory purposes – within the definition of swaps.

---

[7] Neil Mehta, Caitlin Ostroff, and Katherine Long, *$5 Billion Flurry of Nearly Identical Kalshi Trades Draws Scrutiny*, The Wall Street Journal (Sept. 22, 2026), *available at* https://www.wsj.com/finance/currencies/5-billion-flurry-of-nearly-identical-kalshi-trades-draws-scrutiny-fa53289d?msockid=3b59de2c9988663c3c3ccd4c9d88686e.

So-called perpetual futures contracts are typically traded round-the-clock, even if the referenced assets are not open for trading.

So-called perpetual futures contracts often contain significant leverage, which may be unattainable in the market for the referenced assets or other derivatives markets. For example, Kraken currently advertises "up to 20x" leverage on for its perpetual futures for stocks[8] – a level that would be unthinkable for trading related equities or other equity derivatives available for retail traders, as it would be both contrary to investor protection and financial responsibility.[9]

So-called perpetual futures contracts may be traded in lightly or un-regulated "de-centralized" trading platforms, which typically are not subjected to the same regulatory and reporting requirements as traditional trading centers, such as registered national securities exchanges.

Like other derivatives, so-called perpetual futures contract markets are not necessarily subjected to the same regulatory treatment as the markets for the referenced assets. For example, while there are clear position reporting obligations for large holders of US public equity securities and options, it is unclear whether and how those would reconcile with large positions in so-called perpetual futures for those same US public equity securities. Similarly, transactions in security-based swaps are subject to detailed reporting and disclosure requirements that do not apply to security futures products.

These unique features and a lack of enforcement of the law have led to a massive new flood of trading in so-called perpetual futures contracts for US public equity securities outside of the United States – and within it. Recent press reporting suggests trillions of dollars of investments in perpetual futures markets are being traded currently, but those figures are highly questionable, given the lack of consistent regulatory reporting and some obviously manipulative trading practices that appear on some perpetual futures markets.

***<u>The Administrative Records Fail to Support Approval</u>***

Prior to May of 2026, the SEC and CFTC had never expressly permitted so-called perpetual futures contracts in the United States. The exact legal prohibitions and policy rationales have evolved over the decades, but since 2010, the statutory direction has been exceedingly clear.

Despite this longstanding policy, on May 29th, the CFTC granted Kalshi approval to begin trading perpetual futures contracts related to Bitcoin–one day after Kalshi had

---

[8] Kraken, *How xStocks perps differ from buying stocks*, *available at* https://www.kraken.com/learn/futures-trading-what-are-xstocks-perps (updated Oct. 1, 2026)(last viewed Oct. 29, 2026) (reflecting side-by-side comparison wherein perpetual futures of stocks are identified as having "up to 20x" leverage versus "Typically none (or limited margin via broker)" for stocks).

[9] *See, e.g.*, 15 U.S.C. § 78g.

submitted its request.[10] This policy reversal was not preceded by any public solicitation of facts, nor was it accompanied by a comprehensive review of relevant data and analysis. To the contrary, the only public record reflects a request made by Kalshi on May 28, 2026, and an order by the CFTC granting the unprecedented request the very next day.

Chicago Mercantile Exchange Inc. has rightly challenged that approval as inconsistent with the Commodity Exchange Act and the Administrative Procedure Act.[11] That case is pending before a federal district court in the District of Columbia.

Rather than seeking to justify its action, the CFTC is instead pressing the court to throw out the case on technical grounds.

The CFTC attempted to avoid having to provide the administrative record – even though a key element of the case is the adequacy of that record.[12] The court correctly rejected that request.[13] The CFTC is now separately seeking to have the matter dismissed on the alleged grounds that the plaintiff lacks sufficient standing to challenge the agency's decision.

We understand that these procedural issues will be decided in the near future, and the merits of the claims against the CFTC may take years to resolve in court.

Despite this significant legal uncertainty, Kalshi, Coinbase, and Bitnomial are seeking to rely on that dubious approval order to justify yet another unprecedented new set of products before those issues are resolved. At the same time, other perpetual futures contracts for US public equity securities are apparently being offered and sold in the US, to US persons, or with the involvement of US persons with the implicit approval of the CFTC and SEC.[14]

The filings do not identify nor adequately address innumerable relevant facts or analysis related to whether the rules may be consistent with the law and sound policy. As described in greater detail below, the filings would establish a new, different regulatory framework for what are – by definition – security-based swaps in US public equity securities.

