**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CAPITAL MARKETS ALLIANCE ASSOCIATION,<br><br>Plaintiff,<br><br>v.<br><br>COMMODITY FUTURES TRADING COMMISSION, MICHAEL S. SELIG, *in his official capacity as Chairman of the Commodity Futures Trading Commission*,<br><br>Defendants. | Case No. 1:26-cv-9608-LGS |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS


INTRODUCTION ....... 1

BACKGROUND ....... 3

A. Futures regulation ....... 3

B. Perpetual futures enter U.S. derivatives market ....... 5

C. CMAA files suit ....... 6

ARGUMENT ....... 7

I. CMAA is not likely to succeed on the merits ....... 7

A. CMAA lacks standing ....... 7

1. CMAA fails to demonstrate it is a legitimate membership organization ....... 8

2. No CMAA "member" is injured ....... 10

B. CMAA has not stated a cognizable APA claim ....... 13

C. Exchanges can list single-stock perpetual futures as security futures ....... 16

D. The Commission did not act arbitrarily by not issuing a notice of non-approval ....... 24

II. CMAA will not be irreparably harmed ....... 26

III. The equities do not favor Plaintiff ....... 27

CONCLUSION ....... 28

# TABLE OF AUTHORITIES

Cases

*Air Excursions LLC v. Yellen*,
66 F.4th 272 (D.C. Cir. 2023) ....................11

*Brotherhood of Locomotive Engineers and Trainmen v. FRA*,
972 F.3d 83 (D.C. Cir. 2020)....................15

*CFTC v. Calvary Currencies, LLC.*,
2004 WL 2330725 (D. Md. Oct. 15, 2004) ....................20

*CFTC v. Co Petro Mktg. Group, Inc.*,
680 F.2d 573 (9th Cir. 1982) ....................21

*CFTC v. Erskine*,
512 F.3d 309 (6th Cir. 2008) ....................17

*CFTC v. International Fin. Servs. (New York), Inc.*,
323 F. Supp. 2d 482 (S.D.N.Y. 2004) ....................1, 17, 20

*CFTC v. International Foreign Currency, Inc.*,
334 F. Supp. 2d 305 (E.D.N.Y. 2004)....................17, 18, 19, 20

*CFTC v. MEK Global Ltd.*,
No. 1:24-cv-2255 (S.D.N.Y. Mar. 26, 2024) ....................23

*CFTC v. Zelener*,
373 F.3d 861 (7th Cir. 2004) ....................17, 18, 19

*Cheney v. U.S. District Court*,
542 U.S. 367 (2004) ....................15

*Chicago Mercantile Exchange v. SEC*,
883 F.2d 537 (7th Cir. 1989) ....................18, 19, 20

*Chicago Mercantile Exch. v. Selig*,
No. 1:26-cv-2157 (D.D.C.)....................2, 10

*Citizens for Resp. & Ethics in Wash. v. Trump*,
953 F.3d 178 (2d Cir. 2019) ....................10

*Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*,
96 F.4th 351 (2d Cir. 2024) ....................7, 26

*Disability Advocs., Inc. v. New York Coal. for Quality Assisted Living, Inc.*,
675 F.3d 149 (2d Cir. 2012) ....................8

*Do No Harm v. Pfizer, Inc.*,
126 F.4th 109 (2d Cir. 2025) ....................................................................................7

*DTCC Data Repository (U.S.) LLC v. CFTC*,
25 F. Supp. 3d 9 (D.D.C. 2014)....................................................................................14, 15

*Erie Boulevard Hydropower, LP v. FERC*,
878 F.3d 258 (D.C. Cir. 2017)....................................................................................25

*FDA v. Alliance for Hippocratic Med.*,
602 U.S. 367 (2024) ....................................................................................9, 13

*FDA v. Wages & White Lion Investments, L.L.C.*,
604 U.S. 542 (2025) ....................................................................................24

*Hunt v. Washington State Apple Advertising Comm'n*,
432 U.S. 333 (1977) ....................................................................................7

*Hyatt v. USPTO*,
146 F. Supp. 3d 771 (E.D. Va. 2015) ....................................................................................15

*In re Amaranth Nat. Gas Commodities Litig.*,
730 F.3d 170 (2d Cir. 2013) ....................................................................................3, 4

*Kisor v. Wilkie*,
588 U.S. 558 (2019) ....................................................................................24

*Mahdawi v. Trump*,
136 F.4th 443 (2d Cir. 2025) ....................................................................................27

*New World Radio, Inc. v. FCC*,
294 F.3d 164 (D.C. Cir. 2002)....................................................................................11

*New York v. U.S. Dep't of Educ.*,
477 F. Supp. 3d 279 (S.D.N.Y. 2020) ....................................................................................7

*Norton v. Southern Utah Wilderness All.*,
542 U.S. 55 (2004) ....................................................................................15, 24

*PSSI Glob. Servs., L.L.C. v. FCC*,
983 F.3d 1 (D.C. Cir. 2020)....................................................................................10

*Public Emps. for Env't Resp. v. Zeldin*,
174 F.4th 183 (D.C. Cir. 2026) ....................................................................................8, 9

*Safari Club Int'l v. Jewell*,
47 F. Supp. 3d 29 (D.D.C. 2014)....................................................................................26, 27

*Salomon Forex, Inc. v. Tauber*,
8 F.3d 966 (4th Cir. 1993) .....19

*Set Capital LLC v. Credit Suisse Grp. AG*,
996 F.3d 64 (2d Cir. 2021) .....20

*Sprint Nextel Corp. v. FCC*,
508 F.3d 1129 (D.C. Cir. 2007) .....15

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .....10

*Sussman v. Crawford*,
488 F.3d 136 (2d Cir. 2007) .....26

*United States v. Eisenberg*,
784 F. Supp. 3d 579 (S.D.N.Y. 2025) .....24

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025) .....23

*Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.*,
435 U.S. 519 (1978) .....25

*Viasat, Inc. v. FCC*,
47 F.4th 769 (D.C. Cir. 2022) .....8, 9

*XY Planning Network, LLC v. SEC*,
963 F.3d 244 (2d Cir. 2020) .....10, 11

Statutes

5 U.S.C. § 706 .....14, 15

7 U.S.C. § 1a .....4, 16, 17, 20, 22, 23

7 U.S.C. § 2 .....3, 4

7 U.S.C. § 6 .....18

7 U.S.C. § 7a-2 .....14, 25

15 U.S.C. § 78c .....16, 17, 22

15 U.S.C. § 78f .....4

28 U.S.C. § 1391 .....9

Rules

Fed. R. Civ. P. 65 ....................................................................................................28

Regulations

17 C.F.R. § 40.2 ....................................................................................................14

17 C.F.R. § 40.3 ....................................................................................................6, 14, 15, 25

17 C.F.R. § 40.6 ....................................................................................................14

17 C.F.R. § 41.23 ....................................................................................................4

Other Authorities

Adam C. Ford, Ford O'Brien Landy LLP,
https://www.fordobrien.com/our-team/adam-c-ford/ ....................................................9

Bitnomial Exchange, LLC; Notice of a Filing of a Proposed Rule Change Relating to
Security Futures Product Listing Standards, Customer Margin and Related Rules,
91 Fed. Reg. 60,438 (Sept. 18, 2026) ....................................................6, 27

Capital Market Alliance,
https://capitalmarketsalliance.org/ ....................................................9

Cboe Exchange, Inc.; Notice of Filing of Amendment No. 1 and Order Granting
Accelerated Approval of a Proposed Rule Change, as Modified by Amendment
No. 1, To Permit the Listing of Binary Options Overlying Key Performance
Indicators Reported by Certain Issuers of Stock,
91 Fed. Reg. 65,854 (Oct. 16, 2026) ....................................................22, 23

