**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

CAPITAL MARKETS ALLIANCE ASSOCIATION,

*Plaintiff,*

–v.–

COMMODITY FUTURES TRADING COMMISSION, *et al.*,

*Defendants.*

Case No. 26-cv-9608

# BRIEF OF CHICAGO MERCANTILE EXCHANGE INC. AS AMICUS CURIAE IN SUPPORT OF PLAINTIFF

## TABLE OF CONTENTS

INTRODUCTION AND INTERESTS OF AMICUS CURIAE .................................................. 1

ARGUMENT ................................................................................................................ 1

I. Futures Developed to Hedge Against Future Risks. ......................................................... 1

II. Dodd-Frank Introduces Federal Regulation of Swaps. ...................................................... 3

III. Perpetuals Are Intraday Bets on the Price of the Underlying. ............................................ 5

IV. Perpetuals Are Swaps, Not Contracts of Sale of Commodities or Securities for Future Delivery. ......................................................................................................... 7

CONCLUSION ............................................................................................................ 10

# TABLE OF AUTHORITIES

**Cases**

*CFTC v. Zelener*, 373 F.3d 861 (7th Cir. 2004) ........ 8

*Chicago Mercantile Exchange v. SEC*, 883 F.2d 537 (7th Cir. 1989) ........ 9

*Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992) ........ 8

*Duncan v. Walker*, 533 U.S. 167 (2001) ........ 9

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ........ 9

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) ........ 1, 2

*Niz-Chavez v. Garland*, 593 U.S. 155 (2021) ........ 8

*United States v. Phillips*, 155 F.4th 102 (2d Cir. 2025) ........ 3

**Statutes**

7 U.S.C. § 1a ........ 2, 4, 9, 10

7 U.S.C. § 2 ........ 2, 10

7 U.S.C. § 6 ........ 7

7 U.S.C. § 6d ........ 4

7 U.S.C. § 6s ........ 4

26 U.S.C. § 1212 ........ 4

26 U.S.C. § 1222 ........ 4

26 U.S.C. § 1256 ........ 4

Future Trading Act, Pub. L. No. 67-66, ch. 86, § 4, 42 Stat. 187 (1921) ........ 2

**Regulations**

17 C.F.R. § 16.01 ........ 7

17 C.F.R. pt. 22 ........ 4

17 C.F.R. pt. 38 app. C ........ 7

17 C.F.R. § 39.13 ........ 4

17 C.F.R. §§ 43.1–.7 .......... 4

17 C.F.R. §§ 45.1–.15 .......... 4

17 C.F.R. pt. 190 .......... 4

**Other Authorities**

Am. Cotton Shippers Ass'n, Comment Letter on Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives (May 2025), https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=74926 .......... 6

CFTC, *CFTC Glossary*, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm .......... 9

CFTC, *Crypto Asset Perpetual Contracts* (May 2026), https://www.cftc.gov/sites/default/files/2026/05/Perps%20-%20One%20Pager%20(Final)_0.pdf .......... 6

Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48208 (Aug. 13, 2012) .......... 8

*Futures Contract*, Black's Law Dictionary (12th ed. 2024) .......... 2, 7

Krystal Hur & Vicky Ge Huang, *Kalshi Looks to Expand a Rapidly Growing Universe of Risky Trading*, Wall St. J. (Sep. 11, 2026), https://www.wsj.com/finance/kalshi-looks-to-expand-a-rapidly-growing-universe-of-risky-trading-a7670fde .......... 6

Nat'l Council of Farmer Coops., Comment Letter on Request for Comment on the Trading and Clearing of "Perpetual" Style Derivatives (May 2025), https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=74915 .......... 6

Order Approving KalshiEX LLC BTCPERP Futures Contract (CFTC May 29, 2026), https://www.cftc.gov/filings/documents/2026/orgdcmkexbtxperporder26601.pdf .......... 5

*Perpetuals*, Kalshi, https://kalshi.com/perpetuals/learn#s7 .......... 5

Policy Statement Concerning the Listing of Perpetual Contracts, 91 Fed. Reg. 33160 (June 3, 2026) .......... 2, 3, 5

## INTRODUCTION AND INTERESTS OF AMICUS CURIAE

CME Group—which includes subsidiaries Chicago Mercantile Exchange Inc. (CME), Chicago Board of Trade, New York Mercantile Exchange, and Commodity Exchange—is the world's leading derivatives marketplace. Its subsidiary designated contract markets (DCMs) host some of the highest trading volumes for futures contracts across all types of commodities. CME Group and its DCMs have innovated in the futures industry for over 150 years.

