No. 1:26-cv-9608

# In the United States District Court for the Southern District of New York

CAPITAL MARKETS ALLIANCE ASSOCIATION,
*Plaintiff*,

v.

COMMODITIES FUTURES TRADING COMMISSION and MICHAEL S. SELIG in his official capacity as Chairman of the Commodities Futures Trading Commission
*Defendants*.

## BRIEF OF THE AMERICAN SECURITIES ASSOCIATION AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF

Thomas A. Burns
(*pro hac vice forthcoming*)
BURNS, P.A.
301 W. Platt St., Ste. 137
Tampa, FL 33606
(813) 642-6350
tburns@burnslawpa.com

Molly Schindler
(New York Bar No. 5118138)
KYNES, MARKMAN & FELMAN, P.A.
100 S. Ashley Dr., Ste. 1450
Tampa, FL 33602
(813) 229-1118
mschindler@kmf-law.com

*Counsel for amicus curiae*

**CORPORATE DISCLOSURE STATEMENT**

A*micus curiae*, American Securities Association, is trade association that exclusively represents the wealth management and capital markets interests of regional financial services firms. It has no parent corporation, and no publicly held company has 10% or greater ownership in it.

November 10, 2026

/s/ Thomas Burns
Thomas A. Burns

# TABLE OF CONTENTS

**Page**


CORPORATE DISCLOSURE STATEMENT ........................................ ii

TABLE OF AUTHORITIES ........................................ v

STATEMENT OF *AMICUS CURIAE*'S IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE ........................ 1

SUMMARY OF ARGUMENT ........................................ 3

ARGUMENT ........................................ 5

I. Plaintiff is likely to succeed because Congress, not the CFTC, decides which investment products may be sold to retail investors ........................................ 6

A. A contract that never delivers isn't a "contract of sale for future delivery" ........................................ 6

B. The CFTC's label gets no deference ........................................ 7

C. The CFTC reversed itself without explanation ........................ 8

II. Retail investors and the equity market will suffer irreparable harm without preliminary relief ........................................ 9

A. These products put retail investors into leverage that Congress protected them from ........................................ 9

B. The products are being marketed to the least sophisticated investors ........................................ 10

C. The products create a shadow stock market whose stress will reach investors who never trade them ........................ 11

D. Once trading starts, the harm cannot be undone ............... 17

III. The balance of equities and the public interest favor preliminary relief ..... 18

A. There's no public interest in unlawful agency action ..... 18

B. Defendants lose nothing cognizable from preserving the status quo ..... 18

C. "Innovation" doesn't license an agency to set aside a statute ..... 19

CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Able v. United States*,
44 F.3d 128 (2d Cir. 1995) .......... 5

*Am. Wild Horse Pres. Campaign v. Perdue*,
873 F.3d 914 (D.C. Cir. 2017) .......... 8

*Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*,
2011 WL 5865296 (S.D.N.Y. 2011) .......... 3

*Bloomberg LP v. SEC*,
45 F.4th 462 (D.C. Cir. 2024) .......... 9

*Dep't of the Army v. Blue Fox, Inc.*,
525 U.S. 255 (1999) .......... 10

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) .......... 8

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......... 8

*In re Amaranth Nat. Gas Commodities Litig.*,
730 F.3d 170 (2d Cir. 2013) .......... 6

*In re NYSE Specialists Sec. Litig.*,
503 F.3d 89 (2d Cir. 2007) .......... 16

*Int'l Org. of Masters, Mates & Pilots v. NLRB*,
61 F.4th 169 (D.C. Cir. 2023) .......... 9

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 18

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980) .......... 6

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 7

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 5

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) .......... 19

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 5, 9

**Statutes** **Page(s)**

5 U.S.C. § 702 .......... 10

5 U.S.C. § 705 .......... 5, 20

7 U.S.C. § 1a .......... 6–7

15 U.S.C. § 77e .......... 3, 7, 15, 20

15 U.S.C. § 78c .......... 6–7

15 U.S.C. § 78f .......... 3, 7, 15, 20

15 U.S.C. § 8302 .......... 19

15 U.S.C. § 8306 .......... 19–20

**Rules and regulations** **Page(s)**

12 C.F.R. § 220.12 .......... 9

91 Fed. Reg. 33,160 .......... 18

91 Fed. Reg. 37,873 .......... 2

91 Fed. Reg. 37,876 .......... 11

Fed. R. App. P. 29 ........ 1

**<u>Other authorities</u>** **<u>Page(s)</u>**

Sapien, Brendan,
Note, *Financial Weapons of Mass Destruction: From Bucket Shops to Credit Default Swaps*,
19 S. Cal. Interdisc. L.J. 411 (2010) ........ 12–13

