**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CAPITAL MARKETS ALLIANCE ASSOCIATION,<br><br>*Plaintiff*,<br><br>v.<br><br>COMMODITY FUTURES TRADING COMMISSION, et al.,<br><br>*Defendants*. | Civil Action No. 1:26-cv-09608-LGS |

# PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND 5 U.S.C. § 705 STAY

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION .......... 1

ARGUMENT .......... 2

I. The Alliance Has a Strong Likelihood of Success on the Merits .......... 2

A. The Stock Perpetual Approvals are Final Agency Action .......... 2

B. The Stock Perpetual Approvals are Arbitrary and Capricious .......... 5

C. The Stock Perpetual Approvals are Contrary to Law .......... 7

II. The Alliance Has Standing to Sue on Behalf of Its Members to Prevent Imminent Irreparable Harm .......... 9

III. The Court Should Stay the Approvals and Issue a Preliminary Injunction to Prevent Irreparable Harm and Protect the Markets, Investors, and the Public .......... 14

CONCLUSION .......... 15

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Afr. Communities Together v. Lyons*,
799 F. Supp. 3d 362 (S.D.N.Y. 2025)......14

*Air Excursions LLC v. Yellen*,
66 F.4th 272 (D.C. Cir. 2023)......12

*Bennett v. Spear*,
520 U.S. 154 (1997)......3

*Bldg & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*,
448 F.3d 138 (2d Cir. 2006)......10

*Brotherhood of Locomotive Engineers & Trainmen v. FRA*,
972 F.3d 83 (D.C. Cir. 2020)......4, 5

*CFTC v. Int'l Fin. Servs., Inc.*,
323 F. Supp. 2d 482 (S.D.N.Y. 2004)......8

*Chamber of Com. v. Edmondson*,
594 F.3d 742 (10th Cir. 2010)......14

*Clarke v. CFTC*,
74 F.4th 627 (5th Cir. 2023)......13

*CME v. SEC*,
883 F.2d 537 (7th Cir. 1989)......8

*Disability Advocates, Inc. v. New York Coal. for Quality Assisted Living, Inc.*,
675 F.3d 149 (2d Cir. 2012)......10

*DTCC Data Repository (U.S.) LLC v. CFTC*,
25 F. Supp. 3d 9 (D.D.C. 2014)......4

*FDA v. Wages & White Lion Investments, L.L.C.*,
604 U.S. 542 (2025)......6

*In re Amaranth*,
730 F.3d 170 (2d Cir. 2013)......7, 8

*Kakar v. USCIS*,
29 F.4th 129 (2d Cir. 2022)....5

*League of United Latin Am. Citizens v. Exec. Office of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025)....15

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980)....8

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983)....6

*Mullins v. City of New York*,
626 F.3d 47 (2d Cir. 2010)....14

*Polk v. Crawford*,
184 F.4th 715 (5th Cir. 2026)....13

*Public Employees for Environmental Responsibility v. Zeldin*,
174 F.4th 183 (D.C. Cir. 2026)....10

*Regeneron Pharms., Inc. v. HHS*,
510 F. Supp. 3d 29 (S.D.N.Y. 2020)....13

*Rural & Migrant Ministry v. EPA*,
565 F. Supp. 3d 578 (S.D.N.Y. 2020)....14

*S. Lyme Prop. Owners Ass'n., Inc. v. Town of Old Lyme*,
539 F. Supp. 2d 524 (D. Conn. 2008)....11

*Schulz v. Williams*,
44 F.3d 48 (2d Cir. 1994)....11

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023)....10, 11

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
980 F.3d 157 (1st Cir. 2020)....11

