UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

CAPITAL MARKETS ALLIANCE ASSOCIATION,

Plaintiff,

v.

COMMODITY FUTURES TRADING COMMISSION, MICHAEL S. SELIG, *in his official capacity as Chairman of the Commodity Futures Trading Commission*,

Defendants.

Case No. 1:26-cv-9608-LGS

# DEFENDANTS' OMNIBUS RESPONSE TO AMICUS BRIEFS FILED IN SUPPORT OF PLAINTIFF

Pursuant to this Court's Order, *see* Dkt. No. 75, Defendants Commodity Futures Trading Commission ("CFTC" or "Commission") and Chairman Michael S. Selig file this omnibus response to the amicus briefs of Better Markets, Inc., et al. (Dkt. No. 63-1) ("Better Markets Br."); Chicago Mercantile Exchange Inc. (Dkt. No. 69-1) ("CME Br."); Securities Law Scholars (Dkt. No. 70-1) ("Scholars Br."); and the American Securities Association (Dkt. No. 71-1) ("ASA Br.").

***

Neither Plaintiff nor its amici can deny that a single-stock futures contract, even with a funding-rate mechanism, would be a security future if it expired in 10 years, 100 years, or even 1,000 years. The question is whether the mere absence of a specified expiration date means that the same contract is no longer a security future, but instead is a security-based swap. Viewing the transaction "as a whole with a critical eye toward its underlying purpose," the answer is no. *CFTC v. Co Petro Mktg. Grp., Inc.*, 680 F.2d 573, 581 (9th Cir. 1982). Amici offer no plausible explanation to the contrary and instead resort to a slew of red herrings.

**1.** For starters, CME claims that perpetual futures do not provide "for future delivery." CME Br. 9. That objection might have force if futures contracts required actual delivery of the underlying commodity. But no one thinks that—and certainly not CME, which later admits that "some futures are cash settled (instead of settled via physical delivery)." *Id.*; *see Chicago Mercantile Exch. v. SEC* ("*CME*"), 883 F.2d 537, 549 (7th Cir. 1989) ("[N]o one … doubts that a contract may be a futures contract even though it provides for cash settlement….").

Since cash settlement counts as delivery, perpetual futures *do* provide for "future delivery." Imagine that a trader buys 1,000 Apple stock perpetual futures at a price of $350 (a value of

$350,000).[1] Three months later, Apple's stock price—and, by extension, the perpetual-future price—appreciates to $360 (increasing the trader's position to $360,000), and the trader decides to sell. At that time, the trader is entitled to "delivery" of $10,000 in cash, which represents the difference between the value of the contracts purchased and the value of the contracts sold. That is no different from an Apple future with a fixed expiration date offered by CME, which also settles in cash based on the delta between the purchase price and the sale price—and which all agree is a security future.[2] Put simply, perpetual futures and dated, cash-settled futures entail economically identical forms of "delivery."

CME's wheat-farmer example illustrates the overwhelming similarities between a dated future and a perpetual future. CME postulates a farmer who agrees "to sell 1,000 bushels of wheat for $10 per bushel in six months' time (a value of $10,000)." CME Br. 3. After six months, the contract trades at "the prevailing spot price" of $9 per bushel, so the farmer "enter[s] into an offsetting futures transaction to exit her position, agreeing to buy 1,000 bushels of wheat for $9,000." *Id.* "As a result, she pockets the $1,000 difference." *Id.* A perpetual wheat future would work *exactly the same way*.[3] A farmer could buy 1,000 contracts (one bushel per contract) at $10 per bushel. In six months' time, when "the prevailing spot price" is $9 per bushel, the perpetual price will also be $9 per bushel due to the funding-rate mechanism that forces convergence with the spot price. The farmer can sell the perpetual contracts at that time and "pocket[] the $1,000 difference." *Id.*

---

[1] This hypothetical assumes that an Apple perpetual futures contract represents one share of Apple stock.

[2] CME Group, Apple Futures, https://www.cmegroup.com/markets/equities/single-stock/apple.html (last visited Nov. 20, 2026).

[3] The Commission has not approved perpetual futures on agricultural products and takes no position on that issue in this brief. The Commission simply responds to CME's hypothetical.

The only difference is that with a dated future, a trader *must* exit her position at or before an expiration date set by the exchange, or else pay a rollover fee. With a perpetual future, the trader can exit the position and accept (or make) cash-equivalent delivery any time she chooses. But the notion that perpetual futures lack "delivery," but dated futures do, is simply wrong.