---

[10] Order for Approval to KalshiEX, LLC for the Listing of Perpetual Futures Contracts, CFTC (May 29, 2026), *available at* https://www.cftc.gov/PressRoom/PressReleases/9240-26.

[11] Complaint, *Chicago Mercantile Exchange, Inc. v. Michael S. Selig and CFTC*, 1:26-cv-02157-CKK (D.D.C. 2026), *available at* https://clearinghouse.net/doc/171764/.

[12] Docs. 25, 27, 28, *Chicago Mercantile Exchange, Inc. v. Michael S. Selig and CFTC*, 1:26-cv-02157-CKK (D.D.C. 2026).

[13] Doc. 29, *Chicago Mercantile Exchange, Inc. v. Michael S. Selig and CFTC*, 1:26-cv-02157-CKK (D.D.C. 2026).

[14] See Suehyeon Lee, *Hyperliquid's HIP-3 Nears 50% of Perpetual Volume as On-Chain Stock Futures Surge*, BloomingBit (July 13, 2026), *available at* https://en.bloomingbit.io/feed/news/116182 (citing The Block).

A MEMBER ORGANIZATION

Congress and the SEC, with feedback from the CFTC, have spent over 16 years establishing clear rules for security-based swaps.[15] These products and the trading operations identified in the filings do not comply with those rules. The agencies would need to identify the consistencies and inconsistencies, and explain why the inconsistencies with the otherwise applicable law would be appropriate. They haven't done it. At a minimum, the SEC would then have to undertake a formal rule change or statutorily authorized exemptive process to effectuate those changes. It hasn't done that either.

The agencies' final actions – whether by appropriate rulemaking, order, or purportedly through passive acquiescence – are subject to the Administrative Procedure Act, and may be readily challenged in court. Where the agencies have failed to collect the relevant facts and adequately articulate their actions and how they reasonably relate to the facts and issues sought to be addressed, their actions will be vacated.[16]

Oddly, the SEC staff appears to recognize that the proposals don't address some very important issues. For example, the proposals don't materially address how the notice-registered exchanges interact with their own affiliates in ways that are illegal for traditional equities exchanges.

For traditional registered securities exchanges, the SEC is obligated to review exchange filings and determine that those filings are consistent with the Exchange Act,[17] including that an exchange's rules:

- "provide for the equitable allocation of reasonable dues, fees, and other charges;"[18]
- not be "designed to permit unfair discrimination";[19]

---

[15] After more than a decade of consideration and rulemaking, the regulatory framework for security-based swaps was finally implemented, starting in 2021, as Security-Based Swap Dealers began registration and complying with reporting and margin requirements.

[16] See, e.g., *Cboe Futures Exchange, LLC v. SEC*, 77 F.4th 971 (D.C. Cir. 2023); see also, *Susquehanna Int'l Grp., LLP v . SEC*, 866 F.3d 442, 445 (D.C. Cir. 2017) (ruling that the APA "requires us to hold unlawful agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that is "unsupported by substantial evidence." To satisfy the "arbitrary and capricious" standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.").

[17] See *Susquehanna Int'l Grp., LLP v . SEC*, 866 F.3d 442 (D.C. Cir. 2017)("The SEC "shall approve" a self regulatory organization's proposed rule change only "if it finds that such proposed rule change is consistent with" provisions of the Exchange Act."). *Accord*, Remarks of Brett Redfearn, SEC, before the SEC Roundtable and Market Access and Market Data, Oct. 26, 2018, *available at* https://www.sec.gov/news/public-statement/statement-redfearn-102518 (declaring that in order for the Commission to "meet our obligations under the Exchange Act, we also need to ensure that the fees that are being charged for such important market services are fair and reasonable, not unreasonably discriminatory, and do not impose an undue or inappropriate burden on competition.").

[18] 15 U.S.C.§ 78f(b)(4).

[19] 15 U.S.C.§ 78f(b)(5).

- "not impose any burden on competition not necessary or appropriate in furtherance of the purposes of" the Act;[20] and
- be designed "to protect investors and the public interest.[21]

But those requirements apply only to registered securities exchanges, including whatever qualifies as a "facility of an exchange."