Cboe, Cboe Relative Performance Futures,
https://www.cboe.com/relative-performance-pipeline-hub/ ....................................................19

Cboe, Volatility Index (VIX®) Futures,
https://www.cboe.com/tradable-products/vix/vix-futures ....................................................19

CFTC, *Designated Contract Market Products*, https://www.cftc.
gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts ....................................................6

CFTC, *Order Approving KalshiEX LLC BTCPERP Futures Contract* (May 29, 2026)...........5, 23

CFTC, *Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives*
(Apr. 21, 2025), https://www.cftc.gov/media/12041/Perpetuals_RFC042125/download .........24

CME Group, Apple Futures,
https://www.cmegroup.com/markets/equities/single-stock/apple.html....................................17

CME Group, Chicago HDD Monthly,
https://www.cmegroup.com/markets/weather/hdd/chicago-hdd-monthly.
contractSpecs.html...............................................................................................................20

Coinbase Derivatives, LLC; Notice of Filing and Immediate Effectiveness of a Proposed Rule Change Relating to the Adoption of Coinbase Derivatives, LLC's Rules Governing Cash Settled Futures on Individual Equity Securities and Exchange-Traded Fund Shares, Including Perpetual Single-Stock Futures,
91 Fed. Reg. 60,448 (Sept. 18, 2026)..........................................................................................6

Joint Request for Comment on Further Definition of “Swap” and “Security-Based Swap” and on Alternative Compliance,
91 Fed. Reg. 37,873 (June 24, 2026)..........................................................................................22

KalshiEX LLC; Notice of Filing and Immediate Effectiveness of a Proposed Rule Change Relating to Listing Standards for Security Futures Products,
91 Fed. Reg. 60,467 (Sept. 18, 2026)..........................................................................................6

Policy Statement Concerning the Listing of Perpetual Contracts,
91 Fed. Reg. 33,160 (June 3, 2026)............................................................................................5

Pursuant to this Court's orders, *see* Dkts. 11, 14, Defendants Commodity Futures Trading Commission ("CFTC" or "Commission") and Chairman Michael S. Selig file this opposition to Plaintiff's motion for a temporary restraining order and preliminary injunction, Dkt. 4-1 ("PI").

## INTRODUCTION

Last year, Cboe Global Markets told the CFTC that a "perpetual derivative that is a futures contract is a contract that 1) either does not have an expiration date or has a long-term-to-expiration, and 2) is designed to include a price convergence mechanism between the futures price and spot price," like "a funding rate mechanism." Ex. A at 2. Further: "Perpetual futures simply represent another futures instrument through which market participants can meet different investment goals and manage risk." *Id.* at 6. Cboe was right to say as much. Perpetual futures, whether in securities or otherwise, bear all the hallmarks of a future: they offer exposure to price changes in an underlying asset, are exchange-traded, centrally cleared, funded by margin, and subject to offset.

Now, the newly-minted "Capital Markets Alliance Association" ("CMAA")—of which Cboe is a purported "member"—says the opposite. Perpetual futures are not futures, it claims, because they "have no expiration date and no future delivery obligation." PI 2. But it is widely understood that "delivery" is not a necessary element of a futures contract; Cboe itself offers cash-settled futures where there is "no future delivery obligation." Nor is there support for the notion that every futures contract must expire. Again, Cboe itself offers "continuous futures"—which it describes as a "perpetual-style futures product"—whose expirations are a decade away. Ex. B. To say that 10-year "perpetual-style" contracts are futures, but true perpetuals are not, would "exalt form over substance"—an approach courts have never taken when defining futures contracts. *CFTC v. Int'l Fin. Servs. (N.Y.), Inc.*, 323 F. Supp. 2d 482, 498 (S.D.N.Y. 2004).

At minimum, the Court should avoid resolving that issue against the Commission on such a short fuse. This is not the first lawsuit to challenge the classification of perpetuals as futures, but that case has proceeded on a normal schedule—entirely appropriate given the complexity of the issues. *See Chicago Mercantile Exch. v. Selig*, No. 1:26-cv-2157 (D.D.C.). The sky has not fallen for that challenger, and there is no reason to think it will here. In fact, CMAA does not even have standing to bring this lawsuit: CMAA lacks the indicia of a true membership organization, and as Judge Caproni observed, it is entirely speculative whether its "members" face any real harm, much less irreparable harm.

Furthermore, while CMAA's complaint purports to challenge "final agency action," the Commission has not taken any "action" here. Rather, CFTC-registered exchanges submitted perpetual futures for trading, and the Commission did nothing, allowing exchanges to trade those products by operation of law. At best, CMAA seeks to compel "agency action unlawfully withheld," which it did not plead and would be subject to a much higher burden. That also dooms CMAA's arbitrary-and-capricious claim: the Commission's rules *contemplate* agency inaction, and it is hardly unreasonable for the Commission to follow its own rules.

CMAA asks the Court to make a rushed, high-stakes judgment on a theory that its member has already rejected in practice and in writing. That CMAA also lacks standing, misunderstands the Commission's processes, and fails to demonstrate irreparable harm should end the inquiry entirely. The Court should deny the motion.

## BACKGROUND

### A. Futures regulation

A "future" is a standardized contract that provides exposure to future price changes in an underlying asset, such as a commodity or security. Futures contracts trade on exchanges—called "designated contract markets," or "DCMs"—regulated by the CFTC. 7 U.S.C. § 2(a)(1)(A).

Every future has two contractual counterparties: a "long" and a "short." In an ordinary futures contract, the "long" agrees to buy the underlying asset at a fixed price in the future, while the "short" agrees to sell it at that price. Actual delivery, however, rarely occurs. Instead, the parties typically enter into offsetting transactions before the delivery date to cancel their delivery obligations, netting a profit or loss. *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173-74 (2d Cir. 2013).

To illustrate: suppose a trader takes a "long" position in a wheat future for 1,000 bushels at $6 per bushel. As the delivery date nears, the price increases to $7 per bushel. The trader could accept delivery of the wheat for $6,000 and resell it in the "spot" market for $7,000, netting a $1,000 profit. But to avoid physical delivery, the trader can simply sell the contract on the exchange at $7 per bushel, still realizing the $1,000 gain. A trader who took the mirror-image "short" position absorbs a $1,000 loss (she promised to *sell* 1,000 bushels of wheat at $6 per bushel but must pay $7 per bushel to buy it in the spot market).

A critical benefit—and risk—of futures trading is leveraged exposure to the underlying asset. A trader need only post a security deposit, called "margin," which is a fraction of the total contract exposure. If 20% margin is required on the wheat future, a trader seeking exposure to $6,000 of wheat deposits only $1,200. That leverage magnifies gains and losses, making capital allocation more efficient. The "long" in the example above earns a $1,000 return on a $1,200

deposit—far more attractive than the return available to a trader who physically bought and sold 1,000 bushels by putting up the full $6,000.