CME submits this amicus brief in support of Capital Markets Alliance Association (CMAA) because CME has a significant interest[1] in ensuring that the CFTC complies with the Commodity Exchange Act's (CEA) regulation of contracts of sales of commodities "for future delivery," colloquially known as futures. The CFTC, through the action in this case and others, has fundamentally changed what it means to be a future, contrary to the statute. That action has adversely impacted CME as both a market participant and an entity dependent on consistent and lawful government regulation. Because the government's decision to allow perpetual contracts to trade as futures is blatantly contrary to the statute, this Court should rule in favor of CMAA.

## ARGUMENT

### I. <u>Futures Developed to Hedge Against Future Risks.</u>

Futures contracts originated as a means to hedge against future changes in the price of agricultural commodities. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 357 (1982). Rather than buy and sell agricultural products in real-time through "central markets,"

[1] As CME explains in its motion accompanying this brief, CME is litigating a challenge to Defendants' approval of different perpetual contracts. Referencing that case, the CFTC misleadingly claims that "[t]he empirical evidence suggests that cryptocurrency perpetual futures have not diverted trading in cryptocurrency dated futures." CFTC Opp'n at 10-11 n.2. That argument has no bearing on this case, and CME has already explained why that argument is wrong. *See* ECF 45 at 19 n.6, *Chicago Mercantile Exchange v. Selig*, No. 26-cv-2157 (D.D.C. 2026).

"buyers and sellers entered into contracts for the future delivery of an agricultural product," agreeing on a contract price based on "their judgment about expected market conditions at the time of delivery." *Id.* Buyers could hedge against higher anticipated future prices by locking in a price today for a delivery date in the future, and sellers could hedge against lower anticipated future prices by promising to deliver in the future at a price agreed to today. *Id.*

By the 19th century, boards of trade developed to facilitate the trading of futures. *Id.* at 358. These exchanges created "standardized agreements covering specific quantities of graded agricultural commodities to be delivered during specified months in the future." *Id.* Due to market-manipulation concerns, Congress began regulating futures in the 1920s. *Id.* at 361. In 1921, through the Future Trading Act, Congress sought to regulate certain contracts "for future delivery." Pub. L. No. 67-66, ch. 86, § 4, 42 Stat. 187 (1921).

Today, the CEA regulates the same contracts: "contract[s] of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A); *see also id.* § 1a(44) (regulating "a contract of sale for future delivery of a single security or of a narrow-based security index"). That text works because futures are just that: contracts that specify a future time to buy or sell a commodity. *See, e.g.*, *Futures Contract*, Black's Law Dictionary (12th ed. 2024) ("An agreement to buy or sell a standardized asset (such as a commodity, stock, or foreign currency) at a fixed price at a future time[.]"). That future delivery time is the contract's expiration date.

Expiry is more than just a statutory requirement: it is the structural feature of a future that allows for hedging. The expiry date causes "convergence with the underlying asset's spot price." Policy Statement Concerning the Listing of Perpetual Contracts, 91 Fed. Reg. 33160, 33161 (June 3, 2026) (Policy Statement). On the contract's expiration date, the price of the contract can be expected to be the same as the price of the underlying commodity in the spot market. *Id.*

Convergence allows a party to hedge, because the party knows that it can exit its position as the delivery date approaches in a manner that reflects the actual prevailing market price of the commodity. *Id.* That future prevailing market price is exactly what the party hedged against.

A hypothetical example demonstrates this function. Imagine a wheat farmer wishes to effectively guarantee a price at which she can sell six months from now and is worried that the price of wheat will be lower in the future. To hedge against that possibility, she takes a short position in a futures contract today, agreeing to sell 1,000 bushels of wheat for $10 per bushel in six months' time (a value of $10,000). The farmer guessed correctly; six months from today, wheat is selling for $9 per bushel. Because at the future's expiration in six months the contract will be trading at $9 per bushel—the prevailing spot price—the farmer can enter into an offsetting futures transaction to exit her position, agreeing to buy 1,000 bushels of wheat for $9,000. As a result, she pockets the $1,000 difference and sells her harvested wheat in the spot market for $9,000, achieving the effective price of $10 per bushel.

## II. Dodd-Frank Introduces Federal Regulation of Swaps.

Futures are not the only type of derivatives contract. Among the other types of derivatives are "swaps," which for years were not subject to regulation under the CEA. *See United States v. Phillips*, 155 F.4th 102, 112 (2d Cir. 2025). Compared to futures, which "contemplate delivery of … a commodity at some future time, swaps are 'pure financial instrument[s] … based on the difference between two fluctuating values.'" *Id.* (citation omitted).