## STATEMENT OF *AMICUS CURIAE*'S IDENTITY, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE

The American Securities Association ("ASA") is a trade association that represents the retail and institutional capital markets interests of regional financial services firms who provide Main Street businesses with access to capital and advise hardworking Americans how to create and preserve wealth. ASA's mission is to promote trust and confidence among investors, facilitate capital formation, and support efficient and competitively balanced capital markets. ASA has a geographically diverse membership base that spans the Heartland, Southwest, Southeast, Atlantic, and Pacific Northwest regions of the United States.[1]

ASA's member firms are SEC-registered broker-dealers and investment advisers. They serve the retail investors this case is about: retirees, savers, and working families who hold individual stocks, mutual funds, and exchange-traded funds in brokerage accounts, IRAs, and 401(k) plans. Those firms owe their customers best execution, segregate and

[1] The Plaintiff consents to *amicus* filing this brief, whereas the Defendants oppose on timeliness grounds because they believe they will not have an opportunity to respond. No party's counsel authored this brief in whole or in part, and no person or entity other than *amicus*, its members, or its counsel made any monetary contribution to its preparation or submission. *See* Fed. R. App. P. 29(a)(4)(E).

protect customer assets, extend margin only within Federal Reserve limits, and answer to the SEC and FINRA. ASA therefore sees, from the retail side, what happens to ordinary investors when a leveraged product reaches them without those protections.

ASA has opposed listing single-stock perpetual derivatives as "security futures" from the start. In September 2026, ASA submitted a comment letter to the SEC and the CFTC in response to their Joint Request for Comment on Further Definition of "Swap" and "Security-Based Swap," 91 Fed. Reg. 37,873 (June 24, 2026). It urged both agencies to reaffirm that instruments based on a single security are securities subject to SEC jurisdiction, regardless of how a trading venue labels them.

In this *amicus* brief, ASA offers a perspective the parties do not. Plaintiff's members are exchanges, market makers, and trading firms, and its standing rests on their competitive injury. The CFTC and Chairman Selig speak for themselves. None speaks for the retail investor who will actually be sold these products and for the long-term saver whose portfolio sits in the equity market these products will affect. That perspective bears directly on irreparable harm, the balance of the equities,

and the public interest. *See Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, 2011 WL 5865296, at *1–2 (S.D.N.Y. 2011).

## SUMMARY OF ARGUMENT

After the 2008 financial crisis, Congress made a deliberate choice about who may buy swaps on individual stocks and where. It placed security-based swaps under the SEC's exclusive jurisdiction and made it unlawful to sell them to retail investors except on an SEC-registered national securities exchange under an effective registration statement. 15 U.S.C. §§ 77e(e), 78f(l). Those two provisions exist for one reason: to keep leveraged, synthetic stock exposure away from ordinary investors unless every safeguard of the securities laws comes with it.

On November 3, 2026, the CFTC set that choice aside without saying a word. By letting a 45-day review period lapse, it "deemed approved" applications from three platforms to list perpetual derivatives on dozens of individual U.S. stocks as "security futures." Doc. 1 ¶¶ 4, 107–14. These contracts never expire, never deliver, and convey no ownership. They give the holder leveraged, cash-settled exposure to a single stock's price for as long as the holder can meet margin. They are security-based swaps under

the plain text of the statute, and the CFTC itself treated perpetuals as swaps for years.

ASA writes to address what the parties' competitive-injury and jurisdictional arguments do not fully capture: what happens to retail investors and to the cash equity market if these products trade while this case is decided. The answer is concrete. Retail customers will be offered roughly 6.5-to-1 leverage on individual stocks, with positions marked to market throughout the day and liquidated automatically when margin falls short. Trading in thin overnight and weekend sessions will create a parallel, less-supervised market in synthetic shares whose stress can spill into the prices every American saver depends on. And once open positions accumulate, the Court will not be able to unwind them without the very disruption it has already recognized. Indeed, that's exactly what seems to be already transpiring. *See* Docs. 18–19 (describing immediate consequences of open trading in perpetuals).