*United States v. New York*,
708 F.2d 92 (2d Cir. 1983)....13

*Viasat, Inc. v. FCC*,
47 F.4th 769 (D.C. Cir. 2022)....10

*XY Plan. Network, LLC v. SEC*,
963 F.3d 244 (2d Cir. 2020) .......... 11, 14

**Statutes and Constitutional Provisions**

5 U.S.C. § 551(13) .......... 4

5 U.S.C. § 705 .......... 14

5 U.S.C. § 706(1) .......... 5

7 U.S.C. § 1a(42) .......... 7

7 U.S.C. § 1a(44) .......... 2, 7, 8

7 U.S.C. § 1a(47) .......... 7

7 U.S.C. § 7a-2(c) .......... 1, 3, 4

15 U.S.C. § 77e(e) .......... 7

15 U.S.C. § 78c(a)(68)(A) .......... 7

15 U.S.C. § 78c-3 .......... 7

15 U.S.C. § 78f(l) .......... 7

Commodity Futures Modernization Act of 2000, Pub. L. No. 106-554, app. E .......... 9

**Regulations**

17 C.F.R. § 40.2 .......... 15

17 C.F.R. § 40.3 .......... 3, 4, 5

17 C.F.R. § 41.23(a) .......... 15

Joint Request for Comment on Further Definition of “Swap” and “Security-Based Swap” and on Alternative Compliance, 91 Fed. Reg. 37,873 (June 24, 2026) .......... 6

Policy Statement Concerning the Listing of Perpetual Contracts, 91 Fed. Reg. 33,160 (June 3, 2026) .......... 1, 4, 6

**Other Authorities**

13A Wright & Miller's Federal Practice & Procedure
§ 3531.9.5 (3d ed. 2008) ........................................................................ 13

CFTC, Order Approving KalshiEX LLC BTCPERP Futures Contract
(May 29, 2026)........................................................................................ 6

## INTRODUCTION

Within hours, Judge Caproni confirmed what is clear from the statute: the Alliance is likely to succeed on its claim that the CFTC's "action in approving the trading of single stock perpetual derivatives as security futures exceeded its statutory authority." Dkt. 11 at 2. The CFTC's actions also "seem to represent a major disruption to the equities market." *Id.* She denied a temporary restraining order only because the record described events that "could occur." *Id.* at 2-3. But that same day, Kalshi listed four stock perpetual contracts, and within two days, it listed more than fifty, reporting trailing-24-hour notional volume of approximately $375 million. Dkt. 10, ¶ 3; Dkt. 18, ¶¶ 3, 6–7; Dkt. 19, ¶¶ 6–8. The supplemental declarations now establish actual, imminent, and growing irreparable harm.

The CFTC offers no meaningful rebuttal. Instead, it seeks to avoid judicial review. Although it directed platforms to seek CFTC "review and approval" for equity perpetuals given the significant questions involved, 91 Fed. Reg. 33,160, 33,161–62 & n.5 (June 3, 2026), and its Chairman heralded *these* Stock Perpetual Approvals as a "milestone," Dkt. 1-1 at 1, the CFTC implausibly claims that this "milestone" was not action at all. The CFTC took "final action" with legal consequence, 7 U.S.C. § 7a-2(c)(4)(C), and its lack of reasoned decision-making does not insulate its approvals from judicial review. Its standing arguments fare no better: the Alliance has identified members with concrete

and substantial injuries, and the CFTC's inapposite cases cannot rebut that showing.

When the CFTC addresses, for the first time, how it believes single-stock perpetuals satisfy the "security future" definition, it tellingly avoids the statutory text. Resp.16-18. A "security future" is "a contract of sale for future delivery of a single security." 7 U.S.C. § 1a(44). Perpetual derivatives, by design, "do not provide for a 'sale for future delivery,'" and do not meet this definition. Dkt. 11 at 2. They are security-based swaps under the SEC's exclusive jurisdiction.

On the heels of Judge Caproni's decision, the CFTC now asks this Court to "avoid resolving" the classification of stock perpetuals "on such a short fuse." Resp.2. That delay would leave the unlawful approvals in effect while harms to Alliance members, the markets, and investors balloon. The preliminary injunction should be granted.