**2.** Amici also take aim at various aspects of perpetual security futures that are equally true of dated security futures. For example, Better Markets characterizes perpetuals as "highly leveraged," explaining that "[t]he approved contracts require minimum margin of roughly 15 to 15.5 percent," while "a retail investor buying the same stock on credit must post 50 percent." Better Markets Br. 3, 10; *see also* ASA Br. 9 (same). But that difference is equally true of dated security futures—indeed, CME touts this as an advantage of trading in security futures rather than in securities themselves. CME, *The Benefits of Futures Margins*, https://www.cmegroup.com/education/courses/understanding-the-benefits-of-futures/the-benefits-of-futures-margins (last visited Nov. 20, 2026) ("The good news is that futures margin generally represents a smaller percentage of the notional value of the contract, typically 3-12% per futures contract as opposed to up to 50% of the face value of securities purchased on margin."); CME, *FAQ: Single Stock Futures* (Aug. 11, 2026), https://www.cmegroup.com/articles/faqs/faq-single-stock-futures.html ("initial and maintenance margin requirements for long or short outright Single Stock futures positions must be, at a minimum, 15% of the current market (notional) value of the futures contract"). Better Markets also faults perpetual futures for giving "the investor … no equity—no vote, no dividends, and no share of the company's assets." Better Markets Br. 3. But that is true of any future—the entire point is to gain exposure to the asset without actually acquiring it.

CME also claims that "[t]he funding-rate mechanism introduces fundamental differences between a true futures contract and a perpetual." CME Br. 6. But futures contracts with long-

distant expirations already use funding-rate mechanisms to keep spot and futures prices aligned. One of Plaintiff's members, Cboe Global Markets, offers these "perpetual-style" futures contracts. *See* Dkt. No. 31-3. And the funding-rate mechanism is not that different from CME's daily "mark-to-market" process. Every day, CME calculates a daily settlement price, compares it to the previous day's settlement price, and credits or debits each trader's account for the difference. Thus, if a trader is long in a wheat contract for 5,000 bushels, and the price of wheat increases by 10 cents a bushel in a day, the trader will receive a credit of $500 that day. By contrast, the trader who is short in the same contract will incur a $500 debit. Accordingly, as CME itself acknowledges, "[i]n the futures markets, losers pay winners every day." CME, Mark-to-Market, https://www.cmegroup.com/education/courses/introduction-to-futures/mark-to-market (last visited Nov. 20, 2026). The notion that a contract is a swap simply because there are "intraday" payments between opposite parties to a futures contract is also wrong. CME Br. 6.

**3.** Finally, amici raise various policy arguments about the perceived ills of perpetual futures contracts. But the Commission has no mandate to address those concerns. Congress devised a system allowing "[a] registered entity [to] request that the Commission grant prior approval to any new contract or other instrument," 7 U.S.C. § 7a-2(c)(4)(A), and it only gave the Commission permission to deny that request if it "finds that the new contract or other instrument would violate this chapter (including regulations)," *id.* § 7a-2(c)(5)(B) (emphasis added). Thus, because a perpetual security future is a security future, the Commission had *no discretion* to disapprove these contracts—full stop.[4] If extra-statutory policy arguments counsel against that conclusion, that is a matter for Congress, not the Commission.

[4] The CFTC's argument is not, as one brief suggests, "that if a financial instrument can be classified as either a future[] or a swap, the Commission may choose how to classify that instrument." Scholars Br. 11. The correct argument is that if a DCM applies to list a contract as a

Notably, in the very next provision of the CEA, Congress did provide limited discretion for the Commission to ban specifically enumerated contracts that, in the Commission's view, are not in the public interest. *See* 7 U.S.C. § 7a-2(c)(5)(C). But that narrow carveout is for event contracts that "involve" "activity that is unlawful," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission … to be contrary to the public interest"—none of which implicates single-stock perpetual futures. The Commission also has discretion to make "exempt" any agreement, contract, or transaction from various CEA provisions "[i]n order to promote responsible economic or financial innovation or fair competition," 7 U.S.C. § 6(c), but that exemptive power—even if it could do anything for Plaintiff's amici—does *not* apply to the CFTC and SEC's joint jurisdiction over security futures, *id.* § 2(a)(1)(D).

***

Perpetual futures are economically equivalent transactions to dated futures, including those offered by Cboe. The absence of a fixed expiration date does not transform these contracts into swaps. The motion for a preliminary injunction should be denied.

Dated: November 19, 2026

Respectfully submitted,

By: <u>*/s/ Henry J. Dickman*</u>

Henry J. Dickman (*pro hac vice* pending)
Senior Assistant General Counsel
U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, DC 20581
Tel. (202) 418-5607
hdickman@cftc.gov

future, and that contract is in fact a future, the Commission has no discretion to reject the application.

*Attorneys for Defendants*

TYLER S. BADGLEY
General Counsel
M. JORDAN MINOT
Deputy General Counsel
HENRY J. DICKMAN
Senior Assistant General Counsel
ANNE STUKES
Senior Assistant General Counsel
ANDREW J. WEISBERG
Senior Assistant General Counsel

U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581
Tel. 202-209-1087
Fax. 202-418-5567
tbadgley@cftc.gov
jminot@cftc.gov
hdickman@cftc.gov
astukes@cftc.gov
aweisberg@cftc.gov

**CERTIFICATE OF COMPLIANCE**

I, Henry J. Dickman, certify that this document complies with the word limitation in the Court's Order (Dkt. No. 75) in that it contains 1,499 words, exclusive of the caption, signature blocks, and certificate of compliance.

Dated: November 19, 2026

By: */s/ Henry J. Dickman*
Henry J. Dickman