Unfortunately, the approval of so-called perpetual futures contracts, as contemplated by the filings, could dramatically redefine the "facility of an exchange" for the first time in history. That's because the venues – like many digital asset-native firms – are not just trading centers, but also have affiliated introducing brokers, clearing firms, and more. Approving these products effectively blesses a backdoor redefinition of exchange facilities, bypassing standard SEC oversight of affiliated brokers and clearing firms.

The SEC's application of its exchange oversight functions has essentially precluded this type of "vertical integration." Not surprisingly, the SEC's expert staff in the Division of Trading and Markets released a statement about the apparent conflict between this long-standing SEC policy and the practices of these venues.[22] If the products are approved, then a trading center for a perpetual futures contract for a US public equity security could have an affiliated introducing broker that would not be subjected to the SEC's "exchange" rules, while an exchange that trades the underlying stock or an option or a traditional security future of that same equity would still have to comply with the SEC's exchange rules.

In the immediate term, this difference creates unjustified competitive disadvantages for other securities exchanges, as compared to these notice-registered exchanges for so-called perpetual futures contracts.

Investors and other market participants also lose. There's a reason the SEC has – for decades – broadly applied its exchange protections to apply to affiliated services, including brokers, order management systems, and data products. Failure to do so would be a recipe for monopolization of all of these markets as self-regulatory exchanges could act as gatekeepers to the benefit of their own affiliates.

The SEC has determined, time and again, and under Democratic and Republican leadership, that fair access, reasonable fees, non-discrimination, and prohibiting undue burdens on competition are essential components to operating exchanges for securities. At the urging of exchanges over the years, Congress and the SEC have been asked to reconsider this determination, and rather than change their minds, the SEC has repeatedly successfully defended its position in court.[23]

---

[20] 15 U.S.C.§ 78f(b)(8).
[21] 15 U.S.C.§ 78f(b)(5).
[22] SEC Staff Statement on Affiliations.
[23] *See, e.g.*, *Intercontinental Exchange, Inc v. SEC*, 23 F.4th 1013 (D.C. Cir. 2022), *available at* https://law.justia.com/cases/federal/appellate-courts/cadc/20-1470/20-1470-2022-01-21.html; *see also*,

Equally troubling, there appears to be no public factual discussion or analysis of the impact of these products on capital formation. Section 3(f) of the Exchange Act requires the SEC to, whenever engaged in its own rulemaking or review of an exchange's rules, to consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation.[24]

The agencies lack a sufficient administrative record to permit the filings to become effective. Moreover, rather than establishing that the products are consistent with the federal securities laws and the CEA, the available evidence strongly suggests the opposite. Further, perpetual futures for stocks would not just impose significant risks to those trading in the products, but also potentially catastrophic risks to the integrity, stability, and fair, orderly, and efficient operation of the U.S. public equity market.

## ***Approval is Contrary to the Plain Language of the Law***

In the aftermath of the Global Financial Crisis, Congress established a new regulatory framework for financial derivatives. Congress bifurcated the oversight of these derivatives between the CFTC and SEC. Congress and the agencies were very clear to ensure to define "swap" and "security-based swap" quite broadly, and distinctly. It was universally recognized that the regulation of security-based swaps, and those that engage in businesses with respect to them, must be properly overseen by the SEC.[25]

The filers – working in conjunction with the agencies pursuant to non-public communications – have erroneously claimed that their "perpetual futures contracts" are "security futures," and not "security-based swaps." Interestingly, as the courts have recognized, "[b]oth the Securities Exchange Act and the Commodity Exchange Act define a "security future" as a 'contract of sale for future delivery of a single security or of a narrow-based security index, including any interest therein or based on the value thereof,' with certain exceptions." with certain exceptions.[26] There must be a future delivery date as part of the contract. There aren't for these so-called perpetual futures products, and so they clearly fall outside of this definition. By contrast, however, they do fall squarely within the definition of "security-based swaps."

---

*Cboe Exchange, Inc. v. SEC*, No. 24-3316 (7th Cir.) (resolved by joint motion for voluntary dismissal following oral argument). Notably, the Commission separately expressly recognized that Cboe's Silexx OEMS was a "facility of an exchange," but then chose to exercise its exemptive authority under Section 36 to excuse compliance with some elements of Exchange Act registration for exchanges. That narrowly targeted exemption sought to preserve the agency's oversight authority and protections for fair access, prohibitions on discrimination, and prohibitions on undue burdens on competition.