Futures trading also relies on an exchange's clearinghouse, which "guarantees both sides of the trade and ensures that neither buyer nor seller is exposed to any counterparty credit risk." *Amaranth*, 730 F.3d at 174. Clearinghouses set margin to "protect itself from risk of nonpayment," and "[a]t the end of each trading day, the clearinghouse examines the change in value to [traders'] positions and determines whether the firm must post additional margin (generally the case if value has decreased) or receives payment on margin (generally the case if value has increased)." *Id.*

Innovation has always been a hallmark of the futures industry. Over the years, the range of commodities subject to futures contracts expanded beyond agriculture to energy, precious metals, foreign currencies, interest rates, stock and volatility indices, and cryptocurrencies. Congress has also subjected "security futures"—that is, futures in "a single security" or "a narrow-based security index"—to the joint jurisdiction of the SEC and the CFTC. *See* 7 U.S.C. §§ 1a(44), 2(a)(1)(D)(i). Security futures trade on CFTC-registered DCMs, but the DCMs are required to notice-register as a national securities exchange, 15 U.S.C. § 78f(g); *see* 17 C.F.R. § 41.23.

The structure of futures has evolved, too. In the 1980s, exchanges introduced "cash-settled futures," in which there is no delivery of the underlying asset but simply a cash settlement of the delta between (1) the contract price, and (2) the settlement price—eliminating the need for traders to engage in offsetting transactions. Exchanges have also begun offering "long-dated" futures, with far-distant expiration dates that eliminate the need to regularly roll a position from one expiration to the next.

### B. Perpetual futures enter U.S. derivatives markets

A perpetual future is a future that does not expire. In nearly every respect, perpetual futures resemble any other futures contract. Both provide exposure to future changes in the price of an asset. Both are exchange-traded at market prices. Both rely on a clearinghouse to eliminate counterparty credit risk. Both are traded on margin, enabling leveraged exposure. And both allow a party to close out its position by entering into an offsetting contract, netting a profit or loss.

The absence of an expiration date is a distinction of difference in only one respect. Expiration dates create an arbitrage dynamic called "convergence" that keeps the futures price tethered to the underlying spot price. For example, if the futures price was artificially low, traders would buy the future, take delivery at the low price, and resell the commodity in the spot market at the high price (and vice versa if the futures price was artificially high). That arbitrage threat keeps the futures and spot prices aligned. Perpetual futures achieve this alignment through periodic "funding payments" between the longs and the shorts. When the perpetual futures price trades above the spot price, holders of long positions pay holders of short positions; when it trades below, the payment runs in the opposite direction. These payments push the futures price back toward the spot price, replicating the convergence that an expiration date would otherwise produce. That said, funding payments are not unique to perpetual futures; futures with long-distant expiration dates also use funding rates to maintain pricing alignment. *See* Ex. B.

Perpetual futures have lawfully traded on U.S. derivatives exchanges since May 2026, when the Commission issued an order approving digital-asset perpetuals. CFTC, *Order Approving KalshiEX LLC BTCPERP Futures Contract* (May 29, 2026) ("BTCPERP Order"), https://www.cftc.gov/filings/documents/2026/orgdcmkexbtxperorder26601.pdf; *see also* 91 Fed. Reg. 33,160 (June 3, 2026) (accompanying policy statement). Since then, exchanges have applied

to offer perpetual futures on other asset classes, such as precious metals, energy, foreign exchange, interest rates, and broad-based stock indices. The Commission took no action on the precious-metals and stock-index applications, so they became "deemed approved" by operation of law. 17 C.F.R. § 40.3(d)(1). Others, like foreign exchange, interest rates, and energy, remain pending. *See generally* CFTC, *Designated Contract Market Products*, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts (last visited Nov. 6, 2026).

In September 2026, three DCMs—KalshiEX, Bitnomial, and Coinbase—submitted new products to the CFTC seeking to list perpetual security futures on individual stocks. These DCMs also filed proposed rule changes with the SEC pursuant to Section 19 of the Exchange Act. 91 Fed. Reg. 60,438 (Sept. 18, 2026) (Bitnomial); 91 Fed. Reg. 60,448 (Sept. 18, 2026) (Coinbase); 91 Fed. Reg. 60,467 (Sept. 18, 2026) (Kalshi). Consistent with its treatment of precious-metals and stock-index perpetuals, the CFTC took no action on Kalshi and Bitnomial's applications, so they were "deemed approved" by operation of law 45 days later. 17 C.F.R. § 40.3(d)(1).

**C. CMAA files suit**

On November 2—the very day single-stock perpetual futures were deemed approved—Plaintiff Capital Markets Alliance Association ("CMAA") made its apparent debut, filing a letter with the SEC and CFTC which asserted that perpetuals are "security-based swaps" rather than "security futures." Dkt. 4-3. The next day, it filed this lawsuit on behalf of its putative "members": Cboe Global Markets, which operates securities, options, and derivatives exchanges; Citadel Securities, which is a market maker that provides liquidity to securities and options markets; and Healthy Markets, a nonprofit. Dkt. 1. CMAA immediately sought an *ex parte* temporary restraining order. Dkt. 4. Judge Caproni denied that request, holding that CMAA failed to demonstrate irreparable harm. Dkt. 11.

## ARGUMENT

"To obtain a preliminary injunction, the plaintiffs must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest." *New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 293 (S.D.N.Y. 2020). But CMAA is asking this Court to affirmatively compel the Commission to take action, and the Second Circuit recognizes a distinction between "mandatory" and "prohibitory" injunctions. A "prohibitory" injunction "requires the non-movant to refrain from taking some action," while a "mandatory" injunction "requires the non-movant to take some action." *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024). Mandatory injunctive relief requires a plaintiff to "show a *clear or substantial* likelihood of success on the merits and make a *strong showing* of irreparable harm." *Id.* (emphasis added).

### I. CMAA is not likely to succeed on the merits

#### A. CMAA lacks standing

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). To obtain a preliminary injunction, CMAA has the "burden" to demonstrate these elements with more than "mere allegations" but rather with "specific facts" "by affidavit or other evidence." *Do No Harm v. Pfizer, Inc.*, 126 F.4th 109, 119

(2d Cir. 2025).[1] CMAA has not carried its associational-standing burden for two reasons: first, there is no evidence that it is a real membership organization as opposed to a vehicle for this litigation, and second, none of CMAA's "members" are injured.

**1. CMAA fails to demonstrate it is a legitimate membership organization**

"Implicit in the three-part test articulated in *Hunt* is the assumption that an organization litigates on behalf of its *members*." *Public Emps. for Env't Resp. v. Zeldin*, 174 F.4th 183, 191 (D.C. Cir. 2026) (citation modified). "Accordingly, associational standing is typically claimed by traditional membership organizations" or "the functional equivalent of a traditional membership organization." *Id.*; *see Disability Advocs., Inc. v. New York Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 159 (2d Cir. 2012) (rejecting associational standing where organization did not have "the indicia of membership that is required under *Hunt*"). Whether an organization has the "indicia of a traditional membership association … turns on considerations such as whether members finance the organization, guide its activities, or select its leadership." *Viasat, Inc. v. FCC*, 47 F.4th 769, 781 (D.C. Cir. 2022). An association does not carry its burden where it "has given [the court] no insight into how it relates with its members" "beyond a bare assertion of membership." *Id.* at 781-82.

CMAA has not carried its burden. Its "Secretary," Adam Ford, states that "[t]he Alliance's members include Cboe Global Markets, Inc., Citadel Securities LLC, and Healthy Markets Association," Dkt. 4-2 ¶ 4, but offers no details of their participation beyond that "bare assertion of membership," *Viasat*, 47 F.4th at 782; *see also* Dkt. 4-4 ¶ 4; Dkt. 4-7 ¶ 4; Dkt. 4-8 ¶ 4 (Cboe, Citadel, and Healthy Markets generically asserting they are CMAA members without detail). Mr.

[1] Plaintiff has failed to carry this burden on the papers, so no evidentiary hearing is necessary. But if the Court believes there is a question as to standing, Defendants request an evidentiary hearing to examine Plaintiff's declarants on the matters discussed below.