The failure to adequately regulate swaps was seen as a major contributing cause of the 2008 financial crisis. *See id.* at 113. In response, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank) to bring swaps within the purview of the CFTC. *Id.* Dodd-Frank broadly defines swaps, including as, *inter alia*,

> any agreement, contract, or transaction that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more … commodities … and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset … that incorporates the financial risk so transferred.

7 U.S.C. § 1a(47)(A)(iii). The definition of swap excludes contracts of sale of a commodity for future delivery. *Id.* § 1a(47)(B)(i).

Although both futures and swaps are forms of derivatives contracts, their regulatory treatment differs in material ways. These differences include:

- ***Swap Dealer Registration***: the CEA and related regulations require that entities that make markets in swaps or regularly trade swaps above a certain threshold register as swap dealers. 7 U.S.C. § 6s. Swap dealers are subject to additional regulatory requirements, including capital, business-conduct, recordkeeping, and supervision requirements. *Id.* There are no parallel requirements for those who trade futures. *Id.*

- ***Margin Treatment***: Derivatives clearing organizations (DCOs) must require initial margin that covers a five-day liquidation time for swaps, whereas the initial margin required for futures must cover only a one-day liquidation time. 17 C.F.R. § 39.13(g)(2).

- ***Swap Data Reporting***: CFTC regulations impose specific reporting obligations on venues where swaps are traded. For example, venues offering swaps must report real-time swap transaction and pricing data. 17 C.F.R. §§ 43.1–.7. Swap transaction data must also be reported to a registered swap data repository. *Id.* §§ 45.1–.15. Futures are not subject to these requirements. *Id.*

- ***Customer Collateral Segregation***: Customer funds and property held in connection with cleared swap positions are segregated under a framework known as LSOC—“legally segregated, operationally commingled.” 7 U.S.C. § 6d(f)(2); 17 C.F.R. pts. 22, 190. Futures are not subject to LSOC.

- ***Tax Treatment***: Under the tax code, 60 percent of any gain or loss on futures is treated as long-term capital gain or loss regardless of how long a taxpayer held her position. 26 U.S.C. § 1256(a)(3), (b)(1)(A). The tax code also provides other benefits for futures, including that a taxpayer may carry back net losses to each of the three taxable years preceding the loss year. *Id.* § 1212(c). Swaps do not get this

favorable treatment and are subject to short-term capital gains taxation unless a position is held for more than one year. *Id.* § 1222(1), (3).

## III. <u>**Perpetuals Are Intraday Bets on the Price of the Underlying.**</u>

CMAA's case, like CME's, concerns perpetual contracts, a novel derivatives contract that had never traded in the United States before this year. Perpetual contracts have "indefinite (or 'perpetual') term[s]." Order Approving KalshiEX LLC BTCPERP Futures Contract, at 2 (CFTC May 29, 2026)[2] (Kalshi Order). Unlike futures contracts, perpetuals do not "expire on a fixed date," and a party to the contract can hold its position forever if so desired. *Id.*

As a result of their lack of expiry, perpetuals do not naturally converge to the spot price of the underlying asset at any given time. For that reason, nothing naturally keeps a perpetual economically tethered to the underlying asset. Policy Statement, 91 Fed. Reg. at 33161. That is a problem, given that price convergence at expiration is what makes hedging against risk with futures possible. *Id.*

In an effort to solve this issue, exchanges offering perpetuals have developed a so-called "substitute mechanism" known as a "funding rate," which futures do not have. *Id.* It is a "periodic payment between the long and short sides of" a perpetual contract, "the direction and magnitude of which is generally determined by the difference between the perpetual contract's market price and the underlying asset's spot price." *Id.* In the case of Kalshi, its funding-rate mechanism requires parties on either side of most contracts to exchange payments every eight hours. *Perpetuals*, Kalshi.[3] When the perpetual contract is trading above the spot price, the long side (i.e., the buyer) pays the funding-rate amount to the short side (i.e., the seller). Policy Statement, 91 Fed. Reg. at 33161. When the inverse is true, the short side pays the long side. *Id.*

---

[2] https://www.cftc.gov/filings/documents/2026/orgdcmkexbtxperporder26601.pdf
[3] https://kalshi.com/perpetuals/learn#s7

The funding-rate mechanism introduces fundamental differences between a true futures contract and a perpetual. Rather than convergence occurring at expiration, which a perpetual lacks, the funding rate is designed to maintain *constant* price convergence between the spot price of the underlying asset and the contract price. In other words, a perpetual provides continuous (and perhaps infinite) "exposure to the underlying reference asset." CFTC, *Crypto Asset Perpetual Contracts*, at 1 (May 2026).[4] A true future, on the other hand, is used to *hedge against* precisely this type of economic exposure. Unlike a true future, perpetuals let traders make intraday bets on the spot price of the underlying asset. *See, e.g.*, Krystal Hur & Vicky Ge Huang, *Kalshi Looks to Expand a Rapidly Growing Universe of Risky Trading*, Wall St. J. (Sep. 11, 2026)[5] ("The contracts—known as perps—let traders bet around the clock and pile on leverage that amplifies their potential gains and losses, with the lack of expiration date further heightening the risks.").