Even before trading began in earnest, this Court had already observed that the CFTC's actions "seem to represent a major disruption to the equities market," and that the public would be served by preventing that disruption before it occurs. Doc. 11 at 2. ASA respectfully submits

that the harm to retail investors supplies the irreparable injury and the harm to the public interest even more concretely, both of which warrant preliminary relief now.

## ARGUMENT

A plaintiff seeking a preliminary injunction must show that it is likely to succeed on the merits, that it is likely to suffer irreparable harm absent relief, that the balance of equities tips in its favor, and that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Because the government is the opposing party, the last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The same factors govern a stay under 5 U.S.C. § 705. Because Plaintiff challenges government action taken under a statutory scheme, it must show a likelihood of success rather than serious questions going to the merits. *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995). Plaintiff meets every element. ASA addresses the merits briefly and focuses on harm to retail investors and the public interest.

## I. Plaintiff is likely to succeed because Congress, not the CFTC, decides which investment products may be sold to retail investors

In defending its silent approval of perpetuals, the CFTC is playing a language game. It says perpetuals are contracts of sale "for future delivery" because, *after* the position has been closed, a security or cash could be delivered. But that language game doesn't bypass the language Congress deliberately chose.

### A. A contract that never delivers isn't a "contract of sale for future delivery"

A security future is "a contract of sale for future delivery of a single security or of a narrow-based security index." 7 U.S.C. § 1a(44); 15 U.S.C. § 78c(a)(55)(A). The Second Circuit has long treated delivery "at a fixed date in the future" as a "basic feature[]" of a futures contract. *Leist v. Simplot*, 638 F.2d 283, 286 (2d Cir. 1980). In contrast, "[s]waps, unlike futures contracts, do not contemplate delivery of the underlying commodity." *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173–75 (2d Cir. 2013). The challenged contracts have no expiration date and no scheduled final settlement. Doc. 1 ¶¶ 109–10. The applicants themselves market them as superior to dated futures precisely because they never roll or expire. *Id.* ¶ 111.

What these contracts do is exactly what the swap definition describes. They provide on an executory basis for payments based on the value of a single security, transfer the financial risk of changes in that value, and convey no ownership interest. 7 U.S.C. § 1a(47)(A)(iii). A swap based on a single security is a security-based swap. 15 U.S.C. § 78c(a)(68)(A). Congress made it unlawful to sell such a product to anyone who is not an eligible contract participant except on a registered national securities exchange, and only with an effective registration statement. 15 U.S.C. §§ 77e(e), 78f(l).

### B. The CFTC's label gets no deference

The meaning of "future delivery"—the statutory phrase Congress deliberately chose—is a question of law for the Court. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024). That is doubly true here, where the agency offered no interpretation of the statutory language at all. Instead, the CFTC let a review clock run out. Doc. 1 ¶¶ 107, 112–14. An agency cannot obtain through silence what it could not obtain through a reasoned order. *See infra* Argument I.C.

### C. The CFTC reversed itself without explanation

For years, across administrations of both parties, the CFTC sued and obtained consent orders on the premise that perpetual contracts are swaps. Doc. 1 ¶¶ 80–84 (discussing *CFTC v. HDR Global Trading Ltd.*, No. 20-cv-08132 (S.D.N.Y. Oct. 1, 2020), *CFTC v. Eisenberg*, No. 23-cv-173 (S.D.N.Y. Jan. 9, 2023), *In re Deridex, Inc.*, CFTC Dkt. No. 23-42 (Sep. 7, 2023), *In re Opyn, Inc.*, CFTC Dkt. No. 23-40 (Sep. 7, 2023), and *CFTC v. Mek Glob. Ltd.*, No. 24-cv-02255 (S.D.N.Y. Mar. 26, 2024)). The SEC has likewise treated contracts that deliver cash-settled exposure to a single U.S. stock, with no ownership transfer, as security-based swaps barred from retail sale. *Id.* ¶¶ 86–89.

An agency that changes position must "display awareness that it is changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *accord Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 928 (D.C. Cir. 2017); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). The CFTC did neither.

Namely, it shirked its obligation to "give a reasoned explanation in response to [any] significant concerns," and it never showed its own work.

*Bloomberg LP v. SEC*, 45 F.4th 462, 466 (D.C. Cir. 2024). That failure alone renders the agency action arbitrary and capricious. *Int'l Org. of Masters, Mates & Pilots v. NLRB*, 61 F.4th 169, 180 (D.C. Cir. 2023) (vacating where the agency "did not acknowledge—much less justify—its adoption of a new rule").