## ARGUMENT

### I. The Alliance Has a Strong Likelihood of Success on the Merits

#### A. The Stock Perpetual Approvals are Final Agency Action

Where, as here, a designated contract market (DCM) seeks the CFTC's preapproval to list a new contract, the Commodity Exchange Act (CEA) directs that the CFTC "shall take final action" on the application within the review period and that the CFTC can approve a new contract only if it would not

violate the CEA or regulations. 7 U.S.C. § 7a-2(c)(4)-(5). The regulations permit the CFTC to take the statutorily required "final action" pursuant to a deemed-approval mechanism. An application "shall be deemed approved by the Commission" at the "conclusion" of a 45-day review period if the Commission does not issue a non-approval or extension. 17 C.F.R. § 40.3.

The CFTC deemed these applications approved. Dkt. 1-1. Those approvals "mark the consummation of the agency's decisionmaking process," *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997): they conclude the CFTC's review under the statute and regulations and are its "final action" on the applications, 7 U.S.C. § 7a-2(c)(4); 17 C.F.R. § 40.3. They also determine "rights or obligations," and "legal consequences" flow from them. *Bennett*, 520 U.S. at 177-78. They remove regulatory barriers to listing and allow the contracts to trade on CFTC-regulated platforms as security futures. The CFTC's Chairman said as much, announcing that the applications were "deemed approved" and touting this as a "milestone" allowing single-stock perpetuals to "begin trading for the first time on CFTC-registered exchanges." Dkt. 1-1 at 1.

The CFTC cannot now avoid judicial review by claiming it "has not taken any 'action' at all." Resp.13. Under the CEA and regulations, "the completion of the [regulatory review] period without objection" *is* the CFTC's "formal and final approval," and has the "same legal effect regarding the rights and obligations at issue as if [the CFTC] had formally stamped 'Approved' on the"

submissions. *Brotherhood of Locomotive Engineers & Trainmen v. FRA*, 972 F.3d 83, 96, 99-100 (D.C. Cir. 2020) (finding "final agency action" where agency allowed 30-day review period to expire and application became "approved"). The CFTC's inaction argument is particularly illogical because the APA defines "agency action" as including "failure to act." 5 U.S.C. § 551(13). The suggestion that *Brotherhood* is distinguishable because the CFTC has "discretion" to approve contracts for trading even if they violate the CEA and regulations (Resp.14-15) is wrong. 7 U.S.C. § 7a-2(c)(5)(B); 17 C.F.R. § 40.3(b).

The CFTC's reliance on *DTCC Data Repository (U.S.) LLC v. CFTC*, 25 F. Supp. 3d 9 (D.D.C. 2014), is misplaced. *DTCC* addressed the CEA's separate and distinct certification process for rules, 7 U.S.C. § 7a-2(c)(1)-(2), and incorrectly held that a certified rule change was not final agency action, 25 F. Supp. 3d at 17-18. Regardless, that decision is limited to the statute's rule-certification procedures: the CFTC did not argue, and the court did not hold, that approval of a rule through the CFTC's regulatory pre-approval process was not final agency action. *Id.* at 18-19. The pre-approval process is what is at issue here. Indeed, the CFTC instructed that single-stock perpetual contracts *must* "undergo Commission review and approval" before listing to promote "transparency" and agency engagement. 91 Fed. Reg. at 33,161-62 & n.5. Those approvals are reviewable. The CFTC was required to "take final action" on these applications, 7 U.S.C. § 7a-2(c)(4)-(5), and it did so—as the Chairman

announced, Dkt. 1-1 at 1—by deeming them approved under 17 C.F.R. § 40.3. For the same reason, the CFTC's assertion that the Alliance should have pleaded a claim to compel agency action, 5 U.S.C. § 706(1), is meritless. Resp.14, 15-16.

### B. The Stock Perpetual Approvals are Arbitrary and Capricious

The CFTC's primary response to the arbitrary-and-capricious showing is to double down on the argument that it has not taken reviewable action. Resp.24-25. But its insistence that it did "nothing" while deeming applications approved, *e.g.*, Resp.2, only confirms the absence of reasoned decision-making, Mot.16-22. Even in the context of a "passive approval" regulatory scheme, the APA's requirements apply. *Brotherhood*, 972 F.3d at 102. The CFTC cannot leave a "total explanatory void" where it has allowed single-stock perpetuals to trade "for the first time" contrary to its own prior position and without answering significant questions that it and commenters raised. *Id.* at 115, 117; Mot.16-22. Nor can the platforms writing as *amici* fill that void. *Kakar v. USCIS*, 29 F.4th 129, 132 (2d Cir. 2022).