[24] 15 U.S.C. §78c(f).

[25] See, Dodd-Frank Act Wall Street Reform and Consumer Protection Act §§ 712(a), 721(a)(21), 761(a), 124 Stat. 1641–43, 1666, 1756; *see also* H.R. Rep. No. 111-517, at 868 (2010); see also, e.g., *Implementing Derivatives Reform: Reducing Systemic Risk and Improving Market Oversight Before the Senate Comm. on Banking, Hous., & Urban Affairs* (112th Cong. 2012) (Testimony of Hon. Mary Schapiro, SEC), *available at* https://www.banking.senate.gov/imo/media/doc/SchapiroTestimony52212.pdf.

[26] See, *Cboe v. SEC* (2023) (citing 7 U.S.C. §1a(44)(Commodity Exchange Act) and 15 U.S.C. §78c(a)(55)(A) (Securities Exchange Act)).

There are very clear and obvious reasons why the proponents of these products are seeking to have the agencies deliberately distort the definitions of the terms "security futures" and "security-based swaps."

First, the process through which these products are purportedly being brought to market can only apply if the products are deemed "security futures," and not "security-based swaps."

The so-called perpetual futures contracts are purportedly being brought to market through a passive approval framework at the CFTC that applies to the "futures" markets. Because these products are obviously related to securities, the filers have (inappropriately) assumed they should be treated as "security futures."

This is important because the law permits eligible Designated Contract Markets overseen by the CFTC to trade security futures following a notice-registration with the SEC.[27] Further, a Designated Contract Market utilizing such a notice-registration process at the SEC may avoid most of the statutory and regulatory obligations applicable to other registered national securities exchanges, including requirements related to access, fees, and approvals. In these instances, new products from these dually registered entities may be brought to market by mere self-certification with or filing and approval by the CFTC. The SEC has extremely limited time to abrogate the filings.

None of that process applies to security-based swaps. The process for security-based swaps is very different.

Second, the products and proposed trading operations themselves are entirely inconsistent with the Dodd-Frank Act and the rules promulgated by the SEC for "security-based swaps." The Dodd-Frank Act established a regime with clear regulation of the trading centers, clearing, sales practices, and more. These include definitions like "security-based swap execution facility" and "major security-based swap participants. Because of the nature of the products and risks, the regime was deliberately established as an "institutional" investor regime. Congress and the agencies have spent 16 years fleshing out exhaustive details related to the requirements for the offer, sale, trading, clearing, and custody of security-based swaps.

The proposals make no effort to comply with those requirements. They must, or they must seek exemptions from them. They have done neither.

***<u>So-Called Perpetual Futures For US Public Equities, As Proposed, Will Impose Costs and Risks on US Public Equity Market Participants</u>***

As currently exist and contemplated, perpetual futures contracts for stocks will create significant equity market-wide integrity risks, because they are disconnected from other market integration rules, opening the door for manipulations and abuses. The proposed

[27] 15 U.S.C. § 78f(g)(1).

products are made materially riskier, in part, because the SEC and CFTC have failed to meaningfully harmonize safeguards and integrate surveillance apparatus for US public equity securities and related derivatives – despite decades of pressure from Congress to do so.[28]

The CFTC does not control surveillance systems that the SEC, FINRA, and securities exchanges utilize for the stock market, and these systems would not readily apply to CFTC regulated entities. With the above-referenced filings, perpetual futures contracts for US public equity securities would be traded without stitching them into the broader safeguards and surveillance apparatus applicable to US public equity securities and related derivatives.

Almost none of the relevant issues are identified, much less addressed in the filings.

For example, the products are constructed so as to have periodic asset transfers, based upon the price movements during the intervening times. However, the timing of those events creates opportunities for “window dressing” of the positions and values. Put simply, the products themselves are inherently susceptible to "gaming" from a valuation and margin standpoint. The periodic "rebalancing" can be readily manipulated so as to shift who gets paid and how much. In this way, trading in a spot market could be easily used to generate significant profits (or losses) in potentially much larger perpetual futures contract positions.