Ford also obliquely refers to "the Alliance's governing documents, membership records, Board materials, and other records," Dkt. 4-2 ¶ 1, but that "in passing[] mention" does "not develop the theory sufficiently" to suggest a true membership organization, *Public Emps.*, 174 F.4th at 192. And there is zero discussion of "whether members finance the organization, guide its activities, or select its leadership." *Viasat*, 47 F.4th at 781.

Instead, CMAA appears to be contrived to instigate this lawsuit. According to CMAA's own website, its only apparent activities are: (1) sending a comment letter to the Commission and the SEC on November 2, 2026 about single-stock perpetual futures, and (2) filing this lawsuit one day later. *See* Dkt. 4-2 ¶¶ 6-9; Capital Markets Alliance, https://capitalmarketsalliance.org/ (last visited Nov. 6, 2026). Furthermore, the only identified officer of CMAA is Mr. Ford (*see* Dkt. 4-2), whose law-firm address is just two floors below CMAA's address. *Compare* Adam C. Ford, Ford O'Brien Landy LLP, https://www.fordobrien.com/our-team/adam-c-ford/ (last visited Nov. 6, 2026) (275 Madison Avenue, Floor 24, New York, NY 10016), *with* https://capitalmarketsalliance.org/ (275 Madison Avenue, 26th Floor, New York, NY 10016).

CMAA's "members" cannot invent standing by creating a sham entity that serves only as a stalking horse for their litigation efforts. *See FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 394 (2024) ("An organization cannot manufacture its own standing…."). That strategy changes the nature of this action in material ways. For example, venue in this lawsuit is predicated on the CMAA having "its principal place of business in New York, New York"—that is, two floors above its secretary's law office. Compl. ¶¶ 13, 17; *see* 28 U.S.C. § 1391(e)(1). But venue would not be proper if Cboe, Citadel, or Healthy Markets had sued as plaintiffs, as their principal places of business are in Illinois, Florida, and the District of Columbia, respectively. If Cboe, Citadel, and Healthy Markets' gambit works, then APA challengers can always hand-pick their judicial district

by forming an "alliance" and finding a "secretary" in the favored district who will sign a generic declaration—undermining venue limitations and the basic premise of associational standing.

**2. No CMAA "member" is injured**

Associational standing requires the organization to allege "that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). Here, CMAA's members allege competitive injury, which requires a showing "(1) that an illegal act bestows upon [the plaintiff's] competitors 'some competitive advantage' … and (2) 'that [the plaintiff] personally compete[s] in the same arena' as the unlawfully benefited competitor." *Citizens for Resp. & Ethics in Wash. v. Trump*, 953 F.3d 178, 190 (2d Cir. 2019), *vacated as moot* 592 U.S. 1233 (2021). Although "[t]he form of [this] injury may vary," there has to be some "detriment [to the plaintiff's] bottom line" for it to have standing. *XY Planning Network, LLC v. SEC*, 963 F.3d 244, 251-52 (2d Cir. 2020); *see PSSI Glob. Servs., L.L.C. v. FCC*, 983 F.3d 1, 11 (D.C. Cir. 2020) ("[A] party asserting competitor standing must 'make a concrete showing that it is in fact likely to suffer financial injury as a result of the challenged action.'").

**a.** Cboe generically claims that stock perpetual futures "threaten immediate and continuing competitive and operational harm to [its] equities and options exchanges," Dkt. 4-4 ¶ 13, but when it gets to the specifics, any harm is speculative at best. Primarily, it "expect[s] some investors who would otherwise trade the underlying stock or a listed option to choose a single-stock perpetual contract instead." *Id.* ¶ 14. Citadel likewise "expect[s] some retail and institutional activity that otherwise would occur in the securities markets to shift to Stock Perpetual venues." Dkt. 4-7 ¶ 18. But neither offers anything to substantiate those expectations with "actual market experience."[2]

[2] The empirical evidence suggests that cryptocurrency perpetual futures have not diverted trading in cryptocurrency dated futures. *See Chicago Mercantile Exch. v. Selig*, No. 1:26-cv-2157, Dkts. 31 at 15-16, 46 at 9-10 (D.D.C.) (CME's trading volume on cryptocurrency dated futures

*XY Planning Network*, 963 F.3d at 252. While their supplemental declarations offer substantial market data on *Kalshi's* perpetual-future trading volumes, Dkts. 18, 19, "a competitor's receipt of a windfall, by itself, is not enough, to demonstrate the actual or imminent increase in competition required before a plaintiff may invoke competitor standing." *Air Excursions LLC v. Yellen*, 66 F.4th 272, 281 (D.C. Cir. 2023) (citation modified). And Cboe and Citadel conspicuously omit any evidence as to how their *own* trading activity is faring.

Nor does "economic logic" suggest that Cboe or Citadel will experience imminent injury. *Id.* To the contrary, their theory of injury requires speculating about a "chain of events" that "depends on the independent actions of third parties"—namely, that traders could substitute away from securities and options products in favor of perpetual futures. *New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002). That chain of events is hardly likely. As Cboe once recognized, "[p]erpetual futures products may provide advantages that complement rather than replace traditional futures or spot markets" and thus "will serve as an addition to the existing ecosystem rather than subsuming traditional markets." Ex. A at 3.

If perpetual futures do not displace other *futures*, *id.*, it is even more speculative to suggest that they would displace stocks and options. In fact, perpetual futures may *increase* stock and options trading. As Cboe itself stated in a recent comment, "Stock Perpetual positions will almost certainly be hedged in the equity markets," which would *benefit* Cboe and Citadel. Dkt. 4-6 at 4.

While Cboe now states that "a Stock Perpetual is a direct economic substitute for the underlying stock," Dkt. 18 ¶ 8, and Citadel even says that "every dollar invested in a Stock Perpetual is effectively a dollar not invested in buying shares or listed options," Dkt. 19 ¶ 10, these

substantially increased in the months following the Commission's approval of cryptocurrency perpetual futures).

assertions are self-evidently not true. Perpetual futures are not substitutes for stocks. Stock trading confers *asset ownership*, while futures trading (perpetuals or otherwise) provides leveraged exposure to the underlying stock. Nor are Cboe's security options substitutable with security futures. The former gives the right, but not the obligation, to buy or sell a security at a certain price—which caps a trader's downside exposure. Futures trading, by contrast, carries upside and downside risk. Cboe and Citadel's unsubstantiated assertions that perpetual futures will "divert[] trading activity" do not hold water as a matter of economic logic. Dkt. 4-4 ¶ 15.

Cboe and Citadel also contend that if perpetuals were "treated as security-based swaps," various Securities Act and Exchange Act requirements would apply rather than "the laxer security-futures framework." Dkt. 4-7 ¶ 15; *see also* Dkt. 4-4 ¶¶ 17-18. But neither explains how they are injured by the applicable legal regime. For example, it does not seem that Cboe wishes to list perpetuals as security-based swaps—in that circumstance, one might see how the legal regime applicable to Cboe's competitors could matter. But even if that was Cboe's intent, the company also operates a DCM, Dkt. 4-4 ¶ 5, so it could just as easily profit from perpetual security futures as perpetual security-based swaps. Finally, it bears emphasis that securities futures are subject to *joint* SEC/CFTC jurisdiction, and thus, any exchange listing securities futures must file a proposed rule change with the SEC, as Kalshi, Coinbase, and Bitnomial have done.