The farmer discussed above would not enter into a perpetual for hedging purposes, because a perpetual would expose her to daily price fluctuations in wheat rather than allow for planning against a future price. For that reason and others, trade organizations representing sellers of traditional commodities have opposed the expansion of perpetuals. *See, e.g.*, Am. Cotton Shippers Ass'n (ACSA) Comment[6] ("In traditional asset markets, ACSA feels that perpetual contracts do not serve the needs of commercial hedgers and do not promote risk management against physical exposure or promote proper price discovery functions."); Nat'l Council of Farmer Coops.

---

[4] https://www.cftc.gov/sites/default/files/2026/05/Perps%20-%20One%20Pager%20(Final)_0.pdf

[5] https://www.wsj.com/finance/kalshi-looks-to-expand-a-rapidly-growing-universe-of-risky-trading-a7670fde

[6] https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=74926

Comment at 2 ("[A]s the delivery month of a futures contract approaches, the cash price and the futures price come together, and it is this convergence that makes hedging effective.").[7]

## IV. Perpetuals Are Swaps, Not Contracts of Sale of Commodities or Securities for Future Delivery.

The CFTC does not meaningfully dispute that perpetuals are swaps unless they are a "contract of sale of a commodity for future delivery," or, in this case, "a contract of sale for future delivery of a single security or of a narrow-based security index." The CFTC, however, fails to show that perpetuals are contracts "for future delivery," as required by the statute. That plain text is dispositive and demonstrates the illegality of the government's action.

The only way that a contract can be "for future delivery" is with an expiration date, because expiry is what forces a party to the contract to in fact deliver the asset or its equivalent. *See Futures Contract*, Black's Law Dictionary (12th ed. 2024) ("An agreement to buy or sell a standardized asset (such as a commodity, stock, or foreign currency) at a fixed price *at a future time*, usu. during a particular time of a month." (emphasis added)). Consistent with the statutory language, the CEA requires that any "contract for the purchase or sale of a commodity for future delivery" include the "terms of delivery." 7 U.S.C. § 6(a).

The plain language is confirmed by the CFTC's own regulations. For example, Appendix C to Part 38 of the CFTC's regulations states that cash-settled futures contracts shall be "settled by cash payment in lieu of physical delivery of the commodity" "*at contract expiration*." 17 C.F.R. pt. 38 app. C(c)(1) (emphasis added); *see also id.* (mentioning contract expiration eight different times). Highlighting the importance of an expiration date, the CFTC mandates that "futures" be reported by "commodity and by futures *expiration date*." 17 C.F.R. § 16.01(a)(1)(i) (emphasis added).

---

[7] https://comments.cftc.gov/PublicComments/ViewComment.aspx?id=74915

Rather than follow the plain language, the CFTC simply ignores the statute and its own regulations, instead offering a vague assertion that substance over form should control. CFTC Opp'n at 1. Yet this Court must apply the language of the statute—not the CFTC's policy view. *See, e.g.*, *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."). Even the cases the CFTC cites reject its attempts to ignore the statutory language. For example, *Zelener* "start[ed] with the statute itself" and emphasized that it is improper to "ignore the contract's form and focus on economic effects"—indeed the CEA is "*about* form." *CFTC v. Zelener*, 373 F.3d 861, 865-66 (7th Cir. 2004). Any faithful statutory analysis emphasizes form—what the statute says—because "words are how the law constrains power." *Niz-Chavez v. Garland*, 593 U.S. 155, 172 (2021).[8]

The CFTC's "substance" arguments only underscore why it is wrong. The CFTC contends that perpetuals are futures because (1) they "allow traders to speculate on the future price of an underlying asset"; (2) "there is no 'prepayment' required"; and (3) the contracts "are fungible, standardized contracts that are traded on national exchanges," allowing for offsetting. CFTC Opp'n at 18. But ever since Dodd-Frank, swaps can be "standardized and fungible" like futures. So characteristics like whether the contract can be traded on an exchange, be cleared, or have margin requirements—perhaps relevant to distinguishing futures *from other types of contracts*—shed no light on the issue here. *See, e.g.*, Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48208, 48303 (Aug. 13, 2012) (after Dodd-Frank, "[p]rior

[8] In any event, perpetuals and futures are not the same in *substance*, either. As CME explained, perpetuals' lack of expiry creates notable differences in how the contracts function and the obligations on parties to the contracts. *See supra* § III.

distinctions that the CFTC relied upon (such as the presence or absence of clearing) to distinguish between futures and swaps may no longer be relevant”). The only way perpetuals can avoid treatment as swaps is if they require future delivery, which they do not.