## II. Retail investors and the equity market will suffer irreparable harm without preliminary relief

Plaintiff has shown irreparable competitive injury to its members. *See* Docs. 4; 10; 18; 19. ASA writes to show the separate, and larger, harm to the people Congress meant to protect: retail investors. That harm bears on irreparable injury and weighs heavily in the public interest. *See Winter*, 555 U.S. at 24 (courts "should pay particular regard for the public consequences" of relief).

### A. These products put retail investors into leverage that Congress protected them from

Congress and the Federal Reserve limit retail stock purchases on credit to 50 percent of the purchase price. 12 C.F.R. § 220.12(a). The challenged contracts carry minimum margin of about 15 to 15.5 percent, so $1,000 controls roughly $6,450 to $6,667 of exposure to a single stock. Doc. 1 ¶ 119. Positions are marked to market and settle repeatedly, with

funding payments as often as hourly. *Id.* ¶ 78. A move of about 15 percent against a fully leveraged customer can exhaust the margin and trigger forced liquidation, even if the stock recovers the next day. *Id.* ¶ 119. Offshore, perpetual trading has produced repeated liquidation events wiping out more than a million traders at a time. *Id.* ¶ 2.

Those losses are irreparable in the most literal sense. A retail customer liquidated out of a position this month cannot be made whole if the Court later vacates the approvals. The customer is not a party, has no damages remedy against the government, *see* 5 U.S.C. § 702; *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 260–61 (1999), and will not recover the loss from the platform that sold a product the Court later holds unlawful.

### B. The products are being marketed to the least sophisticated investors

The platforms that obtained approval have millions of active retail users. Doc. 1 ¶ 31 & n.14. Kalshi has opened a "waitlist" advertising that single-stock perpetuals are "coming soon." *Id.* ¶ 31. In marketing its other perpetuals, it has advertised the leverage customers can obtain and displayed a leaderboard of the largest open positions. *Id.* ¶ 119. That is the opposite of what Congress required: a registration statement disclosing

the product's risks, sold on an exchange "subject to the highest level of regulation." *Id.* ¶ 71 (quoting *In re XBT Corp. SARL*, Securities Act Release No. 10723, at 2 (Oct. 31, 2019)). Customers trading on these platforms also lose the protections ASA's member firms provide every day: best execution, order-routing disclosure, customer-protection segregation, and Securities Investor Protection Corporation ("SIPC") coverage. *Id.* ¶ 41.

### C. The products create a shadow stock market whose stress will reach investors who never trade them

Offshore trading in stock perpetuals grew more than fiftyfold this year, to nearly $700 billion in August 2026. Doc. 1 ¶ 32. Onshore, that activity would form a parallel market in synthetic shares of the same companies, outside the consolidated tape, the Consolidated Audit Trail, and the national market system. *Id.* ¶¶ 43, 53. These contracts trade overnight and on weekends, when liquidity is thinnest. A sharp move in a thin session can set off cascading forced liquidations, and the resulting hedging and selling pressure spills into the cash market when it opens. *Id.* ¶¶ 119–20. The CFTC and the SEC asked about exactly these effects on "liquidity formation, price discovery, and hedging activity" in June. 91 Fed. Reg. at 37,876. They never answered. The pension fund, the 401(k)

participant, and the retiree with an IRA would bear the consequences without ever touching a perpetual contract.

Effectively, the CFTC has given its regulatory imprimatur to what amounts to a national bucket shop in certain stocks. *See generally* Brendan Sapien, Note, *Financial Weapons of Mass Destruction: From Bucket Shops to Credit Default Swaps*, 19 S. Cal. Interdisc. L.J. 411 (2010) (describing calamitous history of 19th century bucket shops).

The history of bucket shops dates back to the late 19th century until their demise in the aftermath of the Panic of 1907. Bucket shops, which got their name for how they served beer, *id.* at 412, were a way for common citizens to participate in stock markets. Back then, for example, the New York Stock Exchange required margins of 10 percent and minimum trades of 100 shares. *Id.* at 413. But instead of purchasing or selling actual shares, bucket shops allowed speculators to bet on which direction the price would move. *Id.* This was a zero-sum game between the speculator and the bucket shop. *Id.* And bucket shops allowed customers to speculate with extraordinary margins of only 1 percent or even 0.5 percent. *Id.* Thus, "the bucket shop acted more like a casino":

> So, if a customer of a bucket shop had bet that the price of sugar would rise by a dollar and it subsequently did, the

> bucket shop, like any casino, would payout the winnings to the patron. However, in the event that the price of sugar dropped below the patron's invested margin, the bucket shop would claim another victim and rake in its winnings.