The CFTC cannot dispute that, for years, it pursued enforcement actions and obtained consent orders on the understanding that perpetuals are swaps, Mot.11-12, which is why single-stock perpetuals were "available only offshore" until last week, Coinbase Amicus 3. The CFTC's argument that it did not need to acknowledge or explain its abrupt change of position because that position

was reflected in "enforcement actions," Resp.14, is foreclosed. *FDA v. Wages & White Lion Investments, L.L.C.*, 604 U.S. 542, 570 (2025) ("[W]e have held that an agency changed its position" when it "expand[ed] the scope" of "enforcement activity" or "'abandon[ed a] decades-old practice' applied in enforcement actions" (cleaned up)).

That the CFTC "*already* approved" perpetuals referencing bitcoin (Resp.26) is no answer. That separate decision, which was also not reasonably explained, expressly did "not extend" beyond "digital commodities." BTCPERP Order at 8-9 & nn.24-25. Even *after* that decision, the CFTC recognized that perpetuals referencing equity securities would raise distinct issues warranting "independent analysis." 91 Fed. Reg. at 33,161-62 & n.5. The Commissions then jointly requested comment on questions relating to single-stock perpetuals. 91 Fed. Reg. 37,873, 37,876 (June 24, 2026). Commenters raised significant concerns in response to that request and the applications here. Mot.20-21 & nn.10-11. The SEC has not yet determined whether single-stock perpetuals are security-based swaps. SEC Amicus 1-2, 6. But the CFTC, for its part, rushed ahead rubber-stamping these applications with no reasoned explanation, much less addressing its prior position or "important aspect[s] of the problem." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

### C. The Stock Perpetual Approvals are Contrary to Law

The CEA defines a "security future" as a "contract of sale for future delivery of a single security." 7 U.S.C. § 1a(44). Perpetual contracts have no future delivery obligation. Single-stock perpetuals instead squarely meet the definition of a "security-based swap" and fall under the SEC's exclusive jurisdiction. 7 U.S.C. § 1a(42), (47)(A)(iii); 15 U.S.C. § 78c(a)(68)(A); *In re Amaranth*, 730 F.3d 170, 175 (2d Cir. 2013) ("Swaps, unlike futures contracts, do not contemplate delivery of the underlying commodity.").

The CFTC never explains how a contract that neither expires nor provides for delivery of the underlying stock or its cash equivalent *at any point* is a "contract of sale for future delivery of a single security." 7 U.S.C. § 1a(44). It instead sidesteps the definition, asserting that a security future "is a futures contract where the underlying asset is a security" (which is not the statutory definition), claiming that a "*futures contract*" is not defined in the CEA, and then citing three "elements" of futures contracts from cases describing futures contracts generally. Resp.16-18. The CFTC cannot rewrite Congress's definition. And the CFTC's "elements" are not the test—if they were, any cleared, exchange-traded security-based swap on a single security or narrow-based security index presumably would be a "security future," swallowing the Dodd-Frank Act's deliberate security-based swap regime. 15 U.S.C. §§ 78c-3, 78f(l), 77e(e). Its selective "elements" also ignore that a "basic feature[]" of a futures contract *includes*

an agreement to "deliver" the referenced asset "at a date in the future." *In re Amaranth*, 730 F.3d at 173; *Leist v. Simplot*, 638 F.2d 283, 286 (2d Cir. 1980); Mot.24.

That most futures contracts do not require *actual* delivery of the underlying asset, Resp.18-19, is beside the point. Whether a futures contract is settled by physical delivery or in cash, it still has a future delivery obligation that the contract holders must confront. Mot.24-25. Perpetuals lack that critical feature. And closing out a position is not delivery. Coinbase's argument that perpetuals settle whenever a holder "ultimately closes out the position," Coinbase Amicus 18, proves the point that perpetuals are not "contract[s] of sale for future delivery." 7 U.S.C. § 1a(44).