On the flip side, given the significant leverage, a perpetual futures contract for a security could have an outsized impact on trading prices in the referenced securities, and other derivatives. This happens quite often in options trading in individual equity securities, particularly at times of large volumes of options trading windows (e.g., when post-IPO options are freed for exercise). Notably, the overall impacts of these options-related trading swings are significantly mitigated by longstanding rules from the SEC and FINRA regarding retail margin accounts and options access. What, if any, analogous protections would the markets have for perpetual futures contracts of the same stocks?

But even more acutely, options trading has long proven to be fertile ground for manipulative trading strategies and attempts to avoid different securities rules (including position reporting). As a result, the SEC and FINRA have spent decades ensuring that options trading-related information for US public equity securities is incorporated into their data and surveillance streams.

Would orders and trades and other information in perpetual futures for US public equities be reported to FINRA and the Consolidated Audit Trail? Would trades in perpetual futures for US public equity securities be subject to the SEC’s Section 31 fees, like other equity securities trades? How would position reporting work for so-called

[28] See, e.g., *Examining the Efficiency, Stability, and Integrity of the U.S. Capital Markets, Before the Cmte on Banking, Housing, and Urban Affairs and Cmte on Homeland Security and Gov’t Affairs*, S.Hearing 111-922, *available at* https://www.govinfo.gov/content/pkg/CHRG-111shrg65272/pdf/CHRG-111shrg65272.pdf.

perpetual futures contracts of US public equities, and how would issuers and other market participants be able to identify holders and manage their risks associated with those positions?

The classification of these instruments also has significant implications for market transparency. If these products were appropriately classified as security-based swaps, Regulation SBSR generally requires transaction information to be reported to a registered Security-Based Swap Data Repository and requires public dissemination of trade information. Security-Based Swap Execution Facilities are separately subjected to additional transaction reporting and marked data requirements. The regulatory regime for security futures is materially different. Designated Contract Markets provide very limited information to the CFTC, and may disseminate market data pursuant to their own rules. They don't have the same transaction-by-transaction public dissemination framework as security-based swaps.

Assuming, *arguendo*, that one were to accept the proponents' assertions that so-called perpetual futures contracts in US public equity securities are "security futures" instead of "security-based swaps," the filings still do not address why economically similar exposures to individual US public equity securities should be subject to materially different transparency regimes.

Perpetual futures contracts for equity securities – like other derivatives – provide pathways to extreme market events, including massive fire-sale loops. For example, just a few years ago, Archegos Capital Management entered into several security-based swaps related to US public equity securities. When some of those bets went bad, leading the counterparties to seize and sell collateral, causing prices in the underlying securities to crater. Fortunately, in that instance, the damage was somewhat mitigated by the SEC's robust rules for security-based swaps and the compliance programs of the bank counterparties. And even still, market participants lost billions of dollars. The protections that limited losses to *just* billions of dollars simply don't exist with respect to the proposed so-called perpetual futures contracts.

As a result, not only could the traders of so-called perpetual futures contracts for US public equity securities face extreme risks, but they could also expose the entire US public equity securities markets to risks of much more manipulative trading and greater volatility (attendant to the easy access to very high leverage and operations of the contract pricing mechanisms).

The fragmentation created by separate entities listing and trading so-called perpetual futures contracts for US public equity securities can also increase costs for market intermediaries, issuers, and investors, with little to no readily identifiable benefit to these stakeholders. After all, security futures and security-based swaps already exist.

Perhaps unsurprisingly, the reason these products are being promoted is because those products and related firms are subjected to regulatory safeguards that the proponents here would like to avoid. Further, the most likely salient forms of "competition" between

the would-be venues offering the so-called perpetual futures contracts would be competition to provide the greatest leverage and fewest other restrictions–something we usually call “regulatory arbitrage.” Put simply, the features making the products arguably more attractive to potential retail investors (e.g., at least 6.5x leverage more than triple purchasing power permitted in cash equity margin accounts) will likely be the very same features that make them riskiest to not just those investors, but to investors and market participants in the broader US public equity securities markets – irrespective of whether they trade in these derivatives or not.

The Federal Reserve Board’s limits on margining and leverage (adopted through Regulation T) were first statutorily authorized by Congress in reaction to the Great Crash of 1929. The goal was to curb excessive margining and leverage in the securities markets. So-called perpetual futures contracts would blow through those decades-old protections for the securities markets by making extremely high leverage available to even retail investors–without any change in law, or careful consideration by the Federal Reserve Board of Governors, SEC, or CFTC. This regulatory arbitrage increases risks and fragility to the securities markets, and returns us to the same market structure and leverage that the post-Great Crash reforms were designed to eradicate.