The theories of harm only spiral from there. Cboe contends that "if retail investors … suffer substantial losses" from perpetual futures, "they may avoid derivatives trading generally." *Id.* ¶ 20. That is not only speculation; it outright contradicts Cboe's earlier theory, which is that traders will substitute *toward* perpetual-derivatives trading and *away* from stock trading. Next, it contends that perpetual stock futures will somehow "increase the surveillance complexities for Cboe," because perpetual futures "could undermine the integrity of prices established on securities markets,

including Cboe's markets." Dkt. 4-4 ¶ 21. Cboe never explains how perpetual futures could affect the "integrity" of stock prices, much less Cboe's surveillance obligations. Similarly vague, Cboe claims that because perpetual-futures trading activity will not be tracked on the Consolidated Audit Trail, but rather "through separate DCM audit trails and applicable CFTC reporting system," it will be "more difficult for Cboe and other regulators to detect" "coordinated or manipulative activity." *Id.* ¶ 22. But "[t]he causal link between" those alleged injuries and the challenged conduct (treating perpetuals as futures rather than security-based swaps) "is too speculative or otherwise too attenuated to establish standing." *Alliance for Hippocratic Med.*, 602 U.S. at 390.

**b.** Healthy Markets "is an investor-focused nonprofit coalition" that "provides independent information and analysis to investors and other market participants … to improve the transparency, efficiency, competitiveness, and fairness of capital markets." Dkt. 4-8 ¶ 5. Its declaration largely focuses on public-policy arguments that do not amount to a concrete and particularized injury. *See id.* ¶¶ 16-19, 22-36; *Alliance for Hippocratic Med.*, 602 U.S. at 381 ("Article III standing screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action."). While Healthy Markets vaguely gestures toward harms to its "members," it never identifies who those members are. Even if it had, the Court would have to accept a *double* associational-standing theory—*i.e.*, an association has standing because its member is an association whose member is injured.

**B. CMAA has not stated a cognizable APA claim**

CMAA challenges "final agency action," Compl. ¶ 14, but the Commission has not taken any "action" at all—so CMAA has not pleaded a valid APA claim.

**1.** When a DCM wishes to list a new product, it has two choices. *First*, it may self-certify compliance with the CEA and the CFTC's Regulations and start trading the contract almost

immediately unless the Commission stays the listing of the contract. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). *Second*, a DCM may seek prior approval from the Commission before listing a new contract. 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. § 40.3(a). Consistent with the CFMA's self-regulatory approach, the Commission's rules also provide that such contracts "shall be deemed approved … at the conclusion of the applicable review period … unless the Commission issues a notice of non-approval to the registered entity." 17 C.F.R. § 40.3(d)(1). Under either approach, products can be listed without any action by the Commission.

In this case, the DCMs followed the second path, filing applications to list single-stock perpetual futures pursuant to Rule 40.3. The Commission never acted on any of these applications. It did nothing, and by law, that inaction allows the exchanges to list perpetual futures. 17 C.F.R. § 40.3(d).

Inaction is not "final agency action" under the APA. 5 U.S.C. § 706(2). Indeed, the APA itself draws an express contrast between "final agency action," *id.*, and "agency action unlawfully withheld," *i.e.*, inaction, *id.* § 706(1). CMAA only pleaded the former theory, presumably because the second is subject to a much higher burden. *Infra* § I.B.2. CMAA's attempt to artfully plead around the law therefore fails to state a cognizable APA claim.

*DTCC Data Repository (U.S.) LLC v. CFTC*, 25 F. Supp. 3d 9 (D.D.C. 2014), is instructive. There, an exchange certified a new rule to the CFTC, and because the Commission "took no action with respect to the proposed rule" within ten days, it was "deemed certified." *Id.* at 13; *see* 17 C.F.R. § 40.6(b)(1) (procedure for rule changes). The court held that this "approval by operation of law … is not final agency action." 25 F. Supp. 3d at 18. "[T]he CEA and the Commission rules provide [] that the Commission *could* block an unlawful rule change—but not that it *must*," which undercut the notion that there was any agency action to review. *Id.* (emphasis in original). "In

addition," the court held, "there is no 'discrete' agency action here for the Court to review," as "there is no agency decision, reasoning, or record for the Court to assess." *Id.* Likewise here: "the Commission rules provide" that the Commission could issue a notice of non-approval, but it also gives the discretion to remain silent. *See* 17 C.F.R. § 40.3(d). That silence is not final agency action.

CMAA's primary authority, *Brotherhood of Locomotive Engineers and Trainmen v. FRA*, 972 F.3d 83 (D.C. Cir. 2020) (cited at PI 16), is not to the contrary. There, the D.C. Circuit held that the Federal Railroad Administration's tacit approval of an engineer certification program was "a final and reviewable order under the Hobbs Act." *Id.* at 99. But the underlying railroad statute there has fundamentally different aims than the CEA. In the former, "the revised certification program could not be implemented *without the Railroad Administration's approval*." *Id.* (emphasis added). Accordingly, the FRA "agree[d] that its regulatorily prescribed tacit approval … was final agency action." *Id.* at 100. By contrast, "the CEA and the Commission rules provide … that the Commission *could* block [new contracts]—but not that it *must*." *DTCC*, 25 F. Supp. 3d at 18; *see Sprint Nextel Corp. v. FCC*, 508 F.3d 1129, 1131 (D.C. Cir. 2007) (no final agency action where agency "did nothing" and "the 'deemed granted' provision kicked in").

**2.** Even if CMAA had pleaded "agency action unlawfully withheld," 5 U.S.C. § 706(1), that claim would fail. "[T]he only agency action that can be compelled under the APA is action legally *required*," a remedy that is comparable to "writs of mandamus under the All Writs Act." *Norton v. Southern Utah Wilderness All.*, 542 U.S. 55, 63 (2004). If principles of mandamus are any guide, then CMAA has the burden of showing its right to relief is "clear and indisputable," a substantially higher standard. *Cheney v. U.S. District Court*, 542 U.S. 367, 381 (2004); *see Hyatt v. USPTO*, 146 F. Supp. 3d 771, 781 (E.D. Va. 2015) (applying mandamus standard to § 706(1)

claim). The Court should deny a preliminary injunction for failure to plead a valid APA claim, but at minimum, the Court should at least apply the exacting standards for compelling affirmative agency action.

### C. Exchanges can list single-stock perpetual futures as security futures

Both the Commodity Exchange Act and the Exchange Act define the term "security future" as "contract of sale for future delivery of a single security or of a narrow-based security index, including any interest therein or based on the value thereof." 7 U.S.C. § 1a(44); 15 U.S.C. § 78c(a)(55)(A). Put another way, a "security future" is a futures contract where the underlying asset is a security (or narrow-based security index). No one disputes that single-stock perpetual futures are based on securities; the question is simply whether perpetual futures are, in fact, futures.

Cboe recognized not long ago that they are. In regard to "whether perpetual derivatives should be classified as swaps or futures contracts," Cboe said that "it is up to the exchange listing any perpetual derivatives product to determine whether a new contract is to be listed as a future or swap," and "[i]f [an exchange] has a view that a particular product is a futures contract, it may self-certify the contract consistent with that view." Ex. A at 2. Cboe went on: "[a] perpetual derivative that is a futures contract is a contract that 1) either does not have an expiration date or has a long-term-to-expiration, and 2) is designed to include a price convergence mechanism between the futures price and spot price," *i.e.*, "a funding rate mechanism." *Id.* And: "Perpetual futures simply represent another futures instrument through which market participants can meet different investment goals and manage risk." *Id.* at 4. Now, in a complete about-face, Cboe's propped-up "alliance" contends that "[p]erpetual derivatives do not meet th[e] definition" of a future because "perpetuals do not expire and do not contemplate delivery or final settlement on any future date." PI 23. Cboe got it right the first time.