The CFTC’s approach would classify as a future any standardized, fungible derivatives contract providing for payments based on future changes in the underlying asset’s value. But under Dodd-Frank, such contracts, where there is no expiry, are *swaps*. Swaps, per their statutory definition, “provide[] on an executory basis” for recurring payments based on a commodity’s value while transferring “the financial risk associated with a future change” in that value. 7 U.S.C. § 1a(47)(A)(iii). Accepting the government’s argument that recurring future payment obligations render a contract a future would completely swallow the definition of swap.

The CFTC’s argument also renders superfluous the phrase “for future delivery.” *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (a court must “give effect, if possible, to every clause and word of a statute” and avoid “treat[ing] statutory terms as surplusage” (citations omitted)). The CFTC does not even attempt to explain what the phrase means. Instead, it relies entirely on pre-Dodd Frank (and pre-*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)) case law applying multi-factor balancing tests in cases involving differentiating futures from forward or spot transactions, not swaps. These cases are not relevant here, and do not permit a court to simply ignore the statute Congress passed. In particular, the CFTC’s reliance on *Chicago Mercantile Exchange v. SEC*, 883 F.2d 537 (7th Cir. 1989), is misplaced because, as with every other futures contract, those contracts had cash-out dates equivalent to expiration dates.

That some futures contracts are cash settled (instead of settled via physical delivery) or have expiration dates years into the future does not alter the statutory text. Cash settlement is just

the delivery of the economic equivalent of the commodity. The CFTC agrees. *CFTC Glossary*.[9] Its glossary defines "delivery" as "the tender and receipt of the actual commodity, the cash value of the commodity, or of a delivery instrument covering the commodity (e.g., warehouse receipts or shipping certificates), used to settle a futures contract." *Id.*

That the physical commodity is not always delivered does not remove the expiration requirement. The CEA makes clear that a "commodity" includes "all services, rights, and *interests* … in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9) (emphasis added). The only way to deliver certain commodities—like an intangible interest—is through exchanging their cash equivalent. So a cash-settled future (as well as an index future) fits comfortably within the definition because, by having an expiration date at which point the party must settle, it is "for future delivery." Moreover, Congress knew how to require "actual delivery" and did so in other contexts in the CEA. *See, e.g.*, 7 U.S.C. § 2(c)(2)(C)(i)(II)(bb)(AA); *id.* § 2(c)(2)(D)(ii)(III)(aa). It did not do so for futures, because they do not require actual delivery. They require an expiration date.

## CONCLUSION

The CFTC's continued approval of perpetuals as contracts of sale for future delivery is contrary to the plain text of the CEA. This Court should find that CMAA has shown a likelihood of success on the merits.

---

[9] https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm

Dated: November 10, 2026

Respectfully submitted,

*/s/ Aitan Goelman*

Aitan D. Goelman
Ivano M. Ventresca (*pro hac vice* forthcoming)
Brian J. Beaton, Jr. (*pro hac vice* forthcoming)

ZUCKERMAN SPAEDER LLP
2100 L Street NW, Suite 400
Washington, DC 20037
Tel: (202) 778-1800
Fax: (202) 822-8136
agoelman@zuckerman.com
iventresca@zuckerman.com
bbeaton@zuckerman.com

*Attorneys for Amicus Curiae Chicago Mercantile Exchange Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c) and Rule III.B.1 of the Individual Rules and Procedures for Civil Cases of the Honorable Lorna G. Schofield, the undersigned certifies that this brief complies with the applicable word limit. This brief was prepared using Microsoft Word in 12-point Times New Roman type, with footnotes in 12-point type, double-spaced, with margins of not less than one inch on all sides. Excluding the caption, any table of contents or table of authorities, the signature block, and this certificate, and including footnotes, this brief contains 3,183 words, as counted by the word-count function of Microsoft Word.

Dated: November 10, 2026

*/s/ Aitan D. Goelman*
Aitan D. Goelman