*Id.* at 413–14. "At their peak, bucket shops totaled in the hundreds and began to rival the very stock and commodities markets on which they took bets." *Id.* at 414.

Thus, comparing perpetual futures to historical bucket shops is apt and analytically rich, and Mr. Sapien's note is worth a careful read to draw historical analogies between our digital financial present and our analog financial past. That's especially so when examining retail-targeted, highly leveraged synthetic stock exposure offered off national securities exchanges.

Although modern perpetuals operate on sophisticated digital infrastructure and centralized or automated clearinghouses, their core economic incentives, structural mechanics, and regulatory conflicts strongly parallel the 19th- and early 20th-century bucket shop model.

First, they both offer synthetic price tracking without share ownership. That is, in historical bucket shops, customers never bought or sold underlying equity on an exchange. Instead, they placed wagers on ticker-tape price feeds. The bucket shop created a parallel, off-exchange ledger

where bets were settled entirely in cash based on stock price movements. Similarly for stock perpetuals, the holders gain continuous cash-settled exposure to a single stock's price movement without ever owning, delivering, or voting the underlying shares. The contract operates as a parallel synthetic layer tracking a reference index.

Second, they both offer extreme leverage with automated payments and forced liquidations. Bucket shops operated on razor-thin margins, which allowed retail speculators to control large positions with minimal upfront cash. Because margins were so thin, minor intraday price dips easily wiped out a customer's margin, at which point the shop instantly "closed out" (*i.e.*, confiscated) the position. Similarly, stock perpetuals offer significant leverage (such as 15% margin or 6.5x leverage under proposed rules, or up to 20x–100x on offshore venues). Because funding rates and mark-to-market prices continually update daily or even hourly, small adverse price swings automatically trigger liquidation algorithms that wipe out retail margin.

Third, they circumvent regulations and supply shadow liquidity. Bucket shops existed to bypass the strict rules, high capital requirements, order routing disclosures, and credit controls of established stock

exchanges like the NYSE. Similarly, stock perpetuals attempt to circumvent regulation by listing off-exchange or under alternative regulatory regimes, bypassing Federal Reserve Regulation T margin limits (50% initial margin for stock purchases), avoiding SEC registration statement requirements, and evading full national market system investor protections. 15 U.S.C. §§ 77e(e), 78f(l).

Fourth, they contaminate markets by allowing cross-market spillover and predatory microstructure. Because bucket shop pricing was anchored to exchange ticker tapes, operators often manipulated thin exchange order books ("painting the tape") to trigger forced liquidations on their internal ledgers. Similarly, because perpetual funding rates update against spot index prices calculated across specific sample windows, bad actors can use localized volume or thin off-session markets (such as overnight ATS feeds) to temporarily distort the spot price, triggering cascading liquidations in the perp market.

To be sure, there are important nuances and differences. The counterparty risk and conflict-of-interest concerns aren't the same. For bucket shops, the shop itself was typically the direct counterparty to every trade. The shop won when the customer lost, creating an inherent incentive for

the operator to actively trade against or fraud their own clients. In contrast, for stock perpetuals, trades are matched between buyers and sellers on a central limit order book, with a clearinghouse acting as central counterparty. The platform earns transaction or funding fees rather than directly serving as counterparty. But conflicts could still emerge if platform affiliates started acting as market makers. *See, e.g.*, *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 93 (2d Cir. 2007) (discussing civil litigation, SEC enforcement proceedings, and criminal prosecutions about NYSE specialists who had engaged in self-dealing by interpositioning, trading ahead, freezing the book, and manipulating the tick).

Another difference is how they handle funding rates and interest or borrowing charges. Bucket shops charged their customers explicit interest/financing fees to hold positions open overnight. In contrast, stock perpetuals rely on a dynamic funding rate mechanism—where long and short traders pay each other directly based on the spread between the stock perpetuals' mark price and the underlying spot price—to force convergence without an expiration date.