Similarly, even if a "futures" contract can lack a *fixed* delivery date, Resp.20, that is not the same as omitting any future delivery or final settlement obligation altogether, Mot.26. And it is obviously relevant, *contra* Resp.20, that the CFTC's cited cases concerning contracts of "indefinite duration" predate the Dodd-Frank Act and did not involve the classification question at issue here. *See, e.g.*, *CFTC v. Int'l Fin. Servs., Inc.*, 323 F. Supp. 2d 482, 495 (S.D.N.Y. 2004) (determining whether contract was "futures" contract or "spot" transaction). When the Seventh Circuit addressed "index participations" in *CME v. SEC*, 883 F.2d 537, 539-40 (7th Cir. 1989), Congress had not yet

enacted Dodd-Frank *or* the "security future" definition. Commodity Futures Modernization Act of 2000, Pub. L. No. 106-554, app. E, §§ 101(7), 201(5).

Lacking statutory text, the CFTC invokes a 2025 comment letter from Cboe. That letter specifically recognized that whether a perpetual-style contract is a "future or swap" will depend on each "contract's design" and characteristics, as "informed by the CEA" and regulations. Dkt. 31-2 at 2. It was not urging that all perpetual contracts are properly defined as "futures" contracts, and it did not address security futures or single-stock perpetuals. Cboe separately explained in letters to the SEC and CFTC that the single-stock perpetuals at issue here are not "security futures," including because they do not contemplate any future delivery. Dkt. 4-4, Exs. A, B.

## II. The Alliance Has Standing to Sue on Behalf of Its Members to Prevent Imminent Irreparable Harm

The Stock Perpetual Approvals are inflicting imminent, irreparable harm on identified Alliance members and the Alliance has standing to sue on their behalf. Faced with this compelling record, the CFTC mainly responds with the unfounded assertion that the Alliance is a "sham" (Resp.9).

**1.** The Alliance is a nonprofit, nonstock corporation whose members include Cboe, Citadel Securities, and Healthy Markets. Dkt. 4-8, ¶ 4; Dkt. 4-2, ¶¶ 1-5; Dkt. 4-7, ¶ 4; Dkt. 4-4, ¶ 4. Its members would have standing in their own right, the "interests it seeks to protect" are "germane to [its] purpose" to strengthen our nation's capital markets, and this APA challenge does not

require the participation of individual members. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023); *Bldg & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 150 (2d Cir. 2006); *see* Dkt. 4-2, ¶¶ 1-5; Dkt. 4-8, ¶ 4.

In response, the CFTC relies on inapposite cases to demand more information about the Alliance's operations. Resp.8. But this case is not like *Public Employees for Environmental Responsibility v. Zeldin*, 174 F.4th 183, 188, 192 (D.C. Cir. 2026), where the plaintiff pressed a "novel theory that their *employees*[]" were the "functional equivalent" of members. Nor is it like *Disability Advocates, Inc. v. New York Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 152, 157-58 (2d Cir. 2012), where a non-membership contractor asserted standing on behalf of individuals it served. The Alliance has identified members, including Healthy Markets Association, which is "familiar" with the Alliance's advocacy mission and explains its "reasons for joining," including that the Alliance's mission "align[s] closely with Healthy Markets' mission." Dkt. 4-8, ¶ 4. That is more than a "bare assertion of membership." *Viasat, Inc. v. FCC*, 47 F.4th 769, 782 (D.C. Cir. 2022).

Where, as here, an association "has identified members and represents them in good faith," it need not undergo "further scrutiny into how the

organization operates." *Students for Fair Admissions, Inc.*, 600 U.S. at 201.[1] That the Alliance's purposes include litigation to protect its members' interests is no barrier. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 980 F.3d 157, 164 (1st Cir. 2020) (association formed to defend equal protection "through litigation and any other lawful means"); *S. Lyme Prop. Owners Ass'n., Inc. v. Town of Old Lyme*, 539 F. Supp. 2d 524, 528 (D. Conn. 2008) (association "formed for the purpose of invalidating the [challenged] zoning regulations").