So-called perpetual future contracts for US public equity securities may also create risks and concerns for public company issuers.

So-called perpetual futures contracts for US public equities, which would be cash setted, can decouple trading activity from substantive economic investment in the issuer of the referenced stock. This isn’t a hypothetical concern. In every market where so-called perpetual futures contracts have been introduced, the instruments have siphoned significant portions of liquidity – and widened spreads – in the underlying “cash” market.

Unlike a bet on Bitcoin’s pricing, where a spot market wager and a swap wager have little economic distinction, the difference between a public equity investment and a leveraged derivative can be enormous. An investment in the equity security ultimately flows back to the issuer. A wager on the price movement in a security-based swap, may only loosely and ancillary flow back–depending upon the hedging and other activities by counterparties. In this case, the economic justification for these products to exist as a benefit to the issuer is even more loosely attenuated.

In the context of so-called perpetual futures contracts in US public equities, the diversion of capital out of the cash market into these new derivatives will increase corporate cost of capital, essentially acting as a tax on the real economy.

Further, because these products could be offered by many different trading centers, these different contracts could lead to essentially unlimited fragmentation of liquidity in assets tied to a single equity issuer. When stocks are the underlying markets, the proliferation of perpetual futures contracts could lead to highly leveraged volatility swings (in both directions), extreme concentration of ownership, loss of issuer

knowledge or control of its shareholder base, and other grave risks to corporate issuers. None of these issues has been addressed by the SEC or CFTC in consideration of these proposals.

Unlike the SEC's more carefully crafted "Innovation Exemption," these derivatives for US public equity securities are completely outside of the issuers' control. Yet, the SEC and public are already well aware that concerns over the creation of a lightly-regulated derivatives market in their shares is part of the reason many sophisticated public company issuers have already opted out from the SEC's newly created Innovation Exemption.[29]

So-called perpetual futures contracts for US public equity securities could also be abused by issuers or corporate insiders. For example, could a corporate insider avoid insider trading rules or enforcement by the SEC? The lack of surveillance integration makes this not just possible, but likely. Could corporate issuers or insiders secretly or impermissibly hedge or cash out of their exposures or risks through these products in hard-to-detect, or perhaps even arguably legal, ways? Of course.

We also have concerns that so-called perpetual futures contracts for securities could be used to raise capital by issuers or insiders without compliance with otherwise applicable public disclosure requirements for securities offers and sales. These issues have been highlighted by the trading of so-called perpetual futures contracts for stock prices of SpaceX, Anthropic (which Hyperliquid is actively advertising for sale),[30] and OpenAI.

If perpetual futures contracts for stocks are permitted to proceed as filed, market participants in the markets for US public equity securities and related derivatives will face significant new costs and risks. None of these appear to be materially addressed in the very limited public records.

## ***Conclusion***

Your agencies are being asked to ignore the law and the years of work since the passage of Dodd-Frank Act to carefully construct robust, high-integrity derivatives markets. Your agencies are being asked to passively bless – without relevant facts or reasonable analysis – this new regime for products tied to the crown jewel of capitalism – US public equity securities.

These new derivatives in US public equity securities would comply with neither the rules for US public equities nor the rules for all other equity derivatives. The substance of the filings is deeply troubling, as they would create massive new costs and risks for

[29] See, e.g., Joe Light, *Companies Are Saying No to Tokenized Stocks—and Testing Wall Street's Crypto Push*, Barron's, Oct. 16, 2026, *available at* https://www.barrons.com/articles/tokenized-stocks-companies-objections-okx-ice-ea968b03; See also, OKXICE TSV, Public Notice, Oct. 15, 2026, available at https://www.okx.com/cdn/assets/files/2610/F085D8D65135AB9C.pdf.

[30] See, Shanny Basar, *Anthropic Pre-IPO Perpetuals Go Live*, Markets Media, Oct. 27, 2026, *available at* https://www.marketsmedia.com/anthropic-pre-ipo-perpetuals-go-live/.

investors and other market participants in the US public equity securities markets – irrespective of whether they trade in the products. The SEC should abrogate the proposals and the CFTC should reject the filings made with it as inconsistent with the CEA. Thank you for your consideration.

Sincerely,

Tyler Gellasch
President and CEO