**1.** "No statute … defines 'futures contract.'" *International Fin. Servs.*, 323 F. Supp. 2d at 494. Although the Exchange Act and Commodity Exchange Act use the phrasing "contracts of sale for future delivery," 7 U.S.C. § 1a(44); 15 U.S.C. § 78c(a)(55)(A), neither the courts nor the Commission have understood this language to define the metes and bounds of a future. On the one hand, the phrase is overinclusive. *See CFTC v. Erskine*, 512 F.3d 309, 313 (6th Cir. 2008) ("this broad language … cannot reasonably be applied as broadly as it suggests"). Read literally, it would mean that "all contracts in which settlement lies ahead," such as an order placed in the summer for the delivery of heating oil in the winter, are futures that must trade on CFTC-registered exchanges. *CFTC v. Zelener*, 373 F.3d 861, 865 (7th Cir. 2004). The phrase is also underinclusive. It would exclude contracts where no "future delivery" is possible, like futures tied to stock indices or "cash-settled" futures contracts where the parties settle with money payments rather than delivery. *Id.*

"Although there is no precise definition as to what constitutes a futures contract, courts have distilled from case law and regulatory authorities [several] important elements." *CFTC v. International Foreign Currency, Inc.*, 334 F. Supp. 2d 305, 310 (E.D.N.Y. 2004). First, futures contracts allow traders "to speculate on the intervening price changes without actually having to acquire the underlying [asset]." *Id.* Put another way, a futures contract "does not involve a sale *of the [asset]* at all. It involves a sale *of the contract*." *Zelener*, 373 F.3d at 865. For example, when a trader buys an Apple stock future on the Chicago Mercantile Exchange ("CME"), there is no transfer of any Apple stock.[3] Rather, that trader becomes party to a contract obligating her to pay, or entitling her to receive, a monetary payment based on future changes in the Apple stock price.

[3] CME Group, Apple Futures, https://www.cmegroup.com/markets/equities/single-stock/apple.html (last visited Nov. 6, 2026).

Second, because the trader does not acquire the underlying asset, futures "[c]ontracts are entered into without prepayment, although the markets and clearing house will set margin to protect their own interests." *Chicago Mercantile Exchange ("CME") v. SEC*, 883 F.2d 537, 542 (7th Cir. 1989); *see Int'l Foreign Currency, Inc.*, 334 F. Supp. 2d at 310 ("a margin system of investing" is an "important element[]" of "what constitutes a futures contract"). Returning to the example above, a trader does not make "prepayment" to CME to purchase an Apple stock future. Rather, the trader simply posts "margin," which provides a buffer in the event the futures price moves against his position.

Third, "[f]utures contracts are fungible because they have standard terms and each side's obligations are guaranteed by a clearing house." *CME*, 883 F.2d at 542; *International Foreign Currency*, 334 F. Supp. 2d at 310 ("standardization of contract terms" is an element of a futures contract). This standardization ensures that futures contracts can be traded on an exchange, as the CEA requires. *See* 7 U.S.C. § 6(a). It also "makes it possible to close a position by buying an offsetting contract." *Zelener*, 373 F.3d at 865.

Perpetual futures check all these boxes. First, perpetuals allow traders to speculate on the future price of an underlying asset (including a stock), but traders do not actually buy or sell that asset. Rather, traders earn profits and incur losses based on the movements of the stock price, like other futures traders. Second, there is no "prepayment" required; the trader is required only to post margin, just like any other futures contract. And third, perpetual futures are fungible, standardized contracts that are traded on national exchanges, allowing traders to seamlessly enter and exit positions with offsetting transactions.

**2.** CMAA contends that perpetuals are missing two ingredients of a futures contract. *First*, it claims that perpetuals are not futures because they do not contemplate delivery of the underlying

stock.[4] PI 25. The Seventh Circuit rejected that limitation decades ago. "One might have thought the prospect of 'future delivery' the *sine qua non* of a 'futures' contract. Yet no one, not even the SEC, doubts that a contract may be a futures contract even though it provides for cash settlement" rather than delivery. *CME*, 883 F.2d at 549. For example, "[f]inancial futures … are cash settled and do not entail 'delivery' to any participant," and yet no one doubts that these are futures contracts. *Zelener*, 373 F.3d at 865. Indeed, it is rare for *any* futures contract to be settled through actual delivery. *See Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 971 (4th Cir. 1993) ("Trading in futures seldom results in physical delivery of the subject commodity, since the obligations are often extinguished by offsetting transactions that produce a net profit or loss.").

Cboe itself offers many futures contracts where the idea of a delivery obligation would be incoherent. For example, it offers futures on stock-index levels, like the "the 50 best performing stocks among the 100 constituent stocks included in the Cboe U.S. Large-Mid Cap 100 ("CEQX") Index."[5] But there is no way to deliver a stock index, which is merely a measurement that tracks the performance of a market. *CME*, 883 F.2d at 542 ("futures contracts" that are based on "the value of an index of stocks[] do not allow delivery"). Likewise, Cboe pioneered futures on asset-price *volatility* indices—there is no way to deliver an intangible measure of volatility.[6] *See Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 69 (2d Cir. 2021) (a volatility index "is not a tradable asset" but that "investors may take a position on future levels of market volatility by

[4] The court in *International Financial Currency* stated that "an obligation to make or take delivery of a commodity in the future" is an "important element[]" of a futures contract, but the court also concluded that "some futures contracts" can be "of 'indefinite duration.'" 334 F. Supp. 2d at 311-12. Clearly, the court did not view a fixed delivery obligation as an essential prerequisite.

[5] Cboe, Cboe Relative Performance Futures, https://www.cboe.com/relative-performance-pipeline-hub/ (last visited Nov. 6, 2026).

[6] Cboe, Volatility Index (VIX®) Futures, https://www.cboe.com/tradable-products/vix/vix-futures (last visited Nov. 6, 2026).

purchasing futures contracts on the [volatility] index"). Similarly, CME offers weather futures,[7] also not capable of delivery. The absence of delivery does not exclude perpetuals from the definition of a future.

*Second*, CMAA claims that perpetuals are not futures because they have "no expiration date." PI 25. But the lack of "a specified future delivery date is not determinative." *Int'l Foreign Currency*, 334 F. Supp. 2d at 312. "While futures contracts generally have a specified future delivery date … that date is not always specified thus allowing some futures contracts to be of 'indefinite duration.'" *Id.*; *see also Int'l Fin. Servs.*, 323 F. Supp. 2d at 498 (rejecting argument "without a fixed date for future delivery, a transaction cannot be a futures contract within the Commission's jurisdiction"); *CFTC v. Calvary Currencies, LLC*, 2004 WL 2330725, at *5 (D. Md. Oct. 15, 2004) (finding a futures contract, rather than a spot contract, because the positions "could be held open indefinitely").[8]

For example, in *CME*, the Seventh Circuit confronted "[i]ndex participations," or "IPs," which are "contracts of indefinite duration based on the value of a basket (index) of securities." 883 F.2d at 539. The buyer of an IP (or the "long") made an upfront payment for the IP "in cash on the date of the sale." *Id.* In exchange, the seller of an IP (or the "short") "promise[d] to pay the buyer the value of the index as measured on a 'cash-out day'"—specifically, by paying the long "a sum approximating the value of dividends the stocks in the index have paid during the quarter." *Id.* at 539-40. These "IPs last[ed] indefinitely," just like perpetuals. *Id.* at 545. And the Seventh

---

[7] CME Group, Chicago HDD Monthly, https://www.cmegroup.com/markets/weather/hdd/chicago-hdd-monthly.contractSpecs.html (last visited Nov. 6, 2026).