Regardless, this isn't the first time financiers have tried to circumvent Congressional limitations. Bottom line, Congress enacted federal

margin limits (Regulation T) and retail swap restrictions precisely to eliminate modern iterations of the "bucket shop" dynamic, which prevents retail investors from being drawn into hyper-leveraged, off-exchange synthetic betting pools disguised as standard financial products. *See* Doc. 4.8 at 6–7 (¶ 17). In other words, Congress didn't want automated perpetual liquidations to become the high-tech 21st century successor to 19th century bucket shop close-outs—a mechanism that magnifies market volatility and extracts retail capital without facilitating actual corporate capital formation.

### D. Once trading starts, the harm cannot be undone

Every day of trading adds open positions that would have to be closed, transferred, or wound down if the Court rules for Plaintiff. Doc. 1 ¶ 122. Forced unwinding is itself a source of the disruption and investor loss described above. Another platform has already filed to list the same products, so "approval by inertia" will compound. *Id.* ¶ 121. Senator Britt warned of precisely this risk: harm to investors and markets "if these products begin trading and a court subsequently determines that they have been improperly classified." *Id.* ¶ 122 n.75. Preliminary relief is the only way to avoid it.

## III. The balance of equities and the public interest favor preliminary relief

Two final concerns weighing in favor of preliminary relief are the balance of equities and the public interest.

### A. There's no public interest in unlawful agency action

"There is generally no public interest in the perpetuation of unlawful agency action," and "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (cleaned up). Congress has declared the securities markets "an important national asset which must be preserved and strengthened." 15 U.S.C. § 78k-1(a)(1). The public interest Congress identified is investor protection and market integrity, and an injunction serves both.

### B. Defendants lose nothing cognizable from preserving the status quo

Single-stock perpetuals have never traded on a U.S. exchange. Preliminary relief simply keeps in place the regime that governed until last week on November 3. The CFTC itself said that perpetuals referencing equity securities "would benefit from review by the Commission and the U.S. Securities and Exchange Commission." 91 Fed. Reg. 33,160, 33,161

& n.5 (June 3, 2026). It then skipped that review, and the statutory process for resolving which agency regulates a novel product. *See* 15 U.S.C. § 8306; Doc. 1 ¶ 112. A short pause to let the Court decide the question the CFTC declined to address imposes no legitimate burden.

### C. "Innovation" doesn't license an agency to set aside a statute

The CFTC has characterized this lawsuit as an attempt to hinder financial innovation. That framing misunderstands the question before the Court. Novelty is not an exception to the Commodity Exchange Act or the Securities Exchange Act. An agency "has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 325 (2014). If an agency could reclassify a security-based swap as a security future because the product is new, and abandon years of its own enforcement precedent without explanation, then every line Congress drew in Title VII of the Dodd-Frank Act would be optional.

Congress anticipated new products and told the agencies how to handle them. It directed the CFTC and the SEC to "treat functionally or economically similar products … in a similar manner," 15 U.S.C. § 8302(a)(7), and created a procedure for deciding which agency regulates

a novel derivative, *id.* § 8306. It also left open a lawful path to market for any security-based swap: registration with the SEC and trading on a national securities exchange. 15 U.S.C. §§ 77e(e), 78f(l). Nothing in this case prevents anyone from taking that path. What the applicants sought, and the CFTC allowed, was a way around it.

Finally, the asserted benefits of these products do not weigh against relief. Single-stock perpetuals raise no capital for any American company and finance no investment. Their only distinctive feature is continuous, leveraged exposure to stock prices without expiration. Doc. 1 ¶ 111. Whatever value that holds for professional traders, it is no reason to strip retail investors of protections Congress wrote into law while this Court decides whether the CFTC acted lawfully.

## **CONCLUSION**

The Court should grant Plaintiff's motion, stay the Stock Perpetual Approvals under 5 U.S.C. § 705, and preliminarily enjoin Defendants from giving them effect pending final judgment.

Respectfully submitted,

/s/ Molly Schindler
Molly Schindler
(New York Bar No. 5118138)
KYNES, MARKMAN & FELMAN, P.A.
100 S. Ashley Dr., Ste. 1450
Tampa, FL 33602
(813) 229-1118
mschindler@kmf-law.com

Thomas A. Burns
(*pro hac vice forthcoming*)
BURNS, P.A.
301 W. Platt St., Ste. 137
Tampa, FL 33606
(813) 642-6350
tburns@burnslawpa.com

*Counsel for amicus curiae*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I served a true and correct copy of this brief via CM/ECF on November 10, 2026, to all counsel of record.

November 10, 2026

/s/ Molly Schindler
Molly Schindler