**2.** Alliance members have Article III standing and face imminent, irreparable harm.

A plaintiff has standing to challenge regulatory action "that unlawfully bestows upon their competitors some competitive advantage." *XY Plan. Network, LLC v. SEC*, 963 F.3d 244, 251 (2d Cir. 2020) (quotation marks omitted); *Schulz v. Williams*, 44 F.3d 48, 53 (2d Cir. 1994). The plaintiff must "show an actual or imminent increase in competition," but it "need not identify specific customers who switched to its competitors." *XY Plan.*, 963 F.3d at 251 (cleaned up). The Alliance's declarations establish this harm. Cboe's exchanges, for example, earn transaction and related revenues from trading in the same stocks

[1] An evidentiary hearing is unnecessary because the CFTC offers no contrary evidence. The Alliance requests that the Court maintain the expedited preliminary injunction schedule. If a hearing would aid the Court in resolving the motion, the Alliance stands ready to present evidence.

and listed options that the Stock Perpetuals reference. Dkt. 4-4, ¶¶ 5–6, 10. Citadel Securities earns revenue by executing and providing liquidity for retail and institutional orders in those stocks and options. Dkt. 4-7, ¶¶ 5–9, 13. The approved platforms now unlawfully compete for customers seeking exposure to the same stock-price movements. Dkt. 19, ¶¶ 10–11; Dkt. 18, ¶¶ 8, 10; *see also, e.g.*, Dkt. 19-1 at 2–3, 11–13; Dkt. 10-2 at 1 (Kalshi listing single-stock perpetuals in category labeled "Stocks," with company name, ticker symbol, and referenced stock price, inviting users to "Invest").

This case thus does not involve a mere "cash windfall" to a competitor, as in *Air Excursions LLC v. Yellen*, 66 F.4th 272, 280-81 (D.C. Cir. 2023). The Stock Perpetual Approvals allow DCMs to offer products that, if correctly classified, could be offered to retail investors only on national securities exchanges under the SEC's full regulatory oversight. The CFTC's approvals grant the platforms an effective pass from this comprehensive framework, creating an uneven playing field and an actual increase in unfair competition. *See, e.g.*, Dkt. 19, ¶¶ 10-11, 13, 21. This unfair competitive advantage "is magnified by" available leverage, which far exceeds that generally available for stock purchases. Dkt. 18, ¶ 10.

The unlawful diversion of trading activity costs Cboe "the opportunity to execute its share of that activity and to earn the associated transaction and related revenues," Dkt. 18, ¶ 17; and Citadel Securities the "opportunity to

execute or provide liquidity for the corresponding securities transaction," Dkt. 19, ¶ 13. Each day that the Stock Perpetuals trade misclassified as "security futures," Cboe and Citadel Securities lose transactions and revenue they cannot later recover. Dkt. 19, ¶ 20; Dkt. 18, ¶¶ 22-23.[2] Single-stock perpetual trading has grown at a "surprising and troubling" pace. Dkt. 18, ¶¶ 13-14. On the second day after launch, Cboe documented approximately $375 million in reported trailing-24-hour notional trading activity. *Id.* ¶¶ 7, 21. Using its historical data, Citadel Securities quantified the "likely magnitude" of its harm in monthly revenue loss, which it expects to grow. Dkt. 19, ¶ 14. The CFTC's approvals also subject investors and the markets to new and material risks of manipulation and abuse. Dkt. 4-8, ¶¶ 16, 19, 38.