[8] CMAA suggests that these cases are inapposite because they "pre-date the Dodd-Frank Act and Congress's comprehensive swap regime." TRO 26. But in Dodd-Frank, Congress provided that futures contracts are *not* swaps, *see* 7 U.S.C. § 1a(47)(B)(i), so if the courts characterized a contract as a "future" before Dodd-Frank, that conclusion still holds.

Circuit held these "indefinite" contracts to be futures subject to CFTC jurisdiction, highlighting characteristics similar to that of perpetuals: IPs obligated the short "to pay the value of an index on a prescribed day" (much like a funding-rate payment); both sides owe their obligations "to the clearing house" rather than to each other; the contracts "may be settled by buying or selling an offsetting obligation"; and the short "must put up [] margin." *Id.* at 546.

Moreover, the absence of an expiration date is functionally of no difference from futures contracts that are already on the market. For instance, Cboe offers "continuous futures," which are futures with expirations extending up to 10 years that, in Cboe's words, "provide access to a *perpetual-style futures product* in a U.S.-regulated, intermediated environment." Ex. B (emphasis added). Virtually all of CMAA's criticisms of perpetual futures are true of Cboe's continuous futures. For instance, Cboe's continuous futures use a "daily cash adjustment," called a "Funding Amount," to "incentivize[] price convergence of the futures to the underlying crypto reference rate," Ex. B—a feature CMAA now says is a telltale sign of a swap, Compl. ¶ 130. Cboe touts its continuous futures as "designed to provide continuous, long-term exposure," Ex. B, and yet CMAA castigates perpetual futures for providing "continuous exposure," PI 25. Cboe also highlights that continuous futures "eliminate the need for investors to roll positions regularly," Ex. B, but CMAA assails perpetual futures for "provid[ing] exposure without repeatedly rolling an expiring futures position," Compl. ¶ 111 (citation omitted). Continuous futures and perpetual futures have the same "underlying purpose," *CFTC v. Co Petro Mktg. Group, Inc.*, 680 F.2d 573, 581 (9th Cir. 1982), so if the former can be futures, the latter can be too.

**3.** CMAA argues that perpetuals are security-based *swaps* and therefore cannot be security *futures*, since they "offer a recurring exchange of payments based on changes in a stock's value with no future delivery obligation at any time." PI 26-27; *see also id.* at 9-10 (citing 7 U.S.C.

§ 1a(47)(A)(iii); 15 U.S.C. § 78c(a)(68)(A)). But that order of operations—if something is a swap, it's not a future—is backwards. Rather, if something is a future, it's not a swap, much less a security-based swap. *See* 91 Fed. Reg. 37,873, 37,876 (June 24, 2026) (SEC and CFTC jointly recognizing that "[a]ny contract of sale of a commodity for future delivery …, as well as any security futures product, is excluded from the 'swap' definition"). Consider the text:

1. A security-based swap must be a "swap, as that term is defined under section 1a of the Commodity Exchange Act (without regard to paragraph (47)(B)(x) of such section)." 15 U.S.C. § 78c(a)(68)(A)(i).
2. Section 1a(47)(A) of the CEA contains several definitions of a "swap," but those definitions apply only "*[e]xcept as provided in subparagraph (B)*." 7 U.S.C. § 1a(47)(A) (emphasis added).
3. Section 1a(47)(B) of the CEA provides that "[t]he term 'swap' does not include" futures contracts, including securities futures. *Id.* § 1a(47)(B), (B)(i).
4. Thus, if a contract can be classified as a future, it need not be classified as a "swap."

Here, because perpetual futures are futures, the Commission was not required to re-classify them as swaps.

Cboe understands this. In a proposed rule change to the SEC earlier this year, it acknowledged that "[t]he definition of 'security-based swap' in the Act is broad enough to include" the contracts it sought to list, but that "if an instrument qualifies as a securities option under the Act and the Securities Act …, it is categorically removed from the swap and security-based swap definitions as a matter of statutory construction." 91 Fed. Reg. 65,854, 65,867 (Oct. 16, 2026) (citing 7 U.S.C. § 1a(47)(B)(iii)). Applying Cboe's logic here, since single-stock perpetuals are security futures, they necessarily are not security-based swaps, 7 U.S.C. § 1a(47)(B)(i), even if

"[t]he definition of 'security-based swap' in the Act is broad enough to include" them, 91 Fed. Reg. at 65,867.

This order of operations (if a future, then not a swap) makes sense. The "swap" definitions are strikingly "broad[ ]," *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025), and would arguably encompass every futures contract. Consider CME's futures contract on Apple stock, which expires monthly. *Supra* n.3. That stock future, like a perpetual, ostensibly fits the third prong of the "swap" definition, because it "provides on an executory basis for the exchange [of] payment[ ] based on the value [of a] … securit[y]" that "transfers, as between the parties to the transaction … the financial risk associated with a future change in any such value … without also conveying a current or future direct or indirect ownership interest." 7 U.S.C. § 1a(47)(A)(iii). On CMAA's theory, that security future must be re-classified as a swap. *See* PI 22 (emphasizing this definition). But the statute says otherwise: a contract that is a future is not a swap. 7 U.S.C. § 1a(47)(B)(i).

**4.** "Regulatory history" is not to the contrary. PI 27. In May, the Commission issued an order approving the trading of perpetual contracts on digital assets like Bitcoin as futures. *See* BTCPERP Order. Since then, perpetual futures have begun trading in other commodities, like precious metals and broad-based stock indices. *See* Compl. ¶ 106. Digital-asset perpetual futures, to be sure, are the subject of ongoing litigation, but it is hardly revolutionary for the same perpetuals to trade as futures simply because they are based on single stocks.

Nor do prior enforcement actions alleging that certain offshore perpetuals were "swaps" suggest arbitrariness here. While true that the Commission alleged that the perpetuals in those cases were swaps, it also recognized that those perpetuals had the features of a futures contract. *See, e.g.*, *CFTC v. MEK Global Ltd.*, No. 1:24-cv-2255, Compl. ¶ 41 (S.D.N.Y. Mar. 26, 2024)

(describing defendant's "perpetual futures" both as "'swaps' under the Act" *and* as "similar to quarterly delivery futures, except that they have no predetermined settlement time, and therefore perpetual futures contracts can be held indefinitely until the holder decides to close them, or until they are forced to liquidate due to insufficient margin"); *see also United States v. Eisenberg*, 784 F. Supp. 3d 579, 588, 602 (S.D.N.Y. 2025) (holding that "[t]he MNGO Perpetuals are swaps" yet that the contract "is essentially a futures contract—that is, an 'agreement to purchase or sell a particular asset on a later date at a predetermined price'"). Furthermore, "[t]he change-in-position doctrine" applies only when "an agency changed existing *policy*." *FDA v. Wages & White Lion Investments, L.L.C.*, 604 U.S. 542, 570 (2025) (emphasis added). Allegations in enforcement actions do not control agency policy. *Cf. Kisor v. Wilkie*, 588 U.S. 558, 579 (2019) (an agency "litigating position" is not entitled to deference because it does not reflect the agency's "fair and considered judgment"). In fact, the Commission requested comment in 2025 about whether "Perpetual Derivatives [should] be classified as swaps or futures contracts," demonstrating that there was no agency "policy" that perpetuals are swaps. CFTC, *Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives* (Apr. 21, 2025), https://www.cftc.gov/media/12041/Perpetuals_RFC042125/download.