The harm to Alliance members is irreparable. The Second Circuit has recognized that economic losses are irreparable where sovereign immunity leaves no damages remedy. *United States v. New York*, 708 F.2d 92, 93–94 (2d Cir. 1983) (per curiam); *Regeneron Pharms., Inc. v. HHS*, 510 F. Supp. 3d 29, 39 (S.D.N.Y. 2020). Other circuits have agreed, including in issuing a preliminary injunction against the CFTC. *Clarke v. CFTC*, 74 F.4th 627, 643 (5th Cir. 2023); *Polk v. Crawford*, 184 F.4th 715, 728 (5th Cir. 2026); *Chamber of Com.*

---

[2] Healthy Markets' exchange and broker-dealer members face this same harm. Dkt. 4-8 ¶¶ 4, 7, 20-23. There is nothing remarkable about "a *double* associational-standing theory" (Resp.13)—an association can establish standing based on injury to its "members' members." 13A Wright & Miller's Federal Practice & Procedure § 3531.9.5 (3d ed. 2008).

*v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010). These losses are also substantial: the ExxonMobil perpetual, for example, reached 1.14% of the underlying stock's daily dollar volume on its first day, and Citadel Securities projects substantial lost monthly revenue. Dkt. 18, ¶¶ 7, 11–13; Dkt. 19, ¶¶ 4, 14. This trading presents serious market-integrity and manipulation risks. Dkt. 4-8, ¶ 38. Contrary to the CFTC's suggestion, Resp.11, Alliance members need not "identify specific customers" lost or await injury from specific transactions. *XY Plan.*, 963 F.3d at 251. And the Alliance need only show "a *threat* of irreparable harm" for preliminary injunctive relief, "not that irreparable harm already [has] occurred," *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010), a standard it has readily met, *e.g.*, Dkt. 19, ¶¶ 12-14; Dkt. 18, ¶¶ 18, 23.

## III. The Court Should Stay the Approvals and Issue a Preliminary Injunction to Prevent Irreparable Harm and Protect the Markets, Investors, and the Public

As the Alliance's motion explains, the Court should stay the effect of the Stock Perpetual Approvals under 5 U.S.C. § 705, which would restore the status quo. *Afr. Communities Together v. Lyons*, 799 F. Supp. 3d 362, 383 (S.D.N.Y. 2025); *Rural & Migrant Ministry v. EPA*, 565 F. Supp. 3d 578, 605-06 (S.D.N.Y. 2020). The Court should also grant a preliminary injunction to enjoin the CFTC from giving effect to the approvals pending this Court's adjudication on the merits and from permitting the contracts to be listed as security futures. Specifically, to ensure full and fair relief while this case is litigated,

the Court should enjoin Defendants from giving effect to the Stock Perpetual Approvals and from permitting the single-stock perpetuals described in the September 18 applications to trade, whether by approval, certification under 17 C.F.R. § 40.2 or 41.23(a), or otherwise.[3] The requested relief will prevent irreparable harm and "a major disruption to the equities market," Dkt. 11 at 2, while this litigation continues.

## CONCLUSION

Plaintiff's motion for a preliminary injunction and stay should be granted.

Dated: November 10, 2026

Respectfully submitted,

/s/ *Megan Barbero*
Megan Barbero (*pro hac vice*)
Courtney L. Dixon (*pro hac vice pending*)
Elizabeth M. Wilson (*pro hac vice*)
VENABLE LLP
600 Massachusetts Avenue, N.W.
Washington, DC 20001
Phone: 202-344-4000
mbarbero@venable.com

Matthew T. Murphy
VENABLE LLP
151 West 42nd Street

[3] The Court should deny the CFTC's cursory bond request, Resp.28 n.9, which is unwarranted in a case involving the "right to judicial review of unlawful executive action." *League of United Latin Am. Citizens v. Exec. Office of the President*, 780 F. Supp. 3d 135, 225 (D.D.C. 2025). The Court should also deny the request for a stay pending appeal because the CFTC has not established any of the factors.

New York, NY 10036
Phone: 212-307-5500
mtmurphy@Venable.com

*Counsel for Plaintiff*

## CERTIFICATE OF COMPLIANCE

I, Megan Barbero, certify that this document complies with the word limitation in Local Civil Rule 7.1(c) because it contains 3,491 words, exclusive of the caption, table of contents, table of authorities, signature blocks, and required certificates.

Dated: November 10, 2026

*/s/ Megan Barbero*
Megan Barbero