**D. The Commission did not act arbitrarily by not issuing a notice of non-approval**

CMAA also claims that the Commission acted arbitrarily and capriciously by "deeming approved applications for novel derivative products on individual stocks by operation of its regulations" rather than affirmatively explaining "how that decision comports with the statutory framework and the agency's prior position." PI 18. Again, this claim seeks to compel agency action, which is not pleaded. *Supra* § I.B. And even if it had, CMAA cannot satisfy the high bar to compelling agency action, for two reasons.

First, such an order would "direct[] [the Commission] *how* it shall act"—that is, by issuing an affirmative order rather than by deeming the applications approved. *Norton*, 542 U.S. at 64. Second, it is entirely "discretionary" for the Commission to issue an affirmative order as opposed to deeming an application approved, and courts do not compel discretionary agency action. *Id.* Indeed, the Commission's rule expressly provides that products "shall be deemed approved" "at the conclusion of the applicable review period," 17 C.F.R. § 40.3(d)(1), which is exactly what happened here. It would be remarkable to say that an agency acts arbitrarily by complying with its own procedures. *See Erie Boulevard Hydropower, LP v. FERC*, 878 F.3d 258, 269 (D.C. Cir. 2017) ("It is axiomatic … that an agency is bound by its own regulations.").

All of CMAA's process arguments—that agencies must "actually scrutinize the applications," "make its own reasoned findings," etc.—are essentially an attack on Rule 40.3(d) itself, as they presuppose that no application should ever be deemed approved by the Commission. PI 18; *see id.* at 19 ("The APA forbids the CFTC to 'abdicate' its statutory responsibilities in this manner."). CMAA does not challenge the rule in its complaint, and for good reason: that is a hard argument to win against any agency, given the "very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure." *Vermont Yankee Nuclear Power Corp. v. NRDC, Inc.*, 435 U.S. 519, 544 (1978). But it is especially ill-fitted to the Commodity Exchange Act, which recognizes a default rule that a "registered entity may elect to list for clearing any new contract" simply "by providing to the Commission … a written certification that the new contract … complies with" the CEA and Commission regulations. 7 U.S.C. § 7a-2(c)(1). Since the statute permits exchanges to self-certify new products for trading without any agency intervention, it is not arbitrary for new products to be "deemed approved" without Commission intervention.

CMAA also claims that the "deemed approval" is arbitrary because the Commission and SEC put out a joint request for comment on aspects of cash-settled perpetual contracts. PI 20-21. But the joint request did not request comment on whether perpetuals are futures; to the contrary, when the joint request came out, the Commission had *already* approved digital-asset perpetuals as futures. And Plaintiff cites nothing to support the proposition that an agency must account for comments filed in separate proceedings.

***

CMAA is not likely to succeed on the merits for four distinct reasons, and there is no "clear or substantial likelihood" that CMAA will run the table against all of them. *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007). The preliminary injunction should be denied.

## II. CMAA will not be irreparably harmed

Any "party seeking a preliminary injunction must demonstrate that irreparable harm is not only 'possib[le]' but 'likely.'" *Daileader*, 96 F.4th at 358. And "[u]nder the heightened standard applicable" to mandatory injunctions, CMAA "must make a 'strong showing' that [it] will be irreparably harmed." *Id.* CMAA comes nowhere close. It does not even have standing to press its claim, *supra* § I.A, but even if such generic claims sufficed for purposes of standing, the "conjectural" "harm [CMAA's] members would suffer" is "not "irreparable." Dkt. 11.

For one, the exchanges claim "economic harm," which generally "does not constitute irreparable injury." *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36 (D.D.C. 2014); *see* Dkt. 4-4 ¶ 25 ("A transaction diverted to a DCM cannot later be executed on a Cboe exchange, and the trading opportunity and associated revenue are permanently lost."). Indeed, even when "economic losses may be unrecoverable," that "does not, in and of itself, compel a finding of irreparable harm, for the harm must also be more than simply irretrievable; it must also be serious in terms of its

effect on plaintiff." *Safari Club*, 47 F. Supp. 3d at 36 (citation modified). The declarations offer nothing besides speculation to suggest that there will be any "serious" effect to Cboe, Citadel, or Healthy Markets' unidentified exchange members if an injunction is denied here. In fact, the evidence available from the cryptocurrency space indicates that perpetual futures do not even divert trading in *other futures*. *Supra* n.2.

Nor is there support for the conclusory assertions that any harms cannot be remedied after the fact. For example, Cboe worries that "a later judgment" will not "restore future demand for lawfully regulated versions of perpetual products if investors have lost confidence in the product category in the meantime." Dkt. 4-4 ¶ 27. Apart from being pure guesswork, Cboe never specifies what "lawfully regulated perpetual products" it would offer. Likewise, Citadel fears that it "may be difficult to unwind or displace" positions on perpetual futures, but it never explains how that is a harm *to Citadel* as opposed to the exchanges offering perpetual futures. Dkt. 4-7 ¶ 23; *see also* Dkt. 4-8 ¶ 40 (similar).

## III. The equities do not favor Plaintiff

"[W]here the government is a party to the suit," the balance-of-hardships and public-interest factors "merge." *Mahdawi v. Trump*, 136 F.4th 443, 449 (2d Cir. 2025). Those factors favor Defendants. Denying a preliminary injunction would allow perpetual futures to trade on single stocks, much like they have already been trading on various commodities including cryptocurrencies, energy, precious metals, and broad-based security indices. Furthermore, as CMAA acknowledges (*see* PI 8), the SEC has 60 days from the date of CFTC approval to "summarily abrogate" the DCM's rule change. *E.g.*, 91 Fed. Reg. at 60,447. The SEC's ongoing role alleviates Plaintiff's concern that "the CFTC has permitted an end-run around the [SEC's] regulatory regime." PI 1.

Granting an injunction would harm the public interest.[9] Perpetual futures trade in high volumes in foreign jurisdictions, and onshoring those products ensures U.S. investors access to those products in a regulated environment. An injunction would roll that effort back, allowing offshore, unregulated derivatives to continue proliferating to the detriment of U.S. traders and Commission policy efforts.

## CONCLUSION

The motion for a preliminary injunction should be denied.

Dated: November 6, 2026

Respectfully submitted,

By: */s/ Henry J. Dickman*
Henry J. Dickman (*pro hac vice* pending)
Senior Assistant General Counsel
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, DC 20581
Tel. (202) 418-5607
hdickman@cftc.gov

*Attorneys for Defendants*

TYLER S. BADGLEY
General Counsel
M. JORDAN MINOT
Deputy General Counsel
HENRY J. DICKMAN
Senior Assistant General Counsel
ANNE STUKES
Senior Assistant General Counsel
ANDREW J. WEISBERG
Senior Assistant General Counsel

U.S. Commodity Futures Trading Commission
Three Lafayette Centre

[9] If the Court were to grant Plaintiff's motion, Defendants request that any injunctive relief be accompanied by a bond under Fed. R. Civ. P. 65(c). Defendants also request that such relief be stayed pending the disposition of any appeal.

1155 21st Street, NW
Washington, DC 20581
Tel. 202-209-1087
Fax. 202-418-5567
tbadgley@cftc.gov
jminot@cftc.gov
hdickman@cftc.gov
astukes@cftc.gov
aweisberg@cftc.gov

## CERTIFICATE OF COMPLIANCE

I, Henry J. Dickman, certify that this document complies with the word limitation in Local Civil Rule 7.1(c) in that it contains 8,740 words, exclusive of the caption, table of contents, table of authorities, signature blocks, and required certificates.

Dated: November 6, 2026

By: */s/ Henry J. Dickman*
Henry J